**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

**MARK FADLEVICH**

                                        **Case No.: 1:19-cv-04227-NRM-MMH**

                **Plaintiff,**

        **-against-**

**JD 34TH STREET REALTY LLC,**
**GUTMAN, MINTZ, BAKER & SONNENFELDT, LLP,**
**and**
**ERIC KEILBACH,**

                **Defendants.**
-------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AGAINST JD 34TH**
**STREET REALTY LLC, GUTMAN, MINTZ, BAKER & SONNENFELDT, LLP, AND**
**ERIC KEILBACH PURSUANT TO FED. R. CIV. P. 56**

i

# TABLE OF CONTENTS

I.   **PRELIMINARY STATEMENT** ........................................................................... **1**

II.   **STATEMENT OF FACTS** ................................................................................ **2**

III.   **ARGUMENT** ...................................................................................................... **17**

    *A.   The Rule 56 Standard for Summary Judgment* ................................................. *17*

    *B.   Concession of FDCPA Liability* ....................................................................... *18*

    *C.   Public Policy of GBL § 349: Private Attorneys General Litigating Against Deceptive Consumer Oriented Conduct.* ............................................................................................... *18*

    *D.   Defendants violated GBL § 349 by Issuing Bank Restraints Without Performing a Meaningful Attorney Review and Misrepresenting to Consumers that Exempt Funds Would Be Released When GMBS Has No System in Place to Instruct the Bank to Do So.* ...................... *20*

       i.   GMBS violated GBL § 349 by issuing repeated restraints against Mark Fadlevich that represented that Defendant Eric Keilbach had performed a meaningful attorney review.... *21*

       ii.   GMBS violated GBL § 349 by misrepresenting to Mr. Fadlevich that it would release his account when it had no procedures to do so. ................................................................. *27*

       iii.   Eric Keilbach is personally liable for violating GBL § 349 by issuing bank restraints without performing a meaningful attorney review and failing to review exemption claim forms and issue releases. ................................................................................................... *31*

    *E.   Plaintiff's sought punitive damages under GBL § 349 are not capped at $1,000.* ........... *32*

    *F.   Defendants Committed Conversion By Unlawfully Exercising Control Over Mr. Fadlevich's Social Security Funds for Nearly 8 Months.* ........................................................ *37*

       i.   GMBS Committed Conversion by Unlawfully Restraining Mr. Fadlevich's Social Security Funds from November 21, 2018 until July 17, 2019. ............................................. *37*

       ii.   JD 34th is directly and vicariously liable for the conversion committed by its attorneys GMBS. ................................................................................................................................ *39*

    *G.   JD 34th Is Liable for Violating EIPA for Its Failure to Instruct Wells Fargo to Release Plaintiff's Account within Seven Days of Receipt of the Exemption Claim Form and Proof... 43*

IV.   **CONCLUSION** ................................................................................................. **44**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 135-136 (2d Cir. 2017) ................................................................................................................. 1, 23, 38-39

*Bueno v. LR Credit 18, LLC*, 269 F. Supp. 3d 16, 19 (E.D.N.Y. 2017) ........................... 33-34, 37

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986) ................................. 18

*Colavito v. New York Organ Donor Network, Inc.*, 827 NYS 2d 96, 100 (Ct. App. 2006) .......... 37

*Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV 3920 MKB CLP, 2012 WL 1882976, at *5 (E.D.N.Y. May 24, 2012) ........................................................................................... 19, 29

*Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014) .......... 20

*Guzman v. Mel S. Harris & Assocs., LLC*, No. 16 CIV. 3499 (GBD), 2018 WL 1665252, at *13 (S.D.N.Y. Mar. 22, 2018) ........................................................................................... 33, 35

*Hunter v. Palisades Acquisition XVI, LLC,* No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *8 (S.D.N.Y. Nov. 16, 2017) ........................................................................................... 19, 41

*Koch v. Greenberg*, 14 F. Supp. 3d 247, 283 (S.D.N.Y. 2014) (J. Oetken), *aff'd*, 626 F. App'x 335 (2d Cir. 2015) ..................................................................................... 19, 33-34, 36-37

*Link v. Wabash R. Co.,* 370 U.S. 626, 633–34 (1962) ................................................................. 41

*McDonald v. N. Shore Yacht Sales, Inc.*, 134 Misc. 2d 910, 914, 513 N.Y.S.3d 590, 593 (Sup. Ct. 1987) ........................................................................................................................ 19

*Okyere v. Palisades Collection, LLC*, 961 F.Supp.2d 522, 534 (S.D.N.Y.2013). ............. 38, 40, 43

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 744 (1995) ................................................................................... 18-19, 24-25

*Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ......................... 20

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 396–97 (1993) ............. 41

*Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 584 (S.D.N.Y. 2015) (*Polanco II*) ........................................................................................................................ 3, 41

*Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 DLI JO, 2011 WL 2295116, at *5 (E.D.N.Y. June 7, 2011) ................................................................................................................ 20

*Sanchez v. Ehrlich*, No. 16-CV-8677 (LAP), 2018 WL 2084147, at *10 (S.D.N.Y. Mar. 29, 2018) ........................................................................................................................ 19, 29

*In re Scotss EZ Seed Litig.*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015) ............................................ 19

*Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) ..................................................................... 18

*In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016) ............... 19

*Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) .......................................................... 19

*Stutman v. Chem. Bank*, 95 N.Y.2d 24, 28 (2000) ..................................................................... 18

*Swegan v. Svenson*, 960 N.Y.S.2d 768, 769 (App. Div. 4th Dep't. 2013) ............................. 37, 43

**Statutes**

C.P.L.R. § 5222 .................................................................................................... *passim*

C.P.L.R. § 5222-a .................................................................................................. *passim*

New York Gen. Bus. Law § 349 ("GBL § 349") ................................................................. *passim*

## I.    PRELIMINARY STATEMENT

Plaintiff Mark Fadlevich ("Plaintiff") hereby submits this Memorandum of Law in support of his Motion for Summary Judgment against Defendants JD 34th Realty LLC ("JD 34th"), Gutman, Mintz, Baker & Sonnenfeldt, LLP ("GMBS"), and Eric Keilbach (collectively with GMBS "Gutman Defendants") for liability for violations of New York Gen. Bus. Law § 349 ("GBL § 349") and committing conversion; and against JD 34th for liability for violations of the N.Y. Exempt Income Protection Act (EIPA). Gutman Defendants have already conceded liability to violating § 1692e of the Fair Debt Collection Practices Act (FDCPA). Dkt. No. 50.

Federal and state law protects recipients of Social Security from having those dearly needed funds restrained and garnished by debt collectors. Gutman Defendants are especially well-aware of this, having a decision against them in the Second Circuit Court of Appeals, *Arias*, for attempting to evade these protections by filing baseless objections to consumers claims that the funds in their account are exempt and accordingly should not be restrained or garnished, and for misrepresenting to consumers their rights to obtain release of the exempt funds. Restraining exempt funds would allow Gutman Defendants to realize judgments that are generally more than $10,000 – it is extraordinarily lucrative unlawful conduct.

So unfortunately it is unsurprising to see the Gutman Defendants once again in federal court because of their relentless pursuit to take and keep exempt money like Social Security Income (SSI) from consumers despite the unambiguous prohibition against doing so. To accomplish such unlawful restraint and garnishment, GMBS has created a lopsided judgment collection process to maximize the restraint of exempt funds and minimize the release of exempt funds. The issuance of bank restraints is an assembly line, devoid of attorneys despite representing an attorney's involvement to consumers, churning through judgments without any review of the

1

account to prevent unlawful restraints. Conversely, there is no procedure or system for processing exemption claim forms to release unlawfully restrained funds like SSI except one rule that serves as an impediment to review: that only an attorney can authorize release of a bank account based on an exemption claim form.

Mark Fadlevich is exactly who Congress and the New York legislature had in mind when they created protections for SSI. A man with chronic migraines and a seizure disorder, SSI is his sole form of income. And it took him years of navigating federal government bureaucracy and the courts to obtain it. But less than a year after finally receiving the income he needed to live, GMBS swept in with its unthinking judgment collection and prevented Mr. Fadlevich from accessing thousands of dollars of his hard-won SSI funds for 236 days. To this day, he remains uncompensated for hundreds of dollars of bank fees charged against him by Defendants' unlawful restraints, and spent $97.84 in postage to send *four* Release Demands to GMBS (as well as the Marshal and Wells Fargo) by mail. These Release Demands included irrefutable proof the entire account was exempt. The emotional distress caused by Gutman Defendants' unrelenting pursuit of his SSI exacerbated Mr. Fadlevich's chronic impairments, increasing the frequency and severity of his migraines and seizures, and even today his physical impairments and stress have not returned to the levels they were at prior to the Defendants' attack on his SSI.

## II.    STATEMENT OF FACTS

The following facts correspond to Plaintiffs' Local Rule 56.1 Statement of Material Facts for Summary Judgment ("Pl. 56.1"), based on exhibits attached to the corresponding November 15, 2023 Declaration of Ahmad Keshavarz ("Keshavarz Decl"). Both documents are filed in support of Plaintiffs' Motion for Summary Judgment.

Defendant Gutman, Mintz, Baker & Sonnenfeldt, LLP, ("GMBS") is a New York debt

2

collection law firm that engages in business in New York. Pl. 56.1 ¶ 1. This suit arose out of said Defendant's business in New York. *Id.* GMBS and Eric Keilbach have each admitted liability for violating § 1692e of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq, and to liability for the maximum $1,000 in statutory damages under 15 U.S.C. § 1692k(a)(2)(A). ¶ 2. Eric Keilbach is, and was at all relevant times, a senior partner of GMBS. ¶ 3. As a senior partner, he has the ability to hire and fire employees in the collections department, but only with sign-off of the managing partner Howard Menetsky. ¶ 4.

GMBS estimated that, on or around the time of the conduct at issue, it had "a little less than" 100 employees. ¶ 7. There are 15 employees in the GMBS collection department. ¶ 8. Gary Thigpen  is an account representative at GMBS, and described his primary responsibilities as "I answer incoming phone calls, I speak with sheriffs, marshals, I issue income executions and restraining notices, speak with banks, I review files and work – I work the judgments." ¶ 9. Thigpen has worked in the collection industry for about 30 years. ¶ 10. Thigpen estimated that the number of accounts he collects on per year could be more than a thousand. ¶ 11. Thigpen stated that he receives as many as 50 calls from consumers in a day. ¶ 12. Thigpen testified that it is "not unusual" for him to be collecting on judgments for more than $10,000. ¶ 13.

Robert Brust is Mr. Thigpen's supervisor at GMBS and is "in charge of the collection department." ¶ 14. Despite having this responsibility, Brust himself apparently does not think he is Mr. Thigpen's supervisor and believes that he is just a collector. ¶ 15. When asked what Gary Thigpen does with the consumer bank account information that Brust sends him, Brust testified "I don't know…Whatever Gary's instructions are from whoever, I don't know." ¶ 16. Brust also claimed that he does not review correspondence from consumers and does not review filled-out exemption claim forms. ¶ 17. Robert Brust reports to Eric Keilbach. ¶ 18. Brust is unaware of any

3

supervisors at GMBS other than Keilbach. ¶ 19.

Michael Roberts is an account representative at GMBS. ¶ 22. David Uythoven is the "IT Manager" at GMBS who handles any problems with the computer systems, hardware or software, at GMBS. ¶ 23. GMBS does not have standard training materials for the new employees of the collections department, instead relying on "on-the-job training." ¶ 24.

GMBS primarily collects on rental arrears that have been reduced to a judgment, and the firm believes that 80% of its account being judgments would be "a reasonable assumption." ¶ 25. GMBS typically receives 33% of what is collected from the judgments. ¶ 26. Judgments higher than $10,000 are not unusual among GMBS's accounts. ¶ 27. Most of those judgments are for residential rental arrears. ¶ 28. GMBS currently has about 55,000 accounts for collection. ¶ 29-30. While the judgment creditors are landlords, the accounts are usually referred to GMBS for collection by property management companies. ¶ 31. For all practical purposes, the landlords engage with GMBS through the property management companies. ¶ 32. GMBS sends out about 500 demand letters in attempts to collect debts per year. ¶ 33.

The collection systems used by GMBS are called AS/400, iCollect, and Lotus. ¶ 34. The iCollect software was written by GMBS employee David Uythoven. ¶ 35. In none of the screenshots and other documents produced by Defendants regarding these computer systems were there any screens, fields, or other information to show whether a consumer had submitted an exemption claim form and whether that exemption claim form had been reviewed. ¶ 36. Further, Brust testified that he was not aware of anywhere in these systems that would show whether funds in a consumer's bank account were exempt or whether an exemption claim form had been sent. ¶ 37. While GMBS testified that receipt of an exemption claim form "should be noted in the message history [of AS/400]," GMBS also could not testify as to how it would be noted. ¶ 38. Further,

4

GMBS testified that what is logged in the message history is not strictly uniform: putting notations in the message history is only "recommended," which means that sometimes information that should be put in the history is not put in. ¶ 39. AS/400 is the system used to make notes about attempts to collect on the account, including issuing bank restraints and communications with consumers. ¶ 40.When a collector inputs a note into AS/400, they cannot help but see the prior entry. ¶ 41. Eric Keilbach only uses the message history of AS/400 for making notes on negotiations with other attorneys – correspondingly, there are no entries by him in the account notes concerning Mark Fadlevich. ¶42. When asked why, Keilbach testified "I don't want to waste my time…I don't think it's especially necessary or pertinent." ¶ 43.

JD 34th Street Realty LLC ("JD 34th") is a New York limited liability company that previously owned the property where Plaintiff Mark Fadlevich previously resided in Queens, New York ("the Property"). ¶ 52. On May 27, 2015, JD 34th sold its interest in the property to JE 34th Street Realty LLC ("JE 34th"). ¶ 53.Both JD 34th and JE 34th had their respective properties managed by Douglaston Realty Management Company. ¶ 54.

On August 19, 2016, JD 34th entered a judgment against Mark Fadlevich for $13,785.00. ¶ 55. On or around February 10, 2017, GMBS was retained by Douglaston Realty to collect on this judgment obtained in the name of JD 34th, although Douglaston Realty represented to GMBS that the judgment creditor was JE 34th. ¶ 56. However, the copy of the judgment provided to GMBS on or around October 26, 2017 shows that the judgment creditor was actually JD 34th. ¶ 57. GMBS only realized that it had misrepresented the judgment creditor (and that the judgment creditor had been misrepresented to it by JD 34th through Douglaston) after this FDCPA lawsuit was filed. ¶ 58. GMBS believes it should not be faulted for this "mistake" of misrepresenting the name of the creditor. ¶ 59.

On January 8, 2014, Plaintiff Mark Fadlevich suffered a tonic-clonic seizure and brain aneurysm, leading to a fall and epidural hematoma requiring emergency emporo-occipital craniotomy. ¶ 60. On January 13, 2014, Plaintiff had a Neuropsych Consultation at Weil Cornell Medical College, and was found to have ongoing cognitive deficits. ¶ 61. On June 18, 2015, Dr. Stuebgen, Professor of Clinical Neurology at Cornell University, wrote an appeal to the Office of Disability clarifying that he was diagnosed with (1) generalized tonic-clonic epilepsy; (2) chronic post-craniotomy headaches; (3) adult-onset ADHD; (4) anxiety, (5) depression; and (6) post-traumatic anosmia (loss of smell). ¶ 62. In October of 2015, Plaintiff was in a motor vehicle accident due to having a seizure while driving, and was diagnosed in the ER with a L1 burst fracture. ¶ 63. On December 1, 2015, Plaintiff had a kyphoplasty surgery, which only provided limited improvement to his chronic pain. ¶ 64. Between 2014 to 2017, Plaintiff reported 1-2 seizures per month, which decreased over time with medications. ¶ 65. Plaintiff also was able to reduce the frequency and magnitude of migraines from 5 headache days per week to 1-2 headache days per week, with botox treatments reducing intensity by 30 to 50%. ¶ 66. Mark Fadlevich testified "Into that summer [of 2018] I was feeling physically better in that it had been months and months since I had a seizure…my migraines had gotten to a better place, and I was able to sort of control a bunch of factors." ¶ 67.

On or around March 1, 2018, Plaintiff Mark Fadlevich began to receive benefits payments from the Social Security Administration. ¶ 68. Unbeknownst to Plaintiff, Defendant GMBS, on behalf of Defendant JD 34th, issued an information subpoena and bank restraint to Wells Fargo Bank N.A. on or around April 24, 2018. ¶ 69. Bank restraints are generated at GMBS by Gary Thigpen using the software iCollect. ¶ 74. Robert Brust sends Gary Thigpen "whatever electronic bank restraints we get." ¶ 71. Eric Keilbach does not "use the iCollect at all." ¶ 75. The only

information that a collector needs to generate a bank restraint is "The file number/index number." ¶ 76. All of the bank restraints are generated with Eric Keilbach's signature already digitally applied to it. ¶ 77. Eric Keilbach expressly authorized Gary Thigpen to use his digital signature in this way. ¶ 79. The bank restraints are given by Thigpen to Gail Goldfein to be mailed to the bank. ¶ 80. There are no entries in the account notes on or around April 24, 2018 reflecting Eric Keilbach performing a review of the information subpoena and bank restraint in any manner – much less a meaningful attorney review. ¶ 83.

On or around May 1, 2018, Wells Fargo executed a sworn response to the questions in the GMBS information subpoena and sent it to Defendant GMBS. ¶ 84. Well Fargo's May 1, 2018 sworn information response stated Mr. Fadlevich was receiving SSI direct deposits from the Social Security Administration and the balance in his bank account was only $2,356.07. ¶ 85. The information subpoena response provided Defendants with notice for the first time that Mark Fadlevich was receiving SSI exempt from restraint and garnishment under both federal and state law. ¶ 86. Information subpoena responses would be reviewed by Robert Brust or Michael Roberts. ¶ 87. Brust testified that the response to the April 24 Restraint would have meant that GMBS knew that Mr. Fadlevich was receiving SSI. ¶ 88. However, the only place this information, that Mr. Fadlevich was receiving SSI, would be visible is in GMBS's copy of the information subpoena response itself. ¶ 89. That digital copy of the information subpoena response cannot be seen by itself – it requires opening a pdf file titled "370129 – Collec" which contains several other documents merged together. ¶ 90. GMBS testified that the account status was not changed based on this information subpoena response, and when asked if it would be expected to change based on the subpoena response, GMBS testified "I don't know if I'd expect or not expect a change." ¶ 91.

7

On or around August 21, 2018, Plaintiff Mark Fadlevich obtained disability benefits from the Social Security Administration, with the SSA issuing him $33,626.00 to reimburse him for the disability benefits it determined he should have received, but had not, from July of 2014 to June of 2018. ¶ 92. Mark Fadlevich testified "That's backpay for the four and a half years that it took my mom and I to go through that process and be turned down multiple times and took it all the way to a federal appeal level, that took a senator to actually get it across the line." ¶ 93.

On or around November 16, 2018, Defendant GMBS, on behalf of Defendant JD 34th, issued another information subpoena and bank restraint to Wells Fargo Bank N.A. ¶ 96. The November 16 Restraint was sent because the Fadlevich account was included in a list of accounts sent by GMBS collector Robert Brust for GMBS collector Gary Thigpen to execute on. ¶ 97. The November 16 Restraint has the signature of Defendant Eric Keilbach. ¶ 98. Because Defendants knew that, in the event of a restraint of the bank account, that the notice of restraint would be forwarded to Plaintiff Mark Fadlevich, the November 16 Restraint was and was intended to be the first communication by the Gutman Defendants to Mr. Fadlevich. ¶ 100. On the screen that collectors when they are "going to initiate a restraining notice," the iCollect software shows a table listing prior restraints issued on the account, with the columns "Case," "Bank," "Type," "Date," "Amount," and "Bank Resp." ¶ 101. There is no screen like this in AS/400. ¶ 102. The only cells filled in for the "Bank Resp." column are those where the bank in question responded to GMBS's information subpoena with an amount below the then-$3,000 standard exemption - $88.99 for the November 7, 2017 restraint and $2,356.07 for the April 24, 2018 Restraint. ¶ 103. Only the cells under "Bank Resp." are manually filled in – the rest are "Computer generated" when a collector creates a new bank restraint. ¶ 104. When asked why, Robert Brust testified that he did not know. ¶ 105. The iCollect screen for initiating bank restraints does not show if any of the information

subpoena responses to the respective restraints showed that the consumer was receiving exempt income. ¶ 106. GMBS has not requested that any column be added to the screen to show that exempt funds were in the account and has not even sought to determine if it is possible. ¶ 107. iCollect was not third-party software sold to GMBS – rather, it was designed for GMBS and per GMBS's direction. ¶ 108.

And even knowing that on May 1, 2018 Mr. Fadlevich was receiving direct deposit SSI, GMBS believes it was proper to issue another restraint on the same account that year. ¶ 109. On November 21, 2018, $23,839.89 of the funds in Mark Fadlevich's Wells Fargo bank account were restrained and he was charged a $125 fee for the restraint. ¶ 110. On December 4, 2018, Mark Fadlevich called GMBS and spoke to GMBS collector Gary Thigpen. ¶ 111. That day, Mr. Fadlevich told GMBS that the money in the account was Social Security Disability income. ¶ 112. Gary Thigpen testified that: "If someone tells me they have exempt funds I just send a conditional release." ¶ 113. This is despite GMBS testifying, to the contrary, that if a consumer says they have exempt funds, that collectors should ask for "proof," specifically "Bank statements." ¶ 114. Brust testified that he has never dealt with a consumer claiming funds in their account are exempt from garnishment. ¶ 115. Further, Gary Thigpen testified that he did not and would not ever ask a bank if the funds in the account were exempt. ¶ 116. The collectors at GMBS are not empowered to make determinations about whether funds are exempt – only the attorneys can make that determination and release the funds. ¶ 117.

GMBS testified that there would be no investigation of Mr. Fadlevich's claims that the funds in his account were exempt that would not be reflected in GMBS's document production. ¶ 118. In other words, all the steps that GMBS took to attempt to collect on the putative judgment against Mr. Fadlevich are reflected in the GMBS document production. ¶ 119. GMBS's account

9

notes reflect that Thigpen tried to send a conditional release to Mr. Fadlevich, but he refused. ¶ 120. GMBS acknowledges that a property execution "should be reviewed by an attorney and authorized before it goes out." ¶ 121. However, Thigpen testified that it was he that issued the property execution against the bank to seize the money in the account, and he did so in the narrow 10-minute gap after being informed on the phone by Mr. Fadleivh that the money in the account was exempt. ¶ 122. No attorney reviewed the property execution before it was sent given that (1) there was only a 10-minute gap between the call and Thigpen's issuance of the property execution, (2) no one testified that there was any attorney review, and (3) the documents (Message History, emails, or any other documents) do not show any attorney review at any point, much less in that 10 minute period. ¶ 123. The Property Execution has the electronic signature of Defendant Eric Keilbach. ¶ 125.

On December 4, 2018, Mark Fadlevich emailed Gary Thigpen at GMBS to again state that the money was Social Security Disability income, and attached a screenshot from his banking app on his phone showing that Social Security income was being deposited into the account. ¶ 126. On December 5, 2018, GMBS responded by demanding that Mr. Fadlevich provide the last two months of bank statements. ¶ 128. On December 8, 2018, Mr. Fadlevich emailed GMBS, attaching the prior 4 months of bank statements and an exemption claim form. ¶ 129. Gary Thigpen testified that when GMBS receives an exemption claim form from a consumer, "they needed to be reviewed by an attorney," and that it was collectors like Mr. Thigpen who would "take them in, note the file and then request that an attorney review." ¶ 130. GMBS and Thigpen have claimed that only an attorney can make the decision to release a restraint on a bank account based on an exemption claim form. ¶ 131. However, when asked the reason for this, GMBS could not provide one. ¶ 132. As of the deposition of GMBS, this is still their practice for who can review an exemption claim

form and determine that the account should be released. ¶ 133. Keilbach doubts that he would have reviewed more than 50 exemption claim forms in the year 2018. ¶ 134. Thigpen also testified that he does not believe the sworn statements of consumers made on exemption claim forms until he sees bank statements. ¶135.

GMBS has no policies and procedures in place to prevent the restraining of exempt funds and for the prompt release of any restraint. ¶¶ 136-139. There are no account note entries on December 8 or the following three days showing that Mr. Thigpen noted the file for the exemption claim form or requested an attorney review it. ¶ 140. But rather than hearing back from GMBS after providing even more proof than they had asked him for, Mr. Fadlevich instead saw on December 11, 2018 $952.19 being withdrawn from his account and another $125 fee being levied against him. ¶ 141. Panicking, Mr. Fadlevich emailed GMBS again on December 11, 2018, asking why they had proceeded with the garnishment when he had provided the bank statements and exemption claim form. ¶ 142. On December 12, 2018, Mr. Fadlevich emailed GMBS the exemption claim form again. ¶ 143. Unbeknownst to Mr. Fadlevich, also on December 12, 2018, Gary Thigpen forwarded the documents sent by Mr. Fadlevich to Defendant Eric Keilbach for "FOR REVIEW," advising "WE MAY NEED TO RETURN." ¶ 144. Despite this, no account note entries were made reflecting Defendant Keilbach reviewing the evidence or exemption claim form provided by Mr. Fadlevich or making any kind of determination about whether the funds were exempt from restraint and garnishment. ¶ 145. Further, Eric Keilbach could not provide when he reviewed the exemption claim form or any document showing that he reviewed it. ¶ 146.

On December 14, 2018, Wells Fargo cut a check to the NYC Marshal for $16,570.21. ¶ 147. Not receiving any indication that his funds would be returned and his bank account released, on December 14, 2018, Mr. Fadlevich sent a letter to the Defendants, Wells Fargo, and the New

York City Marshal. ¶ 148. Attached to this First Release Demand was:

    i.      The Social Security Administration decision showing the award of $33,626 in Social Security Disability funds;
    ii.    Wells Fargo bank account statements from July, August, September, October, and November of 2018;
    iii.   The Exemption Claim Form; and
    iv.   Mr. Fadlevich's email correspondence with GMBS. ¶ 149.

Consumer complaints are directed to Eric Keilbach. ¶ 150. Letters from consumers are disposed of after being scanned. ¶ 151. In 2018, GMBS did not have any system in place to record the date and content of all documents received in the mail. ¶ 152. There is no field or tracking in the computer systems of GMBS for "any documents that come from outside." ¶ 153. The Account Notes do not show any review by Eric Keilbach or anyone at GMBS of the First Release Demand. ¶ 154. Further, GMBS testified that exemption claim forms mailed to it in 2018 were not necessarily scanned. ¶ 155. The Certified Mail Receipt shows that the First Release Demand was mailed through the United States Postal Service on December 15, 2018, and the corresponding receipt for December 15 shows that Mr. Fadlevich spent $28.84 to send the First Release Demand to each of the respective entities. ¶ 156. Wells Fargo produced a copy of the First Release Demand. ¶ 157. GMBS admitted that the reason it did not produce a copy of the First Release Demand may have been that the letter was misplaced or not scanned. ¶ 158.

On December 18, 2018, the Marshal's office emailed GMBS to ask for the status of the attorney review of the exemption claim form. ¶ 159. GMBS did not respond, and on December 19, 2018, the Marshal's office emailed GMBS saying they were closing the account and releasing the restraint because the Marshal had determined that the funds were exempt. ¶ 160. On December 20, 2018, the Marshal reversed the portion of the funds under his control - $17,522.40. ¶ 161. However, $7,519.68 remained unreturned. ¶ 162. Other than error, Gary Thigpen testified that the only reason an account would be released is if GMBS sent it a release signed by an attorney. ¶ 163. Despite

the First Release Demand from Plaintiff and the communications from the Marshal, no account notes were made by the Gutman Defendants between December 13, 2018 and May 1, 2019, other than to show that the Gutman Defendants were continuing to send electronic subpoenas to attempt to collect on the putative judgment on December 18, 2018, January 7, February 18, March 11, March 25, and April 15, 2019. ¶ 164. GMBS's explanation for why the message history did not have an entries indicating GMBS instructing the release of the property execution or restraint is "I can just guess that Gary [Thigpen] forgot to do it." ¶ 165.

On January 8, 2019, Wells Fargo sent Mr. Fadlevich a letter stating that the bank had not received a fax from GMBS to release the account. ¶ 166. The Letter instructed "Please contact Gutman, Mintz, Baker & Sonnenfeldt, LLP, with any and all attempts to regain the funds, as they're no longer ·in our possession as they have been paid out in direct ·response to the legal order." ¶ 167. Because of the unreturned funds and Wells Fargo's claim that it had not received a release of the account, on January 24, 2019, Mr. Fadlevich sent another Release Demand to the Defendants, Wells Fargo, and the Marshal. ¶ 168. Attached to this Second Release Demand was:

    i.      The First Release Demand;
    ii.     The Social Security Administration decision showing the award of $33,626 in Social Security Disability funds;
    iii.    Wells Fargo bank account statements from July, August, September, October, and November of 2018;
    iv.    The Exemption Claim Form; and
    v.    Mr. Fadlevich's email correspondence with GMBS. ¶ 169.

The Certified Mail Receipts show that the Second Release Demand was mailed through the United States Postal Service on February 6, 2019, and Mr. Fadlevich paid $29.20 for the mailings. ¶ 170. The Account Notes do not reflect GMBS's receipt of the Second Release Demand. ¶ 171. Wells Fargo produced the Second Release Demand. ¶ 172.

Rather than release the account, on March 11, 2019, GMBS instead sent another

information subpoena and bank restraint to Wells Fargo. ¶ 173. The March 11 Restraint was sent because the Fadlevich account was included in a list of accounts send by GMBS collector Robert Brust for GMBS collector Gary Thigpen to execute on. ¶ 174. The email from Brust noted that the last restraint of the account was on November 16, 2018. ¶ 175. This email is one example of a weekly email sent by Brust after receiving a file from Experian which provides which consumers that GMBS is attempting to collect from have bank accounts. ¶ 176. The email triggering the March 11 Restraint provided 135 accounts to issue restraints on, but other triggering emails produced by GMBS listed as many as 260. ¶ 177. The only measure that GMBS had to prevent execution on known exempt funds was, once an attorney determined that the funds were exempt, a collector would change code from "EOJ" to "Further Review," which would take it out of the "queue for judgments to be executed on." ¶ 178. This code change would be reflected in the message history of AS/400. ¶ 179. However, when Eric Keilbach makes a determination that funds are exempt, he does not instruct the appropriate collector to change the code from "EOJ" to "Further Review," asserting the collectors "are fully aware the need to change the coding." ¶ 180. Most crucially, there is no "Further Review" code. ¶ 181. When confronted with this and asked which code of this list of possible codes provided by GMBS would be used, GMBS testified "I am not really sure." ¶ 182. Thigpen testified that "they," seemingly from context the attorneys at GMBS, change the code and thus remove accounts from his queue for collection. ¶ 183.

The March 11 Restraint has the signature of Defendant Eric Keilbach. ¶ 184. Despite going out under the signature of Keilbach, GMBS testified that it was Thigpen that failed to do a sufficient review prior to issuing this restraint. ¶ 185. There are no entries in the Account Notes reflecting the creation and issuance of the March 11 Restraint, which GMBS could not explain. ¶ 188.

On March 14, 2019, $8,016.44 were restrained and another $125 fee was levied against Mr. Fadlevich. ¶ 189. On April 3, 2019, Mr. Fadlevich sent another Release Demand to the Defendants, Wells Fargo, and the Marshal. ¶ 191. Attached to this Third Release Demand was:

i.      The First Release Demand;
ii.     The Second Release Demand
iii.    The Social Security Administration decision showing the award of $33,626 in Social Security Disability funds;
iv.     Wells Fargo bank account statements from July, August, September, October, and November of 2018;
v.      The Exemption Claim Form; and
vi.     Mr. Fadlevich's email correspondence with GMBS. ¶ 192.

The Certified Mail Receipt shows that Mr. Fadlevich sent the Third Release Demand through the United States Postal Service on April 3, 2019, which costs $21.90. ¶ 193. Wells Fargo produced a copy of the Third Release Demand. ¶ 194. No account notes were made reflecting any review or determination by Gutman Defendants following them being sent the Third Release Demand.  ¶ 195.

On April 24, 2019, Mr. Fadlevich sent another Release Demand to the Defendants, Wells Fargo, and the Marshal. ¶ 196. Attached to this Fourth Release Demand was:

i.      The First Release Demand;
ii.     The Second Release Demand
iii.    The Third Release Demand
iv.     The Social Security Administration decision showing the award of $33,626 in Social Security Disability funds;
v.      Wells Fargo bank account statements from July, August, September, October, and November of 2018;
vii.    The Exemption Claim Form; and
1.      Mr. Fadlevich's email correspondence with GMBS. ¶ 197.

The Certified Mail Receipt shows that Mr. Fadlevich sent the Fourth Release Demand through the United States Postal Service on April 24, 2019, which costs $17.90. ¶ 198. On or around May 2, 2019, GMBS received the Fourth Release Demand, and sent "COPY OF DOCS TO ERIC [KEILBACH] FOR REVIEW." ¶ 199. GMBS testified that this entry means a physical copy of

the Fourth Release Demand was placed on Defendant Eric Keilbach's desk. ¶ 200. Again, no account notes were made reflecting any review or determination by Defendant Keilbach following him being sent the Fourth Release Demand. ¶ 201. Keilbach testified that "I have no memory of any review from -- from that date [on or around May 2, 2019].· I don't believe I did." ¶ 202. GMBS could not explain why metadata showed that the Fourth Release Demand was not scanned into their computer system until July 30, 2019. ¶ 203.

On May 31, 2019, $7,269.68 in garnishments were reversed. ¶ 204. On July 10, 2019, GMBS sent another information subpoena and bank restraint to Wells Fargo. ¶ 205. The July 10 Restraint has the signature of Defendant Eric Keilbach. ¶ 206. Despite going out under the signature of Keilbach, GMBS testified that it was Thigpen that failed to do a sufficient review prior to issuing this restraint. ¶ 208. On July 15, 2019, $2,055.67 was restrained. ¶ 209. On July 17, 2019, Gary Thigpen emailed Eric Keilbach and Robert Brust, asking what GMBS should do with the restraint on Mr. Fadlevich's bank account. ¶ 210. Robert Brust testified that he had "no idea" why Gary Thigpen emailed this question to him. ¶ 211. Nevertheless, the funds were ordered to be released by Robert Brust, and there was an account note entry made corresponding to the release being sent to the bank. ¶ 212. Robert Brust testified that he didn't know why he emailed this to Gary Thigpen. ¶ 213. He further testified that "I today probably wouldn't do anything if Eric's name is on it as well," but that it was "highly unlikely" that his email was merely passing along instructions by Eric Keilbach. ¶ 214. Keilbach testified that he could not confirm if he talked to Brust about releasing the account before or after Brust emailed Thigpen to release it. ¶ 215. Later on July 17, 2019, the remaining restrained funds in Mr. Fadlevich's account were released – however, the $375 in legal fees levied by the bank were never refunded. ¶ 216.

Robert Brust testified that he does not know who determines whether accounts are

"uncollectible" and changes the status to "uncollectible" in the AS/400 system. ¶ 217. In fact, Robert Brust testified that he does not know why an account would be marked "uncollectible." ¶ 218. Gary Thigpen admits that the restrained and garnished funds were Social Security. ¶ 219. Despite testifying that Thigpen failed, repeatedly, to perform a sufficient review of the account prior to issuing restraints, when asked whether the firm had given Thigpen or any other employee reprimand or disciplinary action GMBS testified, "Not at all. It was a simple mistake…. [Thigpen] does a great job, and, just like I did here, everybody makes mistakes." ¶ 220. When Robert Brust was asked what policies GMBS has "to prevent it from taking exempt funds like Social Security from consumers?" he testified "I don't know." ¶ 221. While Brust does not know, GMBS testified that it does believe its policies are sufficient to prevent it from taking exempt funds like Social Security from consumers. ¶ 222. GMBS testified that it believed the Plaintiff Mark Fadlevich was not injured by their conduct: "Wells Fargo, if there was a restraint in place, should be responsible because they're the only ones -- they would be the best person to know what's in the account." ¶ 223. But when asked whether GMBS would ever call a bank and ask whether funds in an account were exempt, GMBS testified "I'm not sure." ¶ 224.

When asked why a release was not sent until July of 2019, GMBS responded "there was no indication that any money was ever restrained." ¶ 225. Douglaston Realty, the management company for Defendant JD 34th, is still a client of GMBS today. ¶ 226.

## III.    ARGUMENT

Plaintiff is entitled to summary judgment as to liability as to his GBL § 349, conversion, and EIPA claims because there are no genuine issues of material fact left to be determined and the remaining issues can be decided as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

### A.  The Rule 56 Standard for Summary Judgment

17

"Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009); Fed.R.Civ.P. 56(c). Summary judgment is proper in this case because there is no genuine issue of any material fact and because Plaintiff is entitled to judgment as a matter of law as to the issues brought forth by this motion.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. at 322.

### B.  Concession of FDCPA Liability.

Gutman Defendants have conceded liability as to § 1692e of the FDCPA. Dkt. No. 50. That section prohibits the "use any false, deceptive, or misleading representation or means in connection with the collection of any debt," and contains a non-exhaustive list of 16 types of conduct that violates the general prohibition including "The false representation or implication that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(1) – (16). As delineated below, much of the Gutman Defendants' conduct that violated § 1692e would constitute "[d]eceptive acts or practices" under GBL § 349.

### C.  Public Policy of GBL § 349: Private Attorneys General Litigating Against Deceptive Consumer Oriented Conduct.

GBL § 349 bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 28 (2000). A plaintiff must prove three elements: (1) that the challenged act or practice was "consumer-oriented," (2) that it was materially misleading, and (3) that it caused injury to plaintiff. *Id.*

A violation of GBL § 349 can be found from a single transaction. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 744 (1995) ("Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior"). The conduct must "*potentially* affect similarly situated consumers," though not *all* consumers. *Oswego,*

85 N.Y.2d at 27 (emphasis added). "New York has clearly created a cause of action for citizens to act as private attorneys general in enforcing the consumer protection ideals embodied in the GBL." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 283 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). GBL § 349 is "meant to act as a 'strong deterrent against deceptive business practices.'" *In re Scotss EZ Seed Litig.*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015) *quoting McDonald v. N. Shore Yacht Sales, Inc.*, 134 Misc. 2d 910, 914, 513 N.Y.S.3d 590, 593 (Sup. Ct. 1987).

Under GBL § 349, "'Deceptive practices' are 'acts which are dishonest or misleading in a material respect.'" *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citations omitted). The statute defines "deceptive acts" "objectively [ ] as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* "New York courts use an objective definition of 'deceptive.'" *Hunter v. Palisades Acquisition XVI, LLC,* No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *8 (S.D.N.Y. Nov. 16, 2017) *citing to Oswego*, 85 N.Y.2d at 26. "Both affirmative misrepresentations and omissions may qualify as deceptive or misleading acts or practices." *Sanchez v. Ehrlich*, No. 16-CV-8677 (LAP), 2018 WL 2084147, at *10 (S.D.N.Y. Mar. 29, 2018) *citing to In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016).

Representations that are deceptive under the FDCPA "least sophisticated consumer" test are often also deceptive under the GBL § 349 "reasonable consumer" test. *See e.g. Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV 3920 MKB CLP, 2012 WL 1882976, at *5 (E.D.N.Y. May 24, 2012) (allegation debt collector regularly filed collection lawsuits that were time barred given the state of residency of the original creditor without performing a meaningful attorney review states a claim for violations of the FDCPA and GBL § 349) and *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 700 (S.D.N.Y. 2015) (deceptive filing of a debt collection lawsuit).

Emotional distress is a cognizable injury under GBL § 349. *See e.g. Friedman v. Maspeth*

*Fed. Loan & Sav'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014) ("annoyance, harassment, time, frustration, anger, and anxiety" was sufficient to plead an injury under GBL § 349); *see also Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 DLI JO, 2011 WL 2295116, at *5 (E.D.N.Y. June 7, 2011) ("humiliation, anger, anxiety, emotional distress, fear, frustration and embarrassment"). "[I]n keeping with the prophylactic purposes of § 349, [...a] plaintiff seeking to recover under § 349 [must] show only that the practice complained of was objectively misleading or deceptive and that he had suffered injury 'as a result' of the practice." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Causation is shown by establishing that the emotional distress was "a result of the foregoing acts and practices [...] caused by the Defendant." *Rozier,* 2011 WL 2295116, at *5.

### D. Defendants violated GBL § 349 by Issuing Bank Restraints Without Performing a Meaningful Attorney Review and Misrepresenting to Consumers that Exempt Funds Would Be Released When GMBS Has No System in Place to Instruct the Bank to Do So.

GMBS's collection operation is set up in such a way to systematically restrain and garnish funds from consumer bank accounts that are exempt from restraint and garnishment under federal and state law. GMBS inevitably takes exempt funds from consumers because it issues bank restraints without any review of an account, let alone the meaningful attorney review that is represented by the bank restraint going out under an attorney's signature. That is why GMBS continued to issue new bank restraints even when it knew that the funds were exempt. And GMBS inevitably keeps those exempt funds restrained or garnished because, when a consumer sends in exemption claim forms and proof, GMBS has no system to process that information and send a release to the bank. That is why GMBS did not send any release to the bank when it first received the exemption claim form and bank statements from Mr. Fadlevich on December 8, 2018 (56.1 ¶¶ 129-140), and it is why GMBS did not send any release to the bank when it received further notice

and the same proof on December 14, 2018 (¶¶ 148-158), January 24, 2019 ( ¶¶ 168-173), April 3, 2019 (¶¶ 191-195), and April 24, 2019 (¶¶ 196-203).

This system, as a whole as well as these two separate components, is a deceptive business practice that violates GBL § 349. But it also depends on two express misrepresentations by GMBS to consumers: (1) that an attorney, specifically Eric Keilbach, reviews the bank restraints before they are issued, and (2) "IF YOU SEND THE CREDITOR'S ATTORNEY PROOF THAT THE MONEY IN YOUR ACCOUNT IS EXEMPT, THE ATTORNEY MUST RELEASE THAT MONEY WITHIN SEVEN DAYS."

> i. <u>GMBS violated GBL § 349 by issuing repeated restraints against Mark Fadlevich that represented that Defendant Eric Keilbach had performed a meaningful attorney review.</u>
>> 1. GMBS's misrepresentation of meaningful attorney review by Keilbach is deceptive to the reasonable consumer as it falsely represents any involvement by Keilbach.

A representation by an attorney carries a high degree of weight that has a greater material impact on a consumer than a representation by a non-attorney. That is why important communications like restraining notices are required to be issued by attorneys as officers of the court. C.P.L.R. § 5222(a). It is a representation that an attorney has performed a review sufficient to determine that a judgment creditor is legally permitted to restrain a consumer's funds in their bank account. Accordingly, when a communication signed by an attorney is coming from a non-attorney rather than an attorney, it is materially deceptive to the reasonable consumer. *See e.g. Musah v. Houslanger & Associates, PLLC*, 962 F. Supp. 2d 636, 640–41 (S.D.N.Y. 2013) (misrepresentation of meaningful attorney review in information subpoena and restraining notice).

The bank restraint process at GMBS is an assembly line, and there are no attorneys at any point in this assembly line. The bank restraint process begins at GMBS by every account coded "EOJ" (Execute on Judgment) in their computer system being sent to Experian. 56.1 ¶ 176.

21

Experian then sends GMBS employee and non-attorney Robert Brust a list of the accounts where the consumer has a bank account. *Id.* Brust forwards this list of accounts to Gary Thigpen, a non-attorney collector at GMBS. *Id.* Thigpen then goes through the accounts one-by-one and pulls them up in iCollect using "The file number/index number" and generates a bank restraint. ¶ 76. The bank restraint is generated with Eric Keilbach's signature already digitally applied to it. ¶¶ 77, 98, 125, 184. It then gets mailed to the bank by Gail Goldfein. ¶ 80. In sum, there are three employees involved in the process – Brust (obtaining and forwarding the list of accounts to be executed on to Thigpen), Thigpen (pulling up each account in iCollect by file number and generating the bank restraint), and Goldfein (mailing the restraint to the bank). There are documents which corroborate that this was the process. GMBS has produced the emails from Brust to Thigpen listing the accounts to be executed on. ¶ 176. GMBS has produced account notes which show Thigpen generating the restraints. **Exhibit J**. There are no emails from Eric Keilbach (or any other attorney) showing involvement with the restraint nor are there any entries in the account notes showing Keilbach's involvement. 56.1 ¶ 42.

This misrepresentation of attorney involvement is material. Deceptive conduct under GBL § 349 is material when it influences how a consumer acts or responds considering the misrepresentation. *Winslow v. Forster & Garbus, LLP*, No. CV 15-2996, 2017 WL 6375744, at *4, *10-12 (E.D.N.Y. Dec. 13, 2017) (adopting plaintiffs' argument that false statements were "material because they might reasonably prompt a []consumer to settle rather than litigate, or to settle on less favorable terms"); *Midland Funding, LLC v. Giraldo*, 39 Misc. 3d 936, 949 (N.Y. Dist. Ct. 2013) ("A consumer, unschooled in the law, could be readily deceived into believing that the plaintiff would not be bringing the lawsuit unless it either possessed evidentiary proof of the claim, or could easily obtain such proof"). Notably, the Second Circuit held that similar

misrepresentations by GMBS were material in *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 137-138 (2d Cir. 2017) because they could "reasonably be expected to affect how or even whether a consumer responds to a debt collector's objection to a claim that the restrained funds are exempt from garnishment." If Mr. Fadlevich had known that the restraints were being issued against him without any attorney involvement, and without the involvement of the signatory Defendant Eric Keilbach specifically, he may have, for example, insisted on speaking with Keilbach when he spoke to Gary Thigpen by phone in December of 2018 or asked Thigpen for his email address.

> 2.  GMBS's misrepresentation of meaningful attorney review by Keilbach is deceptive to the reasonable consumer as it falsely represents any substantive review of the account prior to execution.

The representation of meaningful attorney review is additionally deceptive because the person who issues the restraints, Gary Thigpen, performs no review of the account prior to issuing the restraint. This lack of review is not some personal failing of Mr. Thigpen – rather, the iCollect software, created by GMBS itself (56.1 ¶¶ 35, 108), is designed to facilitate the issuance of bank restraints without any substantive review of the account. All that is needed for Thigpen to bring up the account and generate the restraint in iCollect is the file number or index number (¶ 76), which is itself provided on the report forwarded to him by Robert Brust. *See e.g.* **Exhibit SS.** In other words, there is no programming in iCollect to force Thigpen or other collectors to look at the account notes or any other information which would prevent issuing restraints on funds that are known by GMBS to be exempt from restraint and garnishment.

And the system instead is designed disincentivizing this kind of review prior to issuing restraints. The account notes are contained in an entirely different computer system called AS/400. ¶ 40. Meanwhile the screen in iCollect where restraints are generated only shows four data points

for each of the prior restraints: the bank the restraint is issued to, the date the restraint was issued, the amount sought by the restraint, and "Bank Resp.," which only lists the amount in the bank account when the account is **not** restrained by the bank because it is below the standard exemption threshold (at the time $3,000). ¶¶ 101-107. So even if Thigpen were to review all the information on this screen prior to generating a restraint (and he did not testify that he did), none of it would have prevented the additional restraints on Mr. Fadlevich's exempt funds. The only place in GMBS's system that contains information about the funds being exempt is the account notes, which again are in an entirely different computer system.

This misrepresentation of any substantive review prior to issuing the restraint is materially deceptive because if Mark Fadlevich had known that no review was taking place prior to issuing the restraint, he would not have spent so much time, effort, and money on sending his Release Demands to Defendants as he would have known that no amount of notice would prevent GMBS from executing on an account as long as it was coded EOJ.

3. The misrepresentation of meaningful attorney review is consumer-oriented because the whole procedure of issuing a bank restraint does not involve any attorney or any review which would prevent improper restraints.

A violation of GBL § 349 can be found from a single transaction. *Oswego*, 85 N.Y.2d at 25 ("Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior"). The conduct must "potentially affect similarly situated consumers," though not *all* consumers. *Oswego,* 85 N.Y.2d at 27.

As aforementioned, the process of issuing bank restraints at GMBS is an assembly line. While it may not reliably avoid restraining exempt funds, it reliably has the same steps every time a restraint gets issued. Brust forwards a list of consumers with bank accounts to Thigpen to execute on. 56.1 ¶ 176. These lists are sent weekly with as many as 260 consumers listed. ¶¶ 176-177. For

24

any consumer like Mr. Fadlevich who provides an exemption claim form and proof like bank statements, their account will still be executed on because the one screen that shows this information, the account notes, is in a different program (AS/400, ¶ 40) that is not reviewed prior to the restraint being issued. ¶ 76. The iCollect screen for initiating bank restraints does not show if any of the information subpoena responses to the respective restraints showed that the consumer was receiving exempt income. ¶¶ 101-106. GMBS has not requested that any column be added to the screen to show that exempt funds were in the account and has not even sought to determine if it is possible. ¶ 108.

Plaintiff anticipates that Gutman Defendants may argue that the case of Mark Fadlevich is a one-off (and thus not consumer-oriented) because only the accounts coded "EOJ" have restraints sent out, and the failure to change the code on the Fadlevich account was a one-off mistake rather than systemic. First, this argument would do nothing to change that GMBS is misrepresenting a meaningful attorney review by Defendant Eric Keilbach prior to the issuance of bank restraints. The bank restraints are generated with Keilbach's signature already digitally inserted in the form (¶ 77) – that was not just a one-off occurrence, it is programmed into GMBS's iCollect computer system.

Further, an argument that the "EOJ" coding is a reasonable procedure to prevent improper bank restraints is contradicted by the evidence. GMBS admitted that this coding is the only measure it has to prevent execution on known-exempt funds. ¶ 178. However, bizarrely, when Eric Keilbach makes a determination that funds are exempt from restraint, he does not instruct the appropriate collector to change the code on the account, testifying that the collector should already know to do it. ¶ 180. But both GMBS and Thigpen testified that only attorneys at GMBS like Keilbach could make a determination of whether funds were exempt. ¶ 117. So Keilbach expects

that, when he makes a determination that funds are exempt, that he does not need to instruct the collectors to change the code from "EOJ" and does not need to make an entry in the message history to reflect the determination, but somehow the collectors will know he has made the determination and change the code. But the collectors are not seemingly aware of this alleged responsibility to change the coding from "EOJ." When GMBS collector Robert Brust was asked what policies GMBS has "to prevent it from taking exempt funds like Social Security from consumers?" he testified "I don't know." ¶ 221. And Thigpen testified that "they," seemingly from context the attorneys at GMBS, change the code and thus remove accounts from his queue for collection. ¶ 183.

Notably Keilbach testified that in such a situation the code should be changed from "EOJ" to "Further Review": but no "Further Review" code exists in the system. ¶ 181. When confronted with this fact, GMBS could not identify what code would in fact be used to put further executions on hold because the funds are exempt from restraint. ¶ 182. But why would there be one – GMBS believes it has the right to issue restraints when it knows that a consumer is receiving Social Security. If GMBS thought that it should not restrain accounts it knowns have Social Security funds, it would probably design its proprietary computer system iCollect to require a collector to review the information prior to issuing a restraint, or at the very least display that information (and whether a consumer has submitted an exemption claim form) somewhere more prominent than buried in one out of hundreds of account note entries.

GMBS has about 55,000 accounts (¶¶ 29-30), the majority of which are judgments against consumers like Mark Fadlevich. Any of those thousands of consumers who have exempt funds would be similarly situated to Mr. Fadlevich – at risk of having GMBS perform no meaningful attorney review of the bank restraint and thus issuing a bank restraint on funds that GMBS knows

are exempt.

    ii. <u>GMBS violated GBL § 349 by misrepresenting to Mr. Fadlevich that it would release his account when it had no procedures to do so.</u>

        1. "IF YOU SEND THE CREDITOR'S ATTORNEY PROOF THAT THE MONEY IN YOUR ACCOUNT IS EXEMPT, THE ATTORNEY MUST RELEASE THAT MONEY WITHIN SEVEN DAYS" is materially deceptive to the reasonable consumer when GMBS has no policies or practices that will release the account.

GMBS knows that the restraining notices and exemption claim forms it sends to banks to restrain a consumer's account will be forwarded to the consumer, and thus the restraining notice and exemption claim form are a communication to that consumer. ¶ 100. And one of the things that the exemption claim form expressly communicates to the consumer is "IF YOU SEND THE CREDITOR'S ATTORNEY PROOF THAT THE MONEY IN YOUR ACCOUNT IS EXEMPT, THE ATTORNEY MUST RELEASE THAT MONEY WITHIN SEVEN DAYS." *See e.g.* **Exhibit JJ**, p. 7**.** While similar to it, this language is not the same as the language outlining the responsibility of a judgment creditor in C.P.L.R. § 5222-a(4), which states "Where the executed exemption claim form sent to the judgment creditor is accompanied by information demonstrating that all funds in the account are exempt, the judgment creditor shall, within seven days of the postmark on the envelope containing the exemption claim form and accompanying information, instruct the banking institution to release the account, and the restraint shall be deemed void." The language in the exemption claim form recognizes that practically, because a judgment creditor can only restrain bank accounts through an attorney acting as an officer of the court, it is the creditor's attorney rather than the creditor itself that needs to see the proof that the money is exempt and that it will be the attorney directing the release of the money.

    There is no dispute of fact that this statement was a misrepresentation to Mark Fadlevich. Mr. Fadlevich sent the exemption claim form and proof to GMBS on December 8, 2018, December

12, 2018, December 14, 2018, January 24, 2019, April 2, 2019, and April 24, 2019, and in none of those instances was the account fully released within 7 days.

And there is no dispute of fact that the misrepresentation was materially deceptive to the reasonable consumer. A reasonable consumer with entirely exempt funds in their bank account may be influenced by the statement in the exemption claim form to focus their efforts on exercising their rights by sending GMBS the exemption claim form and proof, rather than pursuing other avenues of redress like filing a complaint with a government agency like the Consumer Financial Protection Bureau. Or a reasonable consumer might feel powerless and be discouraged from continuing to fight the restraint, allowing GMBS to retain its ill-gotten gains. Certainly, Mr. Fadlevich testified as to how powerless he felt. Had GMBS done what it represented it would do in response to Mr. Fadlevich's proof, he would not have spent 238 days having his account restrained while sending 6 demands to release it, none of which released his account.

Plaintiff anticipates that GMBS may argue that "IF YOU SEND THE CREDITOR'S ATTORNEY PROOF THAT THE MONEY IN YOUR ACCOUNT IS EXEMPT, THE ATTORNEY MUST RELEASE THAT MONEY WITHIN SEVEN DAYS." is not deceptive because it is an accurate statement of GMBS's obligation under the law, even if in this instance GMBS did not uphold its obligation. First, as stated earlier, this statement is distinct from what C.P.L.R. § 5222-a(4) prescribes – the statute lays out the obligation of the judgment creditor, whereas the language in the exemption claim form is a communication to the consumer that the judgment creditor's attorney will release the money.

Second, exempting false communications because they would be accurate if Defendants had acted differently turns consumer protection statutes against deception like GBL § 349 on their head. GMBS should not benefit by falsely saying it will follow the law and then not following the

28

law. For example, filing time-barred lawsuits has been held to be deceptive under GBL § 349. *See e.g. Diaz v. Portfolio Recovery Assocs., LLC,* No. 10 CV 3920 MKB CLP, 2012 WL 1882976 (E.D.N.Y. May 24, 2012). The representations in a time-barred lawsuit could be truthful but-for it being filed after the statute of limitations has passed. Similarly here, Defendants' representation that "IF YOU SEND THE CREDITOR'S ATTORNEY PROOF THAT THE MONEY IN YOUR ACCOUNT IS EXEMPT, THE ATTORNEY MUST RELEASE THAT MONEY WITHIN SEVEN DAYS" could have been truthful if GMBS has sent a release to Wells Fargo on or before December 15, 2018, but that did not happen, nor did it happen on or before December 19, 2018, December 21, 2018, January 31, 2019, April 9, 2019, or May 1, 2019.

2. Continuing to restrain the exempt funds is itself a misrepresentation to Mark Fadlevich that GMBS was legally entitled to restrain them.

"Both affirmative misrepresentations and omissions may qualify as deceptive or misleading acts or practices." *Sanchez*, 2018 WL 2084147, at *10. By continuing to restrain the exempt funds (or failing to have the funds released), GMBS misrepresented to Mark Fadlevich that it was legally entitled to restrain his Social Security funds despite Mr. Fadlevich providing it with an exemption claim form and bank statements.

3. GMBS's restraint of exempt funds after receiving an exemption claim form and proof is consumer-oriented, as demonstrated by how GMBS's lack of policies and procedures caused the same response to Mark Fadlevich's exemption claim form and proof every time.

Gary Thigpen testified that when GMBS receives an exemption claim form from a consumer, "they needed to be reviewed by an attorney," and that it was collectors like Mr. Thigpen who would "take them in, note the file and then request that an attorney review." GMBS and its employees have claimed that only an attorney can make the decision to release a restraint on a bank account based on an exemption claim form. However, when asked the reason for this, GMBS

29

could not provide one. It is a telling inverse of the complete lack of meaningful attorney involvement with the issuance of bank restraints where such involvement is actually required. Where it is about keeping the bank restraint assembly line moving and freezing consumers' accounts, GMBS does not bother having an attorney involved. But where it is about respecting a consumer's rights to exempt funds, suddenly attorney involvement becomes decisive, even if such "involvement" is as a roadblock to the release of the account rather than actually reviewing it. As of the deposition of GMBS, this is still their practice for who can review an exemption claim form and determine that the account should be released.

The attitude of GMBS towards exemption claim forms, and the rights that consumers exercise with them, shows the reason for its practice of not acting on exemption claim forms. 56.1 ¶ 135. Gary Thigpen also testified that: "If someone tells me they have exempt funds I just send a conditional release." ¶ 113. GMBS has no policies and procedures in place to prevent the restraining of exempt funds and for the prompt release of any restraint. ¶¶ 136-139. Even though an exemption claim form, submitted with proof, triggers a legal obligation for GMBS, GMBS did not make a single entry its account notes reflecting that it received an exemption claim form any of the six times it was sent one by Mark Fadlevich. While GMBS testified that receipt of an exemption claim form "should be noted in the message history [of AS/400]," GMBS also could not testify as to how it would be noted. ¶ 38.

In none of the screenshots and other documents produced by Defendants regarding these computer systems were there any screens, fields, or other information to show whether a consumer had submitted an exemption claim form and whether that exemption claim form had been reviewed. Exemption claim forms sent by consumers were not even necessarily scanned into GMBS's system at all. ¶ 155. Further, Brust testified that he was not aware of anywhere in these

systems that would show whether funds in a consumer's bank account were exempt or whether an exemption claim form had been sent. ¶ 37. Eric Keilbach could not provide when he reviewed the exemption claim form or any document showing that he reviewed it. ¶ 146.

GMBS has about 55,000 accounts (¶¶ 29-30), the majority of which are judgments against consumers like Mark Fadlevich. Any of those thousands of consumers who have exempt funds would be similarly situated to Mr. Fadlevich – at risk of having GMBS restraining exempt funds and not sending a release to a bank despite telling the consumer that they would after the consumer sent an exemption claim form and proof like bank statements.

iii.  Eric Keilbach is personally liable for violating GBL § 349 by issuing bank restraints without performing a meaningful attorney review and failing to review exemption claim forms and issue releases.

"While the Second Circuit has yet to rule explicitly on the issue of individual FDCPA liability, many courts, including courts within this district, have recognized that individual liability may be imposed where the defendant sought to be held liable personally engaged in the prohibited conduct." *Krapf v. Prof'l Collection Servs., Inc.*, 525 F. Supp. 2d 324, 327 (E.D.N.Y. 2007) (collecting cases). Similarly for GBL § 349, "corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally." *Polonetsky v. Better Homes Depot*, 97 N.Y.2d 46 (N.Y. 2001) *citing to Marine Midland Bank v Russo Produce Co*., 50 NY2d 31, 44 (N.Y. 1980). In *Polonetsky*, the Court of Appeals found that the New York City Dept. of Consumer Affairs had stated a claim against the president of Defendant Better Homes Depot for personal liability because he "participate[d] in [Better Homes'] operations on a day-to-day basis and [was] actively involved in its marketing and sales activities." *Polonetsky,* 97 N.Y.2d at 51.

Mr. Keilbach is personally liable for violating GBL § 349 by issuing bank restraints without performing a meaningful attorney review and failing to review exemption claim forms and issue

31

releases. Keilbach may ironically argue that he cannot be liable for the bank restraints misrepresenting meaningful attorney review because he has no involvement in issuing the bank restraints. And while this is true, he is nevertheless responsible because he has directly facilitated and sanctioned the issuance of bank restraints without his review. Specifically, he is aware that bank restraints are generated with his signature digitally applied despite his lack of review, and he has specifically granted Thigpen authority to generate his signature this way. ¶¶ 77-78.

And Keilbach is liable for failing to review exemption claim forms and issue releases. Beyond his admitted failure to review in this case, he also fails to take any steps to ensure that he does exemption claim form reviews in a timely manner despite knowing that he is the bottleneck that consumers depend on for their accounts to get released. He does not use the AS/400 system to keep track of his review of exemption claim forms, and even says that doing so is a "waste [of] my time." ¶ 43. Keilbach does not use any other computer system to track the receipt of exemption claim forms, whether he has reviewed them, or the date he has reviewed them. Such a task would not be burdensome – by Keilbach's own estimate he reviews less than 50 exemption claim forms per year. ¶ 134. Further, GMBS has around 100 employees (¶ 7), including 15 employees in the collections department alone (¶ 8), so it easily has the capacity to devote more human resources to review of exemption claim forms if capacity was the reason for the lack of review. While he claimed that such negligence is only to GMBS's detriment as under the law a bank should release an account if they do not receive an objection to the exemption claim form from a judgment creditor, Thigpen revealed that GMBS is aware that in practice, regardless of requirements of the law, a bank will not release the account without receiving a release from GMBS except by some error. ¶ 163.

**E.  Plaintiff's sought punitive damages under GBL § 349 are not capped at $1,000.**

Plaintiff seeks summary judgment on his entitlement to seek punitive damages under GBL § 349 not capped at $1,000. While there is one notable contrary decision (*see Guzman v. Mel S. Harris & Assocs., LLC*, No. 16 CIV. 3499 (GBD), 2018 WL 1665252, at *13 (S.D.N.Y. Mar. 22, 2018)), the courts in both the Second Circuit and the New York state courts have mostly found in favor of not capping possible punitive damages, particularly following the persuasive reasoning in the *Bueno, Wilner,* and *Koch* cases.

There are significant punitive damages available in this action for Defendants' willful and wanton misrepresentations to consumers. Defendants will likely adopt the argument made in *Guzman*, that any award of punitive damages will necessarily be capped at $1,000 because of the $1,000 treble damages cap set forth in New York General Business Law § 349(h). In *Bueno*, Judge Kuntz considered defendant's motion for judgment on the pleadings to limit punitive damages related to plaintiff's G.B.L. § 349 claim to $1,000. 269 F. Supp. 3d at 18 - 23.  Undertaking its "duty 'carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity,'" the Court considered lines of cases espousing both approaches. *Id.*  The Court denied the motion, holding that punitive damages are available and are not subject to the statute's cap on treble damages. *Id.* at 23.  In reaching its holding, the Court found that the line of cases permitting uncapped punitive damages, beginning with the Appellate Division, Second Department's decision in *Wilner v. Allstate Ins. Co.*, presented the correct approach. *See Bueno*, 269 F. Supp. 3d at 23; *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167 (2d Dep't. 2010).

In *Wilner*, the Second Department upheld the trial court's denial of defendant insurance company's motion to dismiss plaintiff's G.B.L. § 349 claim and demand for punitive damages. 71 A.D.3d at 167.  In discussing recoverable damages, the Second Department held that, "[u]nder General Business Law § 349 consumers may recover actual damages in any amount, and may

33

recover treble damages under General Business Law § 349(h) up to $1,000 [ ]. Moreover, the plaintiffs may seek both treble damages and punitive damages." *Wilner*, 71 A.D.3d at 167 *citing Volt Sys. Dev. Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309, 547 N.Y.S.2d 280 (App. Div. 1st Dep't 1989) and *Bianchi v. Hood*, 128 A.D.2d 1007, 513 N.Y.S.2d 541 (App. Div. 3rd Dep't 1987) (internal citations omitted). This approach follows the language of G.B.L. § 349(h), which enumerates a cap on treble damages but is silent as to punitive damages. *See Bueno*, 269 F. Supp. 3d at 19. Uncapped punitive damages are separately available "where the conduct of the party being held liable 'evidences a high degree of moral culpability, or where the conduct constitutes willful or wanton negligence or recklessness.'" *Wilner*, 71 A.D.3d at 167, 893 N.Y.S.2d at 218 *quoting Pellegrini v. Richmond Cnty. Ambulance Serv., Inc.*, 48 A.D.3d 436, 437, 851 N.Y.S.2d 268, 269 (App. Div. 2d Dep't 2008).

The Second Department's approach in *Wilner* has been widely adopted by New York state and federal courts. *Cohen v. Narragansett Bay Ins. Co.*, 2014 WL 4701167, (E.D.N.Y. Sept. 23, 2014); *Koch v. Greenberg*, 14 F.Supp.3d 247, 278–79 (S.D.N.Y. 2014); *Midland Funding, LLC v. Giraldo*, 39 Misc.3d 936, 945, 961 N.Y.S.2d 743 (Nassau Cnty. Dist. Ct. 2013). In a summary order that this Court should view as persuasive authority, the Second Circuit in *Barkley v. Olympia Mortgage Co. (Barkley II)* relied on *Wilner* in rejecting the argument that punitive damages are not permitted under G.B.L. § 349. *See Barkley II*, 557 Fed.Appx. 22, *26, n.1 (2d Cir. 2014) (summary order), *aff'g Barkley v. United Homes, LLC (Barkley I)*, 04–CV–0875, 2012 WL 2357295 (E.D.N.Y. June 20, 2012). The District Court in *Barkley I* likewise relied on *Wilner* in holding that "G.B.L. § 349(h) restricts the court's award of treble damages, but does not govern the award of punitive damages, which plaintiffs may seek in addition to treble damages." *Barkley I*, 2012 WL 2357295, at *17 n.16 *citing Wilner*, 71 A.D.3d 155.

Notably, *Wilner* has been adopted in the text of the New York Pattern Jury Instructions concerning statutory remedies for a successful G.B.L. § 349 claim. N.Y. Pattern Jury Instr. – Civil 3:20.  And two former justices of the Appellate Division of the Second Department have observed in a law review article that "[a]lthough treble damages are limited to $1,000, New York courts and the legislature have set no such limit on punitive damages in GBL section 349 claims." John M. Leventhal & Thomas A. Dickerson, *Punitive Damages: Public Wrong or Egregious Conduct? A Survey of New York Law*, 76 Alb. L. Rev. 961, 1005 (2013).

The arguments to cap punitive damages at $1,000 primarily rely on an erroneous reading of dicta in a New York Court of Appeals Decision, *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282 (1999). *See Guzman v. Mel S. Harris & Associates*, 16-CV-3499 (GBD) (RLE), 2017 WL 4386369 (Sept. 29, 2017 S.D.N.Y.) and *Rogers v. Brooks*, 2019 WL 1672364 (N.D.N.Y. April 17, 2019). In *Karlin*, the issue before the Court was whether a G.B.L. § 349 claim can be brought against a medical practitioner. 93 N.Y.2d 282.  The Court held in the affirmative. *Id.* at 290.  In dicta, the Court noted that "[a]mong the remedies available to private plaintiffs are compensatory damages, limited punitive damages and attorneys' fees." *Id.* at 291.  Because this statement was made in dicta, *Karlin* is not binding authority. *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006) *citing Cohens v. Virginia,* 6 Wheat. 264, 5 L.Ed. 257 (1821). Nor should this Court find that dicta persuasive because the decision does not stand for the proposition that G.B.L. § 349(h) imposes a $1,000 cap on punitive damages. The language itself ("Among the remedies available") indicates that the list is not exhaustive. *Karlin*, 93 N.Y.2d at 291.  The list is per se not exhaustive as GBL § 349 has other remedies, including injunctive relief and $10,000 in enhanced damages for frauds committed against the elderly. GBL § 349(h); GBL § 349-c.

A number of federal district courts have also adopted *Wilner*. In *Koch,* plaintiff had

purchased 2,600 bottles of rare French wine from defendant. *Koch v. Greenberg*, 14 F. Supp. 3d 247, 253 (S.D.N.Y. 2014) (J. Oetken), *aff'd,* 626 F. App'x 335 (2d Cir. 2015). Plaintiff brought suit against defendant alleging common law fraud and violations of GBL §§ 349 & 350, alleging that 24 of those bottles were counterfeit. *Id.* The jury awarded $355,811 in compensatory damages (the purchase price of the 24 bottles), "an additional $24,000 in statutory damages on one of Koch's GBL claims ($1000 per bottle)," and punitive damages of $12 million. *Id.* Defendant moved, *inter alia*, for remitter of the punitive damage award, claiming the 33:1 ratio of punitive to compensatory damages violated its due process rights. *Id.* In considering the argument, the *Koch* court was guided by the four "guideposts" enunciated in *Gore*. *Id.* at 278 *citing to BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The fourth guidepost considered by the court was to examine comparable civil penalties and similar cases. *Id.* In doing so, the court acknowledged defendant's argument that "the maximum civil penalty for willful deceptiveness under the GBL is $1,000 per violation, which here was $24,000." *Id.* at 278. Defendant argued that the amount of the civil penalty was small in relation to the size of the punitive damage award, supporting an argument for a substantial remittitur. *Id.* The court, however, noted that while GBL § 349 had a $1,000 per violation statutory cap, there was no such cap on punitive damages that could be awarded. *Id.* at 278-279.

On appeal, the Second Circuit affirmed the trial court ruling in all regards, including the holding on GBL § 349 liability, liability for punitive damages, and the amount of the post-remittitur punitive damage award. The Second Circuit did not specifically address *Koch*'s holding that "GBL's treble damages provision does not proscribe an additional award of punitive damages." *Koch* at 279.

Based on the above reasoning provided in *Bueno, Wilner,* and *Koch*, Plaintiff is entitled to

36

seek punitive damages without a cap of $1,000.

### F. Defendants Committed Conversion By Unlawfully Exercising Control Over Mr. Fadlevich's Social Security Funds for Nearly 8 Months.

#### i. GMBS Committed Conversion by Unlawfully Restraining Mr. Fadlevich's Social Security Funds from November 21, 2018 until July 17, 2019.

A person commits the tort of conversion when she "intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 827 NYS 2d 96, 100 (Ct. App. 2006). A plaintiff claiming conversion must establish a) his legal ownership of a specific, identifiable piece of property, and b) the defendant's interference with his property interest in defiance of his rights. *Id*. By GMBS's own admission, as of December 8, 2018, Mr. Fadlevich had sent it the proof necessary to establish that its restraint of his funds was unlawful, but his Social Security funds continued to be restrained for a total of 238 days. *E.g. Swegan v. Svenson*, 960 N.Y.S.2d 768, 769 (App. Div. 4th Dep't. 2013) (holding defendants liable for physical trespass and resulting conversion if they "directed the trespass or such trespass was necessary to complete the contract" between defendants and the purported agent).

When a debt collector restrains a bank account, "even if the initial taking of the money was authorized," if it continues to do so upon notice that the restraint was unlawful, the debt collector can be liable for conversion. *Okyere v. Palisades Collection, LLC*, 961 F.Supp.2d 522, 534 (S.D.N.Y.2013). Further, "[r]eturning property to the rightful owner does not absolve defendants of all liability from the alleged conversion" and that a "claim for conversion will exist even when the deprivation is partial or temporary." *Id*.

In this case, Defendants restrained anywhere from $7,519.68 to $25,042.08 of Plaintiff's exempt Social Security funds for 236 days (from November 21, 2018 to July 15, 2019). Defendants were first put on notice that their restraint was unlawful when Mark Fadlevich spoke with Gary

Thigpen on December 4, 2018. Defendants themselves admit that they knew or should have known that the funds were exempt from restraint upon Plaintiff providing them with an exemption claim form and bank statements on December 8, 2018. Defendants were put on notice again and again that they were trespassing on Mr. Fadlevich's funds with the unlawful restraint on December 12, 2018, December 14, 2018, January 24, 2019, April 2, 2019, and April 24, 2019.

Plaintiff anticipates that Defendants will argue that they were not responsible for the unlawful restraint of the funds because Wells Fargo should have released the restraint upon notice from the Marshal that it was reversing its garnishment. However, this argument is unavailing as Mark Fadlevich provided GMBS notice in his January 24, 2019 Demand that Wells Fargo had not received any communication from GMBS necessary to release the account. In other words, GMBS knew as of receipt of Mr. Fadlevich's January 24, 2019 Demand that Wells Fargo needed a direct communication from GMBS to release the account rather than through the Marshal. And crucially, the Second Circuit in *Arias* already rejected an attempt by GMBS to shift blame for its improper pursuit of exempt funds onto the respective bank: "Without further investigation, there was no good faith basis for GMBS to rely on Bank of America's ambiguous statement that some of Arias's funds "may not" be exempt from garnishment." *Arias,* 875 F.3d at 139.

Plaintiff also anticipates that Defendants will argue that they did not receive the Demands mailed by Mark Fadlevich on December 14, 2018, January 24, 2019, and April 2, 2019. First, this argument is only material as to the egregiousness of GMBS's conversion for purposes of any possible punitive damages, as there is no dispute that GMBS was on notice that the restraint was unlawful as of December 12, 2018 and further that GMBS received the April 24 Demand and failed to act upon it. Second, it seems more plausible that GMBS received the demands by Mr. Fadlevich and simply misplaced and/or failed to scan them into its computer system. Plaintiff sent

the Demands by Certified Mail and has produced the associated Certified Mail Receipts. Defendants do not deny the address on these receipts were their correct mailing address at all relevant times. Wells Fargo, which was cc'ed on the Demands, produced a copy of each of the Demands. And the one Demand that GMBS has produced a copy of had apparently been placed on Defendant Eric Keilbach's desk and was not looked at by Keilbach or scanned into GMBS's system until they received notice of this FDCPA lawsuit.

> ii. <u>JD 34th is directly and vicariously liable for the conversion committed by its attorneys GMBS.</u>

JD 34th is directly liable for the conversion because it was the judgment creditor for which the restraints were issued. Under C.P.L.R. § 5222(a), only the "attorney for the judgment creditor as officer of the court" can issue a restraining notice – the judgment creditor itself cannot do so. Accordingly, the unlawful restraints of Mark Fadlevich were done directly by JD 34th.

The traditional rules of vicarious liability make principals liable to third parties for acts committed by their agents within the scope of the agency. *Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (App. Div. 2d Dep't 2007). *See also Meyer v. Holley*, 537 U.S. 280, 285 (2003); *accord Security Pacific Mortg. & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447, 448 (2d Cir. 1989) (per curiam). Vicarious liability applies to torts in general, including conversion. *Clients' Sec. Fund of State v. Grandeau*, 72 N.Y.2d 62, 67 (Ct. App. 1988) (law partners, who are agents of one another, are liable for conversion committed by any other partner, even if they had no knowledge of it.)

A principal-agent relationship exists when the principal, consents to allow the agent to act on his behalf and subject to his control; and where the agent consents to so act. *Meyer*, 537 U.S. at 286; Restatement (Third) of Agency, § 1.01; *Fils-Aime*, 837 N.Y.S.2d at 200. The principal need only have the *right* to control the agent's conduct; it need not actually control every detail of the

agent's conduct. *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1546 (S.D.N.Y. 1991); *Mazart v. State*, 441 N.Y.S.2d 600, 605 (Ct. Claims 1981); 2A N.Y. Jur. 2d Agency § 1. An agency relationship may exist even where the principal's right of control is limited to making management and policy decisions affecting the agent. *See Basic Books, Inc.,* 758 F. Supp. at 1546; *Mazart*, 441 N.Y.S.2d at 605.

Following these rules, the attorney-client relationship is one that may give rise to a principal-agent relationship, and therefore to vicarious liability. A client has the power to control its attorney in "material respects" if it wishes to do so. *Okyere I*, 961 F. Supp. 2d at 517, citing, *inter alia*, *Martsolf v. JBC Legal Grp., P.C.,* 2008 WL 275719, at *10–11 (M.D.Pa Jan. 30, 2008) (the mere existence of an attorney-client relationship, where debt collector had retained law firm and transmitted information to firm for the purposes of debt collection, showed exercise of control sufficient to impose vicarious liability); *Oei v. N. Star Capital Acquisitions, LLC,* 486 F.Supp.2d 1089, 1094-95 (C.D.Cal. 2006) (imputing principal-agent relationship and vicarious liability even without an explicit showing of control).

The U.S. Supreme Court itself "has made clear that 'clients must be held accountable for the acts and omissions of their attorneys.'" *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 584 (S.D.N.Y. 2015) (*Polanco II*), *quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 396–97 (1993) (*quoting Link v. Wabash R. Co.,* 370 U.S. 626, 633–34 (1962)). In *Polanco II*, the plaintiff alleged that debt collector through its debt collection law firm had refused to return restrained funds after the underlying judgment was vacated. 132 F. Supp. 3d at 570-75. The court observed that because the defendant had voluntarily chosen its attorney as its representative in the action, it could not "now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 584. "Any other notion would be wholly inconsistent with our

40

system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts'....' " *Id.*, *quoting Link,* 370 U.S. at 633–34 (internal citation omitted).

In *Hunter v. Palisades*, the debt buyer Palisades was found to be vicariously liable based on allegations that (1) the debt collector S&L was its attorney, and (2) that Palisades acted through S&L to collect judgments. *Hunter v. Palisades Acquisition XVI, LLC*, No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017). These are precisely the facts before the Court as to this case. Gutman Defendants were the attorney for JD 34th, and JD 34th acted through Gutman Defendants to execute on the judgment against Plaintiff Mark Fadlevich.

Plaintiff anticipates a number of arguments that JD 34th will make against liability: (1) JE 34th was, on paper, the judgment creditor that GMBS acted on behalf of, even if JE 34th did not in fact own the judgment; (2) Douglaston, the property management company for JD 34th, was the client of GMBS and thus the only party that could be vicariously liable for its actions; and (3) JD 34th had no knowledge of the unlawful violations and GMBS's failure to report the restraints means it was acting outside the scope of its employment to collect on the judgment.

GMBS indeed appears to have believed Douglaston's misrepresentation that JE 34th was the judgment creditor it was issuing bank restraints on behalf of given GMBS misrepresenting it as the judgment creditor. However, prior to issuing the bank restraints, GMBS had received a copy of the judgment against Mark Fadlevich, which clearly showed that the judgment creditor it was collecting on behalf of was JD 34th, not JE 34th. In other words, GMBS had the requisite information to know the actual judgment creditor – its misrepresentation of who that judgment creditor was does not alter its relationship with JD 34th.

Douglaston manages the properties owned by JD 34th and JE 34th. It is effectively the

41

means by which JD 34th and JE 34th take actions. Mr. Fadlevich's lease represented that the "owner" was Douglaston. The security deposit was made out to Douglaston. The City of New York Department of Social Services contribution to Mr. Fadlevich's monthly rent was made out to Douglaston. The lease extension agreement similarly listed the "Landlord" as Douglaston. When Mr. Fadlevich was still a tenant, he emailed Douglaston about issues with the apartment. And even in this FDCPA lawsuit, Douglaston responded to Plaintiff's subpoena that "Douglaston states that because the sole principal of Defendant JD 34th Street Realty LLC ("JD") is deceased, the documents produced by JD on November 7, 2019 were from Douglaston." In other words, by their own admission, the acts of Douglaston are the acts of JD 34th, including the referral of the judgment to GMBS for collection.

And whether JD 34th knew in fact about the restraint of exempt funds is immaterial to its vicarious liability. JD 34th, through Douglaston, freely selected GMBS for the express purpose of collecting on its judgment against Mark Fadlevich. Accordingly, the unlawful restraint of Mr. Fadlevich's exempt Social Security funds was within the scope of GMBS's authority. *See e.g. Okyere I*, 961 F. Supp. 2d at 517 ("the facts alleged in the complaint easily lead to the conclusion that [the debt collection law firm was] acting within their authority from Palisades" when they continued executing on a judgment after it was vacated). Vicarious liability is especially pertinent here because the unlawful restraint was actually "necessary to complete the contract" between GMBS and JD 34th. *Swegan v. Svenson*, 960 N.Y.S.2d 768, 769 (App. Div. 4th Dep't. 2013) (holding defendants liable for physical trespass and resulting conversion if they "directed the trespass or such trespass was necessary to complete the contract" between defendants and the purported agent). Because Mark Fadlevich's account was entirely Social Security funds, the only way that GMBS could successfully collect on the judgment entrusted to it by JD 34th was by

deceptively issuing bank restraints on the known-exempt funds and continuing to restrain the exempt funds despite representing that it would release them within 7 days of receiving an exemption claim form and proof. The possible benefit to JD 34th of such illegal restraint of exempt funds was enormous given the sought total balance of $16,550.97. And notably, GMBS continues to represent Douglaston in collection matters.

### G. JD 34th Is Liable for Violating EIPA for Its Failure to Instruct Wells Fargo to Release Plaintiff's Account within Seven Days of Receipt of the Exemption Claim Form and Proof.

Under C.P.L.R. § 5222-a(4), "If the judgment creditor fails to act in accordance with this subdivision, the judgment creditor shall be deemed to have acted in bad faith and the judgment debtor may seek a court award of the damages, costs, fees and penalties provided for in subdivision (g) of this section." This subdivision requires that "Where the executed exemption claim form sent to the judgment creditor is accompanied by information demonstrating that all funds in the account are exempt, the judgment creditor shall, within seven days of the postmark on the envelope containing the exemption claim form and accompanying information, instruct the banking institution to release the account, and the restraint shall be deemed void." *Id.*

JD 34th may argue that the executed exemption claim form and proof was sent by Mark Fadlevich to GMBS rather to JD 34th, the judgment creditor. However, this would undermine the plain apparent authority that GMBS had to receive the exemption claim form and proof on JD 34th's behalf: first, by the listing of GMBS's address under "NAME AND ADDRESS OF JUDGMENT CREDITOR OR ATTORNEY," and second, by GMBS through its collector Gary Thigpen repeatedly requesting Mark Fadlevich send the bank statements to him, rather than sending them to the judgment creditor.

Similarly, JD 34th may argue that if it had notice of the executed exemption claim form and proof it would have sent a release to the bank. Again, GMBS was the freely selected agent of

JD 34th for purposes of collecting on the judgment – JD 34th bears the consequences of that freely made choice of attorney. Violations of consumer protection statutes like EIPA are readily foreseeable in the course and scope of an agent debt collector's conduct. It is JD 34th's responsibility to select its agent debt collector attorney with that possibility in mind. And notably, GMBS continues to represent Douglaston in collection matters.

## IV.    CONCLUSION

For these reasons, Plaintiffs prays for the court to enter summary judgment as to liability under GBL § 349, conversion, and EIPA, and allow the case to proceed to trial solely on the issue of damages, including possible punitive damages under GBL 349.

Dated: Brooklyn, New York
        November 15, 2023

                                       Respectfully submitted,
                                          /s/
                                       Ahmad Keshavarz
                                       ATTORNEY FOR PLAINTIFF
                                       The Law Office of Ahmad Keshavarz
                                       16 Court St., #2600
                                       Brooklyn, NY 11241
                                       Phone: (718) 522-7900
                                       Fax:    (877) 496-7809
                                       Email: ahmad@NewYorkConsumerAttorney.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date I e-mailed the foregoing to the following:

      Arthur Jakoby
      Herrick, Feinstein LLP
      *Attorneys for Defendant JD 34th Street Realty LLC*
      Two Park Avenue
      New York, NY 10016
      ajakoby@herrick.com

      Ken Novikoff
      Rivkin Radler
      *Attorneys for Defendants Gutman, Mintz, Baker & Sonnenfeldt, LLP and Eric Keilbach*
      926 RXR Plaza

44

Uniondale, NY 11556-0926
Ken.Novikoff@rivkin.com


Dated:  Brooklyn, NY
        November 15, 2023
         /s/
        Ahmad Keshavarz
        Attorney for Plaintiff