1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------------x

4   MARK FADLEVICH,

5                             Plaintiff,

6           -against-              Case No.:
                                   1:19-cv-04227
7   JD 34TH STREET REALTY LLC,
    GUTMAN, MINTZ, BAKER &
8   SONNENFELDT, LLP, and ERIC
    KEILBACH,
9                             Defendants.

10  ----------------------------------x

11

12          REMOTE DEPOSITION of KIM DENARO, a

13  nonparty witness herein, witness located in North

14  Carolina, held on December 18, 2025, commencing at

15  12:04 p.m., and before Helene Gruber, a certified

16  shorthand reporter and notary public within and

17  for the state of New York.

18

19

20

21

22

23

24

25



```
 1
 2   A P P E A R A N C E S :
 3   LAW OFFICES OF AHMAD KESHAVARZ
 4   Attorneys for Plaintiff
 5        16 Court Street, 26th Floor
 6        Brooklyn NY 11241
 7   BY:   AHMAD KESHAVARZ, ESQ.
 8        KEVIN KEELTY GARTLAND, ESQ.
 9   ahmad@NewYorkConsumerAttorney.com
10
11   RIVKIN RADLER
12   Attorneys for Defendants Gutman, Mintz, Baker &
13   Sonnenfeldt, LLP, and Eric Keilbach
14        926 RXR Plaza
15        Uniondale, NY 11556-0926
16   BY:   KEN NOVIKOFF, ESQ.
17   Ken.Novikoff@rivkin.com
18
19   ZEICHNER ELLMAN & KRAUSE LLP
20   Attorneys for Wells Fargo
21        730 3rd Ave
22        New York, NY 10017
23   BY:   ANDREW ARTHUR, ESQ.
24   aarthur@zeklaw.com
25
```



Case 1:19-cv-04227-NRM-MMH    Document 153-2    Filed 02/23/26    Page 3 of 131 PageID #: 5405

```
 1
 2
 3                S T I P U L A T I O N S
 4
 5             IT IS HEREBY STIPULATED AND AGREED,
 6    by and between the attorneys for the respective
 7    parties, as follows:
 8             All objections, except as to the form
 9    of the questions, shall be reserved to the time
10    of the trial.
11             The within examination may be signed
12    and sworn to before any Notary Public with the
13    same force and effect as if signed and sworn to
14    before the court.
15             Filing of the original transcript of
16    the examination is waived.
17
18
19
20
21
22
23
24
25
```



1                    K. Denaro

2              (Letter dated 11/26/19, Bates

3     WF000074 – 75, premarked Exhibit 1.)

4              (Letter dated 12/11/18, Bates

5     WF000026, premarked Exhibit 2.)

6              (Letter dated 12/12/18, Bates

7     WF000089 – 90, premarked Exhibit 3.)

8              (Letter dated 12.24.18, Bates

9     WF000330, premarked Exhibit 4.)

10             (Letter dated 1/8/19, Bates

11    WF000328 – 29, premarked Exhibit 5.)

12             (Letter dated 2/6/19, Bates WF000377,

13    premarked Exhibit 6.)

14             (Letter dated 2/25/19, Bates

15    WF000376, premarked Exhibit 7.)

16             (Letter dated 3/18/19, premarked

17    Exhibit 8.)

18             (Letter dated 3/20/19, Bates

19    WF000253 – 55, premarked Exhibit 9.)

20             (Letter dated 4/19/19, Bates

21    WF000436, premarked Exhibit 10.)

22             (Letter dated 7/22/19, Bates

23    WF000048 – 49, premarked Exhibit 11.)

24             (Research record, Bates WF372 – 375,

25    premarked Exhibit 12.)



Case 1:19-cv-04227-NRM-MMH   Document 153-2   Filed 02/23/26   Page 5 of 131 PageID #: 5407

```
 1                    K. Denaro
 2            (Research record, Bates WF429 - 435,
 3    premarked Exhibit 13.)
 4            (Research record, Bates WF490 - 497,
 5    premarked Exhibit 14.)
 6            (Copy of check, Bates WF151,
 7    premarked Exhibit 15.)
 8            (Letter dated 12/13/19 with
 9    enclosures premarked Exhibit 16.)
10            (Subpoena premarked Exhibit 17.)
11            (Letter dated 12/13/19 premarked
12    Exhibit 18.)
13            (Business records declaration
14    premarked Exhibit 19.)
15                 KIM DENARO,
16    Having first been duly sworn, was examined and
17    testified as follows:
18                 EXAMINATION
19    BY MR. KESHAVARZ:
20       Q.   Can you say your full name for the
21    record, please?
22       A.   My full name is Kim Louise Denaro.
23       Q.   Would you prefer to be called
24    Mrs. Denaro, Ms. Denaro?  How do you prefer it?
25       A.   Kim is fine.
```



```
 1                    K. Denaro
 2        Q.    For the court record, I need you --
 3        A.    Ms. Denaro is fine.
 4        Q.    I will do my best.
 5              Have you been known by any other
 6   name before?
 7        A.    Yes.
 8        Q.    What was your other name you were
 9   known by?
10        A.    Kim L. Wojtysiak.
11        Q.    Can you spell for the court reporter?
12        A.    Yes. It's W-o-j-t-y-s-i-a-k.
13        Q.    I want to say I appreciate usual time
14   today.  I am sorry we are starting late, and we
15   will try to make this go as quickly as
16   possible, so thank you for your time, ma'am.  I
17   appreciate it.
18        A.    You are welcome.
19        Q.    Let me go over a couple of ground
20   rules.  Have you ever had your deposition taken
21   before?
22        A.    No.
23        Q.    So the court reporter is taking notes
24   so it's important for you to verbalize answers,
25   yes or no, as opposed to shaking your head or
```



```
 1                    K. Denaro
 2    nodding your head.  Will you try to do that,
 3    please?
 4         A.   Yes, sir.
 5         Q.   If you don't understand a question,
 6    will you please ask me to rephrase it?
 7         A.   Yes.
 8         Q.   If I ask you a question and you don't
 9    ask me to rephrase it, is it reasonable to
10    believe that you understood the question?
11         A.   Yes.
12         Q.   Are you under -- this is an awkward
13    question but it's on the checklist -- are you
14    able to testify truthfully today?  I mean --
15    are you able to testify truthfully today?
16         A.   Yes.
17         Q.   You are not on any narcotics or
18    alcohol that would impair your ability to
19    testify truthfully, are you?
20         A.   No.
21         Q.   Okay.  Well, my name is Ahmad
22    Keshavarz.  I never introduced myself.  I am
23    the attorney for Plaintiff Mark Fadlevich in
24    the lawsuit in New York.  Mr. Novikoff
25    represents one of the defendants in the case,
```



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                        8

```
 1                    K. Denaro
 2    Gutman, Mintz.
 3            Do you know anything at all about
 4    this case, have any idea?
 5        A.   Well, just the research that I did.
 6        Q.   So, basically, this case is about a
 7    restraint of a bank account that my client
 8    alleges that there was exempt Social Security
 9    money in it, so we have a lawsuit against
10    Gutman, Mintz.  That's basically the
11    allegation, just generally.
12            Do you know why you are here to
13    testify?
14        A.   Yes.
15        Q.   What is your understanding of why you
16    are here to testify?
17        A.   I am here to testify as to bank
18    procedures.
19        Q.   Pointing you to the deposition
20    subpoena that you have.  It should be there.
21    It should be Bates stamped on the lower left
22    Depo 1 all the way down to Depo 47 or so, do
23    you see that?
24        A.   497 plus the extra -- I see what you
25    are saying.  Yes, 47, the first batch.  Yes,
```



```
 1                    K. Denaro
 2   sir.
 3             MR. NOVIKOFF:  Now I am getting
 4   confused.
 5             MR. KESHAVARZ:  Let me be more
 6   specific.
 7        Q.   It is what we have marked on our end
 8   as Exhibit Number 17.  It is the subpoena to
 9   testify at deposition.
10             The first page, does it say Subpoena
11   to Testify at a Deposition in a Civil Action,
12   ma'am?
13        A.   Looking at your notice of deposition?
14        Q.   Yes.
15        A.   Yes.
16        Q.   On the lower left side it is called
17   Depo 001; is that right, on the first page?
18        A.   Yes, I see 001.
19        Q.   And it goes all the way through Depo
20   047 on the bottom page; is that right?
21        A.   Yes, sir.
22        Q.   Okay.  This is Exhibit 17.
23             MR. NOVIKOFF:  Okay.  I got that in
24   front of me.
25        Q.   Turning your attention to page 6, it
```



```
 1                    K. Denaro
 2   is called Notice of 30(b)(6) Deposition of
 3   Wells Fargo.  Do you see that?
 4        A.    Page 6?
 5        Q.    Page Depo 006.
 6        A.    My WF006 is a cover letter dated
 7   November 26.
 8        Q.    No.  We are looking at a different
 9   document, the one that is the subpoena that you
10   should have gotten first -- I am not sure when
11   you got it exactly.
12        A.    The notice of deposition.
13        Q.    Now, that should go from page Depo
14   001 all the way through Depo 047.  Is that
15   right?
16        A.    No.  These were not numbered when I
17   got them.
18        Q.    That might be what you printed out
19   earlier this morning.
20        A.    What I printed out earlier was the
21   exhibits from 01 to 046, and then I've got
22   page 48 through 496.
23        Q.    Let's just look at the Depo subpoena
24   that you do have.  The eighth page of it is
25   entitled Notice of 30(b)(6) Deposition of Wells
```



```
 1                    K. Denaro
 2   Fargo.
 3        A.   Yes, sir.  I have that.  Yes, sir.
 4        Q.   Looking at that page and the next two
 5   pages, it has a list numbered 1 through 17.  Do
 6   you see that?
 7        A.   Yes.
 8        Q.   Have you seen that list before?
 9        A.   I separated my pages.  Hold on.
10   Sorry.
11        Q.   Take your time.
12        A.   I try to be organized.
13        Q.   Take your time.
14        A.   None of these are numbered.
15        Q.   That's fine.  I just want to make
16   sure we are on the same page literally.  It
17   says Notice of 30(b)(6) Deposition of Wells
18   Fargo.
19        A.   Yes, sir.
20        Q.   It is number 5 on the center, is that
21   right, page number 5 on the center?
22        A.   Yes.
23        Q.   Going through the center where it
24   says page 7, do you see that?
25        A.   No.  I don't have page 7.
```



```
 1                        K. Denaro
 2        Q.   Well, let's look at the first --
 3   let's go back to the page that says Notice of
 4   30(b)(6) Deposition of Wells Fargo.  Do you see
 5   that?
 6        A.   Yes.
 7        Q.   It should have numbered items.  On
 8   the first page it should say 1 through 8, and
 9   the second page 9 through 17.  Do you see that?
10        A.   Yes.
11        Q.   Is there a page after that that has
12   two lines?
13        A.   Two lines -- oh, yes.  I'm sorry.
14   Yes.
15        Q.   Don't be sorry at all.
16        A.   I'm very sorry.  Yes.
17        Q.   Don't be sorry at all.  It is the
18   attorney's issues of not getting to you what I
19   should have gotten to you, so don't be sorry at
20   all.
21             Have you seen these list of topics
22   before?
23        A.   This week during my research, yes.
24        Q.   Okay.  That's fine.  Did you try to
25   gather information from Wells Fargo's records
```



```
 1                     K. Denaro
 2   to be able to answer -- to know the answers to
 3   the questions 1 through 17?
 4        A.   Yes, sir.
 5        Q.   What steps did you take to try to
 6   gather that information?
 7        A.    Well, I reviewed the case number.  I
 8   went through the case comments, looked at the
 9   requests you named.  I reviewed the account,
10   how much we held, the exemptions that were
11   applied, what was held, what was released, so I
12   did see -- I did see all of that, yes.
13        Q.   And I appreciate you taking the time
14   to go through all that.  I know it probably
15   wasn't an easy thing to go through all those
16   documents, so I do appreciate you having done
17   that, ma'am.
18             Going to -- on top of the documents
19   that are numbered Wells Fargo 01 is a letter
20   dated December 13, 2019, from Wells Fargo to
21   Emma Cateribne.  Do you see that?
22        A.   Yes.
23             MR. KESHAVARZ:  For the attorney's
24   records, it is Exhibit Number 18.
25        Q.   Going through the bottom, tell me if
```



KIM DENARO                                              December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                               14

```
 1                    K. Denaro
 2   I am reading this right, the bottom of the
 3   first page.
 4              "For clarification purposes, Wells
 5   Fargo states that it opened four files
 6   relating to legal orders that are potentially
 7   responsive to the subpoena.  Below is a
 8   summary of the funds that were restrained,
 9   paid out, and returned in response to those
10   legal orders."
11              Did I read that correctly?
12        A.   Yes.
13        Q.   And it goes on to give a number, four
14   different Wells Fargo case numbers?  Do you see
15   that?
16        A.   Yes.
17        Q.   The first question is, do you know
18   why there were multiple Wells Fargo  case
19   numbers related to the restraints on my
20   client's bank account?
21        A.   Yes.
22        Q.   Why did that happen?  Can you explain
23   that to us, please?
24        A.   Because the attorney sent them in, so
25   when we receive a valid order, we process it
```



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                         15

```
 1                    K. Denaro
 2    and, you know, restrain accounts and process
 3    it.
 4         Q.   So are you saying that each -- we
 5    will go through the specific documents in a
 6    second.  I just wanted to ask a general
 7    question.
 8              Is it your understanding that each
 9    Wells Fargo case number is related to an
10    additional information subpoena and bank
11    restraint?  Is that your understanding, or do
12    you know?
13              MR. NOVIKOFF:  Objection.
14         A.   Yes.
15         Q.   Yes, that each Wells Fargo case
16    number is related to a separate information
17    subpoena and bank restraint by Gutman, Mintz;
18    is that correct?
19              MR. NOVIKOFF:  Objection.
20         Q.   Go ahead.
21         A.   Can I answer?
22         Q.   Yes, please.
23              MR. NOVIKOFF:  When Mr. Keshavarz is
24    asking questions, I may object just because of
25    the form of the question, but I have no ability
```



```
 1                    K. Denaro
 2    to tell you not to answer, and you should
 3    answer unless your attorney indicates
 4    otherwise.
 5              THE WITNESS:  Thank you.
 6         Q.  Same thing for Mr. Arthur.  He will
 7    probably object as to form, or he may not -- I
 8    don't know -- but if he does, you are still to
 9    answer the question unless he instructs you not
10    to answer.
11              MR. ARTHUR:  You could answer.
12         Q.  Let me clarify the question because I
13    don't know if I asked the best question.
14              My question is, are you saying that
15    each Wells Fargo case number listed in the
16    letter of December 13, 2009, is related to
17    separate information subpoenas and bank
18    restraints issued by Gutman, Mintz?
19              MR. NOVIKOFF:  Objection to form.
20         A.   In the letter dated December 13,
21    2019, yes.  There are four cases, and they
22    would have been opened for each different legal
23    order served by the requester.
24         Q.  Okay.  And we will go to the specific
25    documents in a second, but by legal order, do
```



```
 1                      K. Denaro
 2   you mean an information subpoena and bank
 3   restraint?  Is that what you mean by legal
 4   order?
 5        A.   Yes.  It would be -- yes, but the
 6   legal order is -- yes, that's what we call it.
 7             It's a New York information subpoena
 8   with restraint.  Yes.
 9        Q.   Thank you.  If you go to Wells Fargo
10   page 494.
11             MR. KESHAVARZ:  And for the purposes
12   of the attorneys, that is Exhibit Number 13 for
13   everyone, for the counsel, Exhibit 13, Bates
14   stamped Wells Fargo 429 to 435 is Exhibit 13.
15             MR. NOVIKOFF:  Wait.  What was the
16   Wells Fargo number?
17             MR. KESHAVARZ:  It is 429 to 435.
18        Q.   I just wanted to point your attention
19   to just page 494.
20             MR. NOVIKOFF:  Wait.  What is the
21   number?  You said 429 to 4 something.
22             MR. KESHAVARZ:  Sorry.  I apologize.
23             MR. NOVIKOFF:  Ahmad, I have no
24   problem if you just refer to the Bates stamp
25   number as opposed to an exhibit.
```



```
 1                    K. Denaro
 2            MR. KESHAVARZ:  I figured it out.
 3       Q.   So Exhibit 14 is Wells Fargo 490
 4   through 497.
 5            MR. NOVIKOFF:  Give me a second to
 6   get there.
 7       Q.   So my question to the witness
 8   specifically on page 494 --
 9            MR. NOVIKOFF:  This is Exhibit 14
10   now.  So we skipped 13.
11       Q.   Can you tell me what the entire
12   document is, the research record on down?  Can
13   you identify what that document is?  It is
14   numbered 490 through 497 on the lower right
15   side.  Can you tell us what that document is?
16       A.   490 -- well, page 490 shows basically
17   a screenshot of what we would see on our
18   computer showing the case number, showing
19   115416218, and it was served on November 21,
20   2018, and it looks to be the case history
21   comments and the amount that we held.
22   Basically, a summary of the case.
23       Q.   Are you able to tell from this
24   exhibit which -- I guess what you would call a
25   legal order -- which legal order this case
```



```
 1                    K. Denaro
 2    number is related to?
 3         A.   Which -- you mean the name of the
 4    legal order?
 5         Q.   The date of the legal order.  Are you
 6    able to tell that?
 7         A.   Yes.
 8         Q.   Which one?
 9         A.   On page 490, the issue date of this
10    legal order was November 16, 2018, and it was
11    served upon us on 11/21/2018 by certified mail.
12         Q.   Okay.
13         A.   And it's an information subpoena and
14    restraining notice.
15         Q.   Okay.  It was by certified mail.  Got
16    it.
17              MR. NOVIKOFF:  Ahmad, can I just jump
18    in?  When the witness said -- she mentioned the
19    11/21/2019 date.  What was that date again?
20    Because it says due date on this.
21              THE WITNESS:  Are you asking me?
22              MR. NOVIKOFF:  Yes, if you could just
23    explain since we are on this document.
24              THE WITNESS:  So the way that the New
25    York information subpoena and restraining
```



```
 1                    K. Denaro
 2   notices work is that when we are served with
 3   that legal order -- again, it gets entered into
 4   our system -- the computer automatically
 5   assigns a due date for a year, because these
 6   legal orders are -- if we attach an account,
 7   it's going to sweep the funds from that account
 8   for a year, so that's the due date, is the end
 9   of the sweeping, if you will.
10        Q.    What do you mean by sweeping?
11        A.    When we get a legal order in, if the
12   account is below threshold, we don't attach the
13   account, but if we do attach the account, we
14   are taking funds on that day, and as every
15   credit or deposit comes into that account, the
16   computer automatically, or system automatically
17   sweeps for the credits or deposits for a whole
18   year.
19        Q.    So are you saying that bank
20   restraint, what you call a legal order,
21   prevents the customer from getting the money
22   that Wells Fargo restrains plus any new
23   deposits; is that what you are saying?
24             MR. NOVIKOFF:   Objection.
25        A.    Correct.
```



```
 1                    K. Denaro
 2       Q.    And that restraint lasts for a year?
 3       A.    Correct.
 4       Q.    If the law firm that issued the
 5   restraint doesn't instruct Wells Fargo to
 6   release the restraint, is it Wells Fargo's
 7   practice not to release the restraint?
 8       A.    Correct.
 9       Q.    Do you know why that is?
10       A.    I don't understand the question.
11       Q.    Do you know why Wells Fargo's policy
12   is when it gets what you call a legal order to
13   restrain an account, that it keeps that
14   restraint for a year unless it receives a
15   notice from the law firm for the debt collector
16   to release the restraint?
17       A.    Because that's -- we have to follow
18   the legal order.  We have to process the legal
19   order, and New York information subpoenas with
20   restraints holds for one year, so we don't --
21   we don't just close an account or a case.  We
22   have to wait for direction from the attorney.
23       Q.    Other than direction from the
24   attorney, is there anything else that would
25   cause Wells Fargo to release a restrained
```



```
 1                    K. Denaro
 2   account?
 3        A.   Not that I'm aware of.
 4        Q.   Going to page 494, how much money was
 5   restrained in Mr. Fadlevich's bank account
 6   because of the bank restraint issued on
 7   November 16, 2018?
 8        A.   According to page 494, we held
 9   $952.19, and collected the bank fee of $125.
10        Q.   When you say you held it, does that
11   stay in Mr. Fadlevich's actual bank account, or
12   does it get moved to another account, or what
13   happens?
14             MR. NOVIKOFF:  Objection.
15        A.   It gets moved into a Wells Fargo
16   general account.
17        Q.   What is a Wells Fargo general
18   account?
19        A.   I can't explain.  It's just, you
20   know, where the funds go from these legal
21   orders.  Whatever we collect, it goes into that
22   Wells Fargo account, and we would cut checks
23   from that account.
24        Q.   Okay.  So are you saying that money
25   is actually taken out of Mr. Fadlevich's
```



```
 1                    K. Denaro
 2   account and put into a different account?  Is
 3   that what you are saying?
 4        A.   Yes, sir.
 5        Q.   And a different account at Wells
 6   Fargo; is that correct?
 7        A.   Yes, sir.
 8        Q.   And do you know if it's the name
 9   entity of Wells Fargo -- do you know if there
10   is one Wells Fargo entity and a different one
11   with a slightly different name?  Do you have
12   any idea?
13        A.   I do not know.
14        Q.   During that period of time when there
15   is a bank restraint, what you call a legal
16   order, the bank customer wouldn't see the money
17   that was taken out on his bank statement?
18             MR. NOVIKOFF:  Objection.
19        Q.   Or do you know?
20        A.   I don't know.
21        Q.   That's fine.  I mean, if you don't
22   know, just tell me you don't know.
23        A.   Yeah, I don't know.  I don't know
24   what it would look like.
25        Q.   After the $924 --
```



```
 1                    K. Denaro
 2            MR. NOVIKOFF:  952.
 3       Q.   Was it 952, ma'am?  I'm sorry.
 4            MR. KESHAVARZ:  Let me redo the
 5  question.
 6       Q.   In response from the November 16,
 7  2018, information subpoena from Gutman, Mintz,
 8  Wells Fargo moved $952.19 from Mr. Fadlevich's
 9  account to a different account at Wells Fargo,
10  correct?
11       A.   Correct.
12       Q.   Now, after the money got removed from
13  Mr. Fadlevich's account and put into Wells
14  Fargo's account, what happened to that $952.19?
15       A.   It will stay there until we pay it
16  out, or if the case is closed and released,
17  then the funds would be returned to the
18  customer.
19       Q.   But the funds wouldn't be returned to
20  the customer unless Gutman, Mintz sent the
21  letter to Wells Fargo to release the money,
22  right?
23            MR. NOVIKOFF:  Note my objection.
24       A.   Correct.
25       Q.   Did you say "correct"?
```



1                      K. Denaro

2       A.    Correct, yes.

3       Q.    Are you able to tell from your bank's

4  records whether the $952.19 was ever moved from

5  Wells Fargo's account back to Mr. Fadlevich's

6  account, or can you not tell?

7       A.    I can tell because the research that

8  I did this week shows that we released these

9  funds back to the customer.

10      Q.    Do you know when?

11      A.    It looks like we received a full

12 release on or about December 20th.  That's for

13 this case.

14      Q.    What document are you looking at?  It

15 ways WF something.

16      A.    WF494 at the bottom -- at the bottom

17 it says received for release, released the

18 1752.40 on December 20th.

19            When you look at the line above,

20 because we received a marshal levy, 16570.21

21 was moved into that marshal levy case.

22      Q.    What do you mean by "that marshal

23 levy case"?

24      A.    When we get a New York information

25 subpoena with restraints, obviously we process



```
 1                     K. Denaro
 2    it and hold the funds.  When we receive a
 3    marshal levy, that's a new legal order from the
 4    marshal that is considered a payout to this
 5    previous case that was served.
 6              So when we receive a marshal levy,
 7    we have to locate a previous case, if we had
 8    one or not.  In this case we did.
 9              We forward the marshal levy to
10    Payouts and Releases, and then they will move
11    funds from the New York information subpoena
12    with restraint case into the marshal levy
13    case.
14         Q.   Are you able to tell which case
15    number, which Wells Fargo case number, is the
16    number that it gets transferred into for the
17    marshal?
18         A.   It looks like the marshal levy case
19    is 121562418.
20              MR. NOVIKOFF:  Can you just read that
21    number back for me?
22              THE WITNESS:  The marshal levy case
23    is 121562418.
24              MR. NOVIKOFF:  Thank you.
25              THE WITNESS:  You are welcome.
```



```
 1                      K. Denaro
 2       Q.   What is the case number that it is
 3   moved from?
 4       A.   Well, the funds would be moved from
 5   the first case, the New York information
 6   subpoena with restraint.
 7            When we hold money from that
 8   particular case and we receive a marshal levy,
 9   the funds that are being held in that first
10   case get now moved into the marshal levy case.
11       Q.   What is the number for what you are
12   calling the first case?
13       A.   This case that we are looking at --
14       Q.   If you need a new record number --
15   there is more than one -- but if you are able
16   to tell from --
17       A.   That's exactly -- yeah.  These are
18   all different cases.  So it looks like it moved
19   from -- hold on.  Sorry about that.
20       Q.   Take your time.
21       A.   I thought they were all the same.
22            MR. NOVIKOFF:  It is one of those
23   questions, Ahmad, I want to jump in and answer
24   for her, but I can't.
25       Q.   Take your time, ma'am.
```



```
 1                    K. Denaro
 2        A.   It looks according to this on
 3   page 490, if this is, you know, the
 4   consecutive -- let me just see what this is.
 5             Starting at 490, it is showing the
 6   case number as 115416218, so that to me looks
 7   like -- but I see that they are different case
 8   numbers for different comments.
 9             But I see the case comments do have
10   the case numbers as well.
11        Q.   And you are looking at page Wells
12   Fargo 0494; is that right?
13        A.   Yes, sir.  I started at 490, and I am
14   looking at 494.
15        Q.   So it went into the account number
16   for the marshal -- sorry.  What was the case
17   number it moved from?  Or am I
18   misunderstanding.
19        A.   The money was moved from case number
20   115416218.
21        Q.   Okay.
22        A.   In that case -- let me back up a
23   little bit.  I apologize.  I might have messed
24   things up here.
25             On the case that was served on
```



```
 1                    K. Denaro
 2   November 21st, 2018, in that case we held
 3   $23,839.89.
 4           MR. ARTHUR:  Where are you looking
 5   at, what document?
 6           THE WITNESS:  Page 491.
 7           MR. NOVIKOFF:  491.
 8           MR. ARTHUR:  What are we looking at?
 9           THE WITNESS:  So the question was --
10   I wanted to go back because I had stated, or I
11   guess somehow I am looking at --
12           MR. ARTHUR:  Ahmad, can we get a
13   clear question?  What is the question?
14           THE WITNESS:  For me?
15           MR. ARTHUR:  I am asking counsel to
16   rephrase the question.
17           MR. KESHAVARZ:  Madam Court Reporter,
18   can you read back the last question, please.
19           (Record read.)
20           MR. KESHAVARZ:  Let me rephrase the
21   question.
22       Q.   The Wells Fargo case number for the
23   marshal ended in 418; is that right?
24       A.   Correct.
25       Q.   And what are the last three digits of
```



```
 1                       K. Denaro
 2   the Wells Fargo case number that it moved from?
 3            MR. NOVIKOFF:  Objection.  Now I am
 4   confused, Ahmad.
 5        Q.   You can answer.
 6        A.   The funds were held in case number
 7   ending in 218, and the amount that was held --
 8            MR. ARTHUR:  Where are we looking,
 9   what document?
10            THE WITNESS:  Page 491.
11        Q.   Go ahead.
12        A.   The legal amount held in case 218 was
13   $23,839.89.
14        Q.   And what happened to the $23,839?
15        A.   That -- when we receive a marshal
16   levy, that's the amount that would get moved
17   into the marshal levy case.
18        Q.   So you talked a minute ago about
19   money being removed from the customer's account
20   into the Wells Fargo general account in
21   response to a restraint; is that right?
22            MR. NOVIKOFF:  Objection.
23            MR. KESHAVARZ:  Let me rephrase the
24   question.
25        Q.   So money goes --
```



```
 1                     K. Denaro
 2           MR. KESHAVARZ:  Strike that.
 3      Q.    The question is, if there is an
 4  information subpoena with restraint for a
 5  customer's account, are you saying the amount
 6  of that restraint plus any additional deposits
 7  gets transferred from the customer's Wells
 8  Fargo account to a general Wells Fargo account?
 9  Is that correct?
10           MR. NOVIKOFF:  Objection.
11           MR. ARTHUR:  You can answer.
12      A.    Yes.
13      Q.    When you say it goes to a -- you say
14  it goes to a marshal account number?
15           MR. KESHAVARZ:  Strike that.
16      Q.    When you say it goes to the marshal,
17  what does that mean?
18           MR. NOVIKOFF:  Objection.
19      A.    Think of it like two bank accounts,
20  or two houses.  You have your information
21  subpoena with restraint, then you have your
22  marshal levy case.
23           In our system, we would move funds
24  from the first case into the second case.  Not
25  necessarily a different bank account or house.
```



```
 1                    K. Denaro
 2   It's just moving the funds because we are
 3   going to act on the marshal levy because
 4   that's a payout order.
 5            So when the bank pays out something,
 6   the money has to be under that case number so
 7   it can then be paid out.
 8       Q.   And was the $23,839 paid out to the
 9   marshal?
10            MR. NOVIKOFF:   Objection.
11       A.   No.
12       Q.   How do you know that?
13       A.   Because I did the research this week.
14   I know that in order for the funds to be
15   transferred internally, the bank has a paper
16   trail, and basically a check, literally, was
17   cut.  This is a different process that we used
18   to do.  But they would cut a check, and then we
19   would literally align it into that new case for
20   the marshal levy.
21       Q.   By align it, you just mean internally
22   Wells Fargo has a different case number?
23       A.   Correct.
24       Q.   In this case, did Wells Fargo cut a
25   check to the marshal?
```



```
 1                    K. Denaro
 2          MR. ARTHUR:  Can you ask a
 3   question --
 4      Q.   Maybe we can go to the documents in a
 5   minute, but let me just ask you the question
 6   now if you know, or if not, we will go to the
 7   specific document, which is fine.
 8          From your memory of your prior
 9   review of the document, do you remember
10   whether or not there was a check that was
11   issued to the marshal?
12      A.   Yes.
13          MR. NOVIKOFF:  I was going to object
14   to the form of that question.  I object to the
15   prior question, but go ahead.
16      Q.   How do you know that?
17      A.   Because I went through the case.  I
18   went through the cases.
19      Q.   That's fine.  Is that the document
20   you are looking at now, which I believe is --
21   well, which pages did you look at that made you
22   come to that conclusion?  Is it in front of you
23   now, or is it not?
24      A.   No, it's not in front of me now.
25          I believe it was in with the
```



```
 1                    K. Denaro
 2   subpoena records.  It is a copy of a check
 3   that is addressed to the marshal, but I don't
 4   see -- I can't put my finger on the page.
 5        Q.   That's on my list of things to do, so
 6   let me take it a little more in order, and
 7   maybe that will be helpful.
 8        A.   Okay.
 9        Q.   If you go to Wells Fargo page 151 --
10             MR. NOVIKOFF:  What exhibit is this?
11             MR. KESHAVARZ:  It is Exhibit 15.
12             MR. NOVIKOFF:  Thank you.
13        Q.   Can you identify what that document
14   is?
15        A.   Yes.  Thank you.  This is a copy of a
16   check that was issued on December 14, 2018, to
17   Ronald Moses City Marshal for case number
18   115416218.
19        Q.   How do you know it's the case ending
20   in 218?
21        A.   Because of the memo line on the
22   check.
23        Q.   Do you know if this check was
24   actually sent to the marshal?
25        A.   I do know if it was sent to the
```



1                        K. Denaro

2     marshal.

3          Q.   And was it sent to the marshal?

4          A.   No, it was not.

5          Q.   How do you know that?

6          A.   Because I know the person that

7     endorsed this check.  She is still with the

8     bank.

9               And if you see on the top of this

10    page, page 151, there's general ledger that

11    shows a credit, and this is the ticket that we

12    had to complete to transfer money from one

13    case into another, and this is the paper.

14         Q.   What about that indicates to you this

15    check that's Exhibit page 151 was not mailed to

16    the marshal?  What about that document, what

17    about the general credit ledger leads you to

18    that conclusion?

19         A.   I wouldn't know until I dug into the

20    file and knew which -- you know, what these

21    cases were.

22         Q.   Okay.

23         A.   If somebody were to -- like when I

24    was, you know, preparing for this, when we have

25    a New York information subpoena with restraint



```
 1                    K. Denaro
 2   and we ever move funds, it's because we
 3   received a New York marshal levy, so that's how
 4   I would know.
 5        Q.    When Wells Fargo pays a marshal levy,
 6   it issues and mails a check; is that how the
 7   process works?
 8        A.    When we receive the marshal levy?
 9        Q.    Yes.
10        A.    I cannot answer for what happens in
11   another department.  I don't know.
12        Q.    Well, what department was the check
13   that is Wells Fargo 151?  What department was
14   that issued from?
15        A.    I believe that's -- I don't know.  I
16   really don't know.
17        Q.    It's not your department?
18        A.    It's not my department.
19        Q.    What is your department?
20        A.    I am in the legal order processing
21   department, so I am the person that has
22   processed these legal orders.
23        Q.    So you are on the restraint side?
24        A.    Correct.
25        Q.    You are not on the side about the
```



KIM DENARO                                          December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                              37

```
 1                    K. Denaro
 2   issuing of the money to the marshal?
 3        A.   Correct.
 4        Q.   That's not part of your
 5   responsibilities?
 6        A.   Correct.
 7        Q.   What is your title there at Wells
 8   Fargo?
 9        A.   I am a team lead in legal order
10   processing.
11        Q.   Team leader in legal order
12   processing.  What do you do?
13        A.   I am one of five or six of us that we
14   just support the processors.
15        Q.   What do you mean by support the
16   processors?
17        A.   Well, the processors receive a legal
18   order, and as they are processing, they may
19   have questions or -- well, it's usually
20   questions about how to process or where to find
21   information or -- oh, gosh, it could be
22   anything.
23             But we are here to support the
24   processors in making sure these cases are
25   processed correctly.
```



```
 1                       K. Denaro
 2         Q.    You mean by those cases, you mean the
 3    information subpoenas and bank restraints,
 4    correct?
 5         A.    Correct.
 6         Q.    You don't --
 7         A.    We receive -- sorry.
 8         Q.    Go ahead.
 9         A.    We do receive -- the marshal levies
10    are received by our department, but then once
11    we forward a copy of that legal order to the
12    Payouts and Release Department, that's when I
13    don't, you know, know what they do, and I don't
14    know when they would cut a check to a marshal
15    or what their process would be.
16         Q.    When you say legal order that you
17    sent to the levy department, by "legal order,"
18    you mean the levy by the marshal; is that
19    right?
20         A.    Correct, because the marshal levy is
21    considered a payout document to that New York
22    information restraint -- New York information
23    with bank restraint.
24         Q.    What do you call that department?
25         A.    Payouts and Releases.
```



```
 1                        K. Denaro
 2        Q.    I will call it the Payout Department
 3   just for short.   Is that okay?
 4        A.    Sure.   We call it P&R.
 5        Q.    So the Payout Department, you don't
 6   work there and you don't know the process for
 7   the Payout Department, right?
 8        A.    Correct.
 9        Q.    From your work at Wells Fargo, you
10   don't know if this check was actually issued,
11   do you?
12              MR. NOVIKOFF:   Objection.   Asked and
13   answered.
14        Q.    Go ahead.
15        A.    According to my research, all of the
16   funds were returned to the customer, so I did
17   not ever see a copy of a canceled check to the
18   marshal's department.
19        Q.    Where would you check to determine
20   that?
21        A.    In our -- in our system, so you might
22   have a couple of pages.   Let's see.
23              So, for example, on Bates stamp 494,
24   you will see in the middle of the page there's
25   little tabs in the center, so I guess it's the
```



```
 1                    K. Denaro
 2    third box from the bottom where it shows the
 3    accounts tab, and it will say, just to kind of
 4    give you a direction, DDA, then JE Open, BCS,
 5    Fee Collected, Fee Released, Fee Balance,
 6    Legal Amount Collected, Legal Amount Released,
 7    so that's 17,522.40 shows that that dollar
 8    amount was released from whatever case this is
 9    related to.
10         Q.   And when you say "released," what do
11    you mean?
12         A.   It gets returned to the customer.
13         Q.   Do you know whether or not Mr.
14    Fadlevich actually had --
15              MR. KESHAVARZ:  Strike that.
16         Q.   That 17,522.40, which account would
17    it come from and which account would it go to?
18         A.   If we received a release on that
19    case, then the funds would be returned.  That's
20    why we have to move money from one case to
21    another, so when we have a release, it releases
22    the proper case.
23              So if the attorney is sending us a
24    release for a certain case, then we would
25    apply that release to that particular case,
```



```
 1                    K. Denaro
 2    and our system will show the amount that was
 3    released.
 4         Q.   When you say one case to another, you
 5    don't necessarily mean from the customer's bank
 6    account to the Wells Fargo general account, do
 7    you?
 8         A.   Say that again.
 9         Q.   Before you said when there's a bank
10    restraint, the money goes from the customer's
11    account to the Wells Fargo general account,
12    right?
13         A.   Yes.
14         Q.   And do you know whether that shows on
15    the customer's bank statement as a removal?
16              MR. NOVIKOFF:   Objection.
17         A.   I do not know.
18         Q.   When you say move from one case
19    number to another, does that necessarily mean
20    it moves between the customer's bank account
21    and Wells Fargo's general account?
22         A.   Well, no, because the funds are
23    removed during the information subpoena
24    restraint.  The funds are removed from the
25    customer's account, and they are held into the
```



```
 1                    K. Denaro
 2   Wells Fargo general account.
 3            When we receive a marshal levy,
 4   those funds -- and when we say "moved," we are
 5   allocating from one case to another.
 6            I believe -- I shouldn't answer if I
 7   don't know, but that's our process.
 8             So we have to -- in order to have
 9   accurate records, I mean, we have to show
10   where this money is being moved to, and that
11   would be allocating to this marshal levy.
12        Q.   So when --
13        A.   I don't know if it goes to a
14   different account.
15        Q.   That is what I am basically getting
16   out of this.  When you said a few minutes ago
17   money that moved from one case number to
18   another case number, you don't know if that
19   necessarily means that it moved between the
20   customer's bank account and Wells Fargo's
21   general account, correct?
22        A.   That's why I am confused, because the
23   funds were already removed on the first case
24   from the customer's account, so I don't
25   understand your question.
```



```
 1              K. Denaro
 2         MR. NOVIKOFF:  If the court reporter
 3    could just read back that answer because some
 4    of the words got a little muddled.
 5         (Record read.)
 6    Q.   So for Mr. Fadlevich, how much money
 7    was removed from his bank account and -- well,
 8    let me just ask the first question.
 9         How much money was removed from Mr.
10    Fadlevich's bank account?
11         MR. NOVIKOFF:  Note my objection.
12    A.   That answer is going to be on these
13    letters from Wells Fargo to the customer.  I
14    never added anything up.
15    Q.   That's fine.  Let's just go through
16    those letters, then.
17         MR. KESHAVARZ:  For the purposes of
18    the attorneys, I am looking at Exhibit Number
19    12, which is Bates stamped number Wells Fargo
20    0372 through 0375.
21         MR. NOVIKOFF:  Just give me one
22    second.
23         MR. KESHAVARZ:  Which I will identify
24    as research record number 144082939 with a
25    letter of November 26, 2018, from Wells Fargo
```



```
1                    K. Denaro
2    to Mr. Fadlevich.
3             MR. NOVIKOFF:  Got it.
4       Q.   My question to you, ma'am, can you go
5    to Wells Fargo 0372 through 0375, and can you
6    identify that document?
7       A.   0372 is a screenshot of the case
8    number 115416218.  That is an information
9    subpoena and restraining notice that was served
10   upon the bank on November 21, 2018.
11            Page 373 looks like -- again, it's a
12   screenshot to show the account balance, what
13   was, you know, held, listed as exempt, the
14   bank fee taken.
15            And page 374 looks like the comments
16   to the case.
17      Q.   And what is page Wells Fargo 375?
18      A.   375 is the letter to the customer
19   dated November 26, 2018, with the results of
20   that case, and it shows that the amount in the
21   account was 28,646.89, and then the amount to
22   garnishment after exemptions were applied, and
23   the bank fee was charged, was $23,839.89.
24      Q.   And you are getting that information
25   from the various account notes that start at
```



1                    K. Denaro

2       Wells Fargo page 372 and ending on Wells Fargo

3       page 374, correct?

4                    MR. NOVIKOFF:  Objection.

5            A.    Correct.

6            Q.    Let's go to the last page, 375.  Can

7       you identify what this document is?  Just this

8       one page.

9            A.    This is a page -- when we process a

10      legal order and it is entered into our system,

11      our computer sends out a customer notification

12      letter usually the next day, and that's what

13      this is; to tell the customer we received the

14      bank -- sorry -- we received the legal order,

15      and what their rights are and so forth, and

16      then what we have done to their accounts.

17           Q.    If you can read to yourself the

18      paragraph under "why I am receiving this

19      notice," read that to yourself, and I want to

20      ask you a specific question about it.

21           A.    Okay.

22                 (Pause in the proceedings.)

23           Q.    I told you the wrong paragraph.  I

24      apologize.

25           A.    Okay.



```
 1                        K. Denaro

 2        Q.   Because you know this stuff backwards

 3   and forwards.  This is my first time.

 4             Underneath it says, "What has

 5   happened to my account."  In the second

 6   paragraph "In the event your account."  Read

 7   to that yourself and then let me ask you a

 8   specific question.

 9             (Pause in the proceedings.)

10        Q.   After that paragraph, when Wells

11   Fargo tells Mr. Fadlevich "We have placed a

12   hold or removed these funds in the amount of

13   $23,839.89," my question is, what does Wells

14   Fargo mean by "placed a hold or removed"?

15        A.   Well, in this case, we have done

16   both.  We are going to remove the 23,000, and a

17   hold will be placed on their account.

18        Q.   So as of November 26, 2018, did Wells

19   Fargo both place a hold and also remove these

20   funds?

21             MR. NOVIKOFF:  Objection.

22        A.   Yes.  The hold would have been placed

23   on the 21st when that legal order was

24   processed, but yes.  This letter is telling the

25   customer what happened in their account.
```



```
 1                    K. Denaro
 2       Q.   So by the 28th, the $23,839.89 was
 3   actually removed from Mr. Fadlevich's bank
 4   account, correct?
 5       A.   Correct.
 6       Q.   And that money was then deposited
 7   into a separate account, correct?
 8       A.   Wells Fargo account.  Yes.
 9       Q.   It was deposited into the Wells Fargo
10   general account, correct?
11       A.   Correct.
12       Q.   And that's where Wells Fargo deposits
13   money that has been frozen per information
14   subpoenas and bank restraints, correct?
15       A.   Correct.
16       Q.   And that is no longer Mr. Fadlevich's
17   money when he goes into that account; is that
18   correct?
19            MR. NOVIKOFF:  Note my objection.
20       A.   Correct.
21       Q.   Just so the record is clear, because
22   there was an objection in there.
23       A.   I'm sorry.
24       Q.   Why are you sorry?  You didn't do
25   anything.  I would just ask that you pause for
```



```
 1                      K. Denaro
 2    a second between the question and the answer.
 3              So my question, again, is per the
 4    letter Bates stamped 397 when Wells Fargo told
 5    Mr. Fadlevich that it had removed these funds
 6    in the amount of $23,839.89, that was moved
 7    out of Mr. Fadlevich's bank account, correct?
 8              MR. NOVIKOFF:  Objection.
 9              MR. ARTHUR:  We were at 375, and now
10    you moved to --
11              MR. KESHAVARZ:  It is 375.
12              MR. ARTHUR:  You said something
13    different before.  Just making sure.
14              MR. KESHAVARZ:  I apologize.
15         A.   Yes.  If we are looking at page 375,
16    yes.
17         Q.   So $23,389.89 was moved from Mr.
18    Fadlevich's bank account into the Wells Fargo
19    general account, correct?
20         A.   Correct.
21         Q.   And when that happened, when the
22    $23,839.89 was moved out of his bank account
23    into the Wells Fargo general account, that was
24    no longer Mr. Fadlevich's money; is that
25    correct?
```



1            K. Denaro

2            MR. NOVIKOFF:   Objection.

3      A.   Correct.

4      Q.   Whose money is it at that point, if

5  you know?

6      A.   Well, it belongs to this legal order.

7  That is why it is attached, and that's why we

8  use the words that we use, but the 23,000 would

9  be allocated to this legal order that we are

10  talking about.

11      Q.   On the same exhibit on Wells Fargo

12  372, are you able -- it says that the issue

13  date was 11/26/2018.  That was the date of

14  Gutman's information subpoena and bank

15  restraint, correct?

16      A.   No.  I am seeing a different date.

17  Are you on page 372?

18            MR. NOVIKOFF:   Yes.  Where are you

19  referring to, Ahmad?

20            MR. KESHAVARZ:   Where it says case

21  detail in the center, additional case detail.

22      Q.   What does that issue date of

23  November 16, 2018 mean?

24      A.   That is the date on the legal order

25  served by the attorney.



```
 1                      K. Denaro
 2        Q.   So that was the date on the
 3   information subpoena and bank restraint,
 4   correct?
 5        A.   Correct.
 6        Q.   And then further up where it says due
 7   date November 21, 2019, that means that you
 8   would hold Mr. Fadlevich's $23,839.89 until you
 9   get a letter from Gutman telling Wells Fargo to
10   return the money, correct?
11             MR. NOVIKOFF:   Objection.
12        A.   Actually, in this case we would
13   either hold the money until we received a
14   release from the attorney, or we receive a
15   court's order to turn over the funds.
16        Q.   Those are the only two circumstances
17   in which you would have returned the
18   $23,839.89, correct?
19             MR. NOVIKOFF:   Note my objection.
20        A.   Correct.
21        Q.   I want to turn your attention to
22   Wells Fargo document 026.  It is Exhibit Number
23   2, a letter of Wells Fargo dated December 11,
24   2018, from Wells Fargo to Mr. Fadlevich.
25             MR. NOVIKOFF:   026?
```



```
 1                    K. Denaro
 2          MR. KESHAVARZ:  Yes, sir.
 3          MR. NOVIKOFF:  What exhibit is this?
 4          MR. KESHAVARZ:  Exhibit 2.
 5          MR. NOVIKOFF:  Exhibit 2.  Okay.
 6      Q.   Let me know when you are at that
 7  Bates stamp number, ma'am.
 8      A.   I am there.
 9      Q.   Can you identify what this document
10  is?
11      A.   This is a letter to the customer from
12  Wells Fargo informing them that we received
13  another legal order dated December -- on
14  December 10 we received it, and the legal order
15  amount was in the amount of 17,522.40, and it
16  will show that we withdrew $952.19 from the
17  customer's account.
18      Q.   Page Wells Fargo 026 demonstrates
19  that Wells Fargo took $952.19 out of Mr.
20  Fadlevich's bank account on or about
21  December 11, 2018, correct?
22      A.   Well, the restraint would have been
23  December 10th.  If we receive it on the 10th,
24  we are going to process it and freeze the
25  account on the date that we receive it.
```



```
 1                    K. Denaro
 2        Q.   Are you able to tell from this letter
 3   Bates stamped 026 when the amount of 952.19 was
 4   taken out of Mr. Fadlevich's bank account?
 5        A.   When it was taken out?
 6        Q.   Yes.
 7        A.   It says in the letter we withdrew
 8   952.19 from your account on December 11th.
 9        Q.   Thank you.  I guess I could have just
10   read that myself and had the answer.  I
11   apologize.
12        A.   A trick question.
13        Q.   So my question is, did that $952.19
14   go from Mr. Fadlevich's account to Wells
15   Fargo's general account?
16        A.   Correct.
17        Q.   On December 11, 2018, when the 952.19
18   went from Mr. Fadlevich's account to Wells
19   Fargo's general account, that money was no
20   longer Mr. Fadlevich's money, correct?
21             MR. NOVIKOFF:  Note my objection.
22        A.   Correct.
23        Q.   If you turn your attention to page
24   Wells Fargo 089 through 090, it is Exhibit
25   Number 3, a letter from Wells Fargo dated
```



```
 1              K. Denaro
 2   December 12, 2018, to Mr. Fadlevich, can you
 3   let me know when you get there, ma'am.
 4          MR. NOVIKOFF:  What exhibit number is
 5   that?
 6          MR. KESHAVARZ:  3.
 7          MR. NOVIKOFF:  Can you repeat the
 8   Bates number, please, Wells Fargo Bates number?
 9          MR. KESHAVARZ:  Wells Fargo 089
10   through 090.
11      Q.   Do you recognize what this document
12   is?
13      A.   Yes.
14      Q.   What is this document?
15      A.   This is a letter to the customer
16   dated December 12.  It is an amended letter, it
17   says at the top.  This is letting the customer
18   know, again, what we have done in his account,
19   and it just shows down below the account
20   summary as of December 12, the account number
21   in question is 0848, the amount in the account,
22   the amount that was protected, and the amount
23   subject to the garnishment was 952.19.
24      Q.   On the bottom of 089 where it says
25   amount protected is $1,562, do you know how
```



1                  K. Denaro

2    Wells Fargo determined that amount is the

3    protected amount?

4         A.    Yes.  In that case, this was his

5    payment, a deposit made by Social Security

6    Administration, and that's why the amended

7    letter went out.

8              When I looked at this case, case

9    number 2418 -- so New York is funny, very

10   funny.  They offer a state exemption.  When

11   the state exemption is higher than the

12   federally-exempted funds, we are to apply the

13   higher amount to the customer, the greatest

14   protection.

15             In this case, the processor didn't

16   enter in that $1,562 into the federally exempt

17   box in our computer.

18        Q.    How do you know that?

19        A.    Because we run a report the next day,

20   the bank runs a report, and we get the report,

21   and it will tell us if we have missed any

22   federally-exempt funds in a case.

23             In this case, it was on the report.

24   We reviewed the case and determined that yes,

25   the processor failed to enter in that dollar



1                        K. Denaro

2      amount; however, it didn't apply because we

3      took the greater, the higher, state exemption

4      for this customer, but the letter still needed

5      to be generated to the customer just to let

6      them know we did protect that dollar amount.

7           Q.   And Wells Fargo knew to protect that

8      dollar amount because it saw that the deposit

9      came from the Social Security Administration?

10          A.   Correct.

11          Q.   When Wells Fargo sees deposits coming

12     in from the Social Security Administration, are

13     you saying it is Wells Fargo's policy not to

14     restrain that account?

15          A.   If the -- no.  If the account is

16     below threshold, we do not restrain the

17     account, but we apply the greater of the two.

18               So in this case, I believe at this

19     time the state exemption was about 2,000.  I

20     don't have my numbers in front of me, but it

21     was about $2,000.

22               So according to our procedures, we

23     apply the higher exemption, which in this case

24     would have been the state exemption, but we

25     are also to enter in the dollar amount as the



1                       K. Denaro

2    federally-exempt protected funds.

3             In this case, the processor did not

4    put -- there was no impact to the customer

5    because that $1,562 is not applied in this

6    case because the state exemption was higher.

7        Q.   Thank you.

8        A.   You are welcome.  It's confusing.

9        Q.   Every time I've got New York's

10   restraint law, it doesn't make a ton of sense

11   to me either.

12            So per this letter that is Wells

13   Fargo 089, $952.19 actually was removed from

14   Mr. Fadlevich's account?

15            MR. NOVIKOFF:  Objection.

16       A.   Correct.

17       Q.   And that was moved from Wells

18   Fargo --

19            MR. KESHAVARZ:  Strike that.

20       Q.   That was moved from Mr. Fadlevich's

21   bank account to Wells Fargo's general account,

22   correct?

23       A.   Correct.

24       Q.   And at that point, that money is no

25   longer Mr. Fadlevich's money, correct?



```
 1                    K. Denaro

 2           MR. NOVIKOFF:  Same objection as

 3   before.

 4      A.    Correct.

 5      Q.    Moving on down --

 6           MR. NOVIKOFF:  When you get to a

 7   natural break, can we take a five-minute break?

 8           MR. KESHAVARZ:  We can do that right

 9   now.

10           (A recess was taken.)

11      Q.    Ma'am, if you look at what we are

12   calling Exhibit 5, it is Bates stamped Wells

13   Fargo 328 to 329, a letter of January 8, 2019

14   from Wells Fargo to Mark Fadlevich.  Please let

15   me know when you are done -- when you get to

16   it.

17      A.    I am at it, yes.  I am looking at it.

18      Q.    If you go to -- actually, why don't

19   you read the letter to yourself, and then let

20   me ask you specific questions about it.

21      A.    Okay, very good.

22           (Pause in the proceedings.)

23      Q.    Look to the next to last paragraph on

24   the first page on Wells Fargo 328, Exhibit 5.

25   Tell me if I am reading this correctly
```



```
 1                    K. Denaro
 2   beginning on the second line.  "As required by
 3   law, we placed a hold and removed funds in the
 4   amount of $23,839.89 and had to turn over these
 5   funds to your creditor as directed by the
 6   garnishment order.  Since we didn't receive a
 7   fax to release the funds to you, check number
 8   1671904 in the amount of $16,570.21 was mailed
 9   to the City Marshal Ronald Moses on
10   December 13, 2018."
11              Did I read that correctly?
12        A.   Yes.
13        Q.   Are those statements true?
14              MR. NOVIKOFF:  Objection to the form.
15              Go on.
16        A.   No.
17        Q.   In what way?
18        A.   So the first thing that sticks out is
19   "since we didn't receive a fax to release funds
20   to you."  We would not ask the customer to send
21   in a release, so I don't understand what that
22   says, means.
23              The check number 1904 it says was
24   mailed to the city marshal, but I made the
25   same mistake when I was going through and
```



```
 1                        K. Denaro
 2    doing this research, to be honest, because the
 3    way that we fax that, it is made payable to
 4    the city marshal, but that's only -- we don't
 5    send it out.  That's only to move the funds
 6    from one case to another, and that's the New
 7    York marshal levy case, is Ronald Moses.
 8         Q.   Can you think of any reason why
 9    Mr. Moses's account notes would say that he
10    received a check from Wells Fargo in the amount
11    around $16,570.21?  Do you have any idea why
12    his notes would say he received that?
13              MR. NOVIKOFF:  Objection.  There's no
14    note that says that to my knowledge, is there?
15              MR. KESHAVARZ:  Yes.
16         A.   Well, can you show me where it says
17    that?
18         Q.   Yes.  It is the marshal's notes, but
19    let me ask you a question.  One second.
20              Let me correct that, and maybe you
21    don't know.  I am just asking you.
22              If Ronald Moses's account notes say
23    that on December 11, 2018, sole check amount
24    held, $23,964.89 --
25              MR. NOVIKOFF:  Where are we looking?
```



```
 1                    K. Denaro
 2           You are reading from a document,
 3    Ahmad, and with all due respect, your first
 4    question said he received a check for $16,000
 5    according to his notes, and that is nowhere in
 6    the notes.
 7           We have been getting along pretty
 8    well, but I think now you may be --
 9       Q.   Well, let me ask you this:  If his
10    accounts notes -- whatever his account notes
11    say, let me ask you, if his account notes say
12    that on December 11, 2018, he had a check in
13    the amount held of $23,964.89, can you think of
14    any reason why that would be?
15           MR. NOVIKOFF:  Objection on many
16    levels, but I can't tell her not to answer.
17       Q.   Go ahead.
18       A.   I don't know what you are looking at
19    so I can't -- I am blind.  If you want to point
20    me to what you are looking at.
21       Q.   If his account notes say that, do you
22    have any idea why that might be?
23           MR. NOVIKOFF:  Same objection.
24       A.   Whose account notes?  I have no idea.
25       Q.   Hold on for one second.
```



```
 1                    K. Denaro
 2             (Pause in the proceedings.)
 3        Q.   Let me read the next sentence.
 4   "Please contact Gutman, Mintz Baker &
 5   Sonnenfeldt LLP with any and all attempts to
 6   regain the funds as they are no longer in our
 7   possession as they have been paid out in direct
 8   response to the legal order."
 9             Is that statement true?
10             MR. NOVIKOFF:  Note my objection to
11   the form.
12        A.   My research did not show that this
13   check was ever sent out to the marshal.
14        Q.   Okay.  Is there a document that you
15   could point me to that is the basis of your
16   conclusion?
17             MR. NOVIKOFF:  Note my objection.
18        A.   Just what I went through -- when I
19   went through the cases, this check that we
20   have, the check number 1671904, is the only
21   check that I saw in any of these cases that was
22   addressed to the marshal, and it was an
23   internal transfer, so I did not see any other
24   checks paid out on any other case.
25             All the funds were released back to
```



                          K. Denaro

1

2    the customer in every single case, except for

3    the bank processing fees.  The processing fees

4    are not refunded.

5         Q.   What did you mean by internal

6    transfer?

7         A.   This check that was signed, the

8    check -- because, remember, we were talking

9    about the case, the information subpoena with

10   restraint case, we have to -- at that time we

11   cut a check, and that was transferred into that

12   new marshal levy case.  This is the only check

13   that I saw in any of my research.

14        Q.   When you say -- I guess I am trying

15   to figure out.  When you said money is going

16   from one case to another, internally, that's

17   how Wells Fargo keeps track of the restraint

18   and the money?  That doesn't mean money is

19   physically moved from one account to another;

20   is that right?

21        A.   No, not moved from an account.  It is

22   moved from a case because we have to transfer

23   the money from the information subpoena with

24   restraint into that marshal levy case, and then

25   we wait for further instructions.



```
 1                      K. Denaro
 2      Q.   I guess what I am trying to figure
 3   out is, from one case to another, is it the
 4   bank's internal reference to what that money
 5   is, right?
 6           MR. NOVIKOFF:  Note my objection.
 7           MR. ARTHUR:  Can you answer the
 8   question?
 9           THE WITNESS:  I believe so.
10           MR. ARTHUR:  Does he need to rephrase
11   the question?
12           THE WITNESS:  Sure.  Let's have him
13   rephrase it, please.
14           MR. KESHAVARZ:  I object to an
15   objection other than objection to form, so let
16   me just ask the question.  We are all trying to
17   get to the same information.
18      Q.   My understanding is that when there
19   is a restraint, there is one Wells Fargo
20   account case number, and when there's a levy,
21   there is a separate Wells Fargo case number,
22   correct?
23      A.   When that marshal levy case comes in,
24   yes, it has a new case number.
25      Q.   Okay.  And when you say money is
```



```
 1                      K. Denaro

 2   transferred between the case number, are you

 3   saying just in the internal records of Wells

 4   Fargo of their case numbers that Wells Fargo

 5   just keeps track of that same money in a new

 6   case number?  Is that what you mean?

 7            MR. NOVIKOFF:  Objection.

 8        A.   Correct.  Sorry.

 9        Q.   Why are you sorry?  You haven't done

10   anything --

11        A.   I keep answering too quick.

12            MR. NOVIKOFF:  I am not offended.

13        Q.   Take your time.  Basically, my point

14   in all this is, even though Wells Fargo

15   transfers the case number from a restraint case

16   number to a levy case number, that doesn't

17   necessarily mean that money is actually moved

18   from the Wells Fargo general account to another

19   account, does it?

20            MR. NOVIKOFF:  Objection.

21        A.   I do not have any -- I don't know.  I

22   can't answer that.

23        Q.   So this is what I am trying to get

24   at:  This check issued to the marshal --

25            MR. NOVIKOFF:  I am going to object
```



1                        K. Denaro

2    to the form, but finish the question, because I

3    think -- again, I don't want to speak, Ahmad,

4    but I think this witness has said the check was

5    never, according to her investigation, it was

6    never sent to the marshal, so when you say

7    issued to the marshal, that's my problem with

8    the question.

9              MR. KESHAVARZ:  That's fine.

10             MR. NOVIKOFF:  Okay.  I know.

11        Q.   What I don't understand is, a check

12   is physically issued from Wells Fargo in the

13   name of the marshal, right?

14             MR. NOVIKOFF:  Objection.

15        A.   Correct.

16        Q.   I don't understand what you mean --

17   Wells Fargo is just applying a different case

18   number to that the check.  Is that what you are

19   saying, or am I misunderstanding?

20        A.   The funds have to be removed from one

21   case and go into the other case, and back then

22   in 2018, this was the process that they did.

23        Q.   I guess what I am trying to figure

24   out is, it is Wells Fargo's accounting method

25   to change from one case number to another when



```
 1                    K. Denaro

 2    it gets a restraint to a levy, right?

 3        A.   Well, they are two different animals

 4    because, again, the marshal levy is a payout

 5    order, so the money has to be somehow

 6    allocated, transferred, however you want it

 7    assigned, however you want to say it, to that

 8    marshal levy case, because that way when we get

 9    a turnover, we are going to have the right case

10    number and it's going to have the correct

11    dollar amount in it.

12        Q.   Is there anything else in Exhibit 5,

13    pages 328 to 329, that is not accurate other

14    than what we talked about?

15            MR. NOVIKOFF:  Note my objection.

16        A.   I am just looking at it real quick.

17    Other than those two items, the letter looks to

18    be correct to me.

19        Q.   Why does the letter direct Mr.

20    Fadlevich to contact Gutman, Mintz as opposed

21    to the marshal?

22        A.   That I don't know.

23        Q.   Do you know who created this letter?

24    Who is Trina Gomez?

25        A.   I don't know who that is.
```



1                        K. Denaro

2        Q.    You don't know?

3        A.    I do not know her.

4        Q.    Operations Complaint Management

5   Executive Office, that's a different division

6   than where you are working?

7        A.    Correct.

8        Q.    Do you know, other than what the

9   title suggests, do you know what that division

10  does?

11       A.    Well, yes, just looking at the title.

12  No, I don't.

13       Q.    Other than what it says, you don't

14  know.  Okay.  That's fine.

15            Physically, where is that check in

16  the name of the marshal?  Physically, where is

17  it now, if you know?

18            MR. NOVIKOFF:  Objection.

19       A.    I have no idea.

20       Q.    When it was physically written, what

21  happened to the physical check?  I mean, it's

22  not just a scanned document.  There is a

23  physical check that existed somewhere.

24            MR. NOVIKOFF:  Objection.

25       Q.    Is that right?



```
 1                        K. Denaro

 2        A.    I have no idea.

 3        Q.    I want to turn your attention to

 4   Exhibit 7, Bates stamped Wells Fargo 376,

 5   letter February 25, 2019, from Wells Fargo to

 6   Mr. Fadlevich.

 7              Please read Exhibit 7 to yourself

 8   and let me know when you are done.

 9              (Pause in the proceedings.)

10        A.    Yes, I read it.

11        Q.    Now, are the statements in Exhibit 7,

12   Bates stamped Wells Fargo 376, are those

13   statements true?

14              MR. NOVIKOFF:  Note my objection.

15        A.    No, not everything is true.

16        Q.    What in the letter is not true?

17              MR. NOVIKOFF:  Same objection.

18        A.    In the first full paragraph where it

19   says for case number 115416218, if you go down

20   to the fourth line, an exemption amount of

21   3,120 was applied to the account ending in 0848

22   due to federal benefits.  That is not correct.

23        Q.    In what way?

24        A.    The 3,120 is actually a state

25   exemption.
```



1                   K. Denaro

2       Q.   So the thing that is wrong, it calls

3    it a federal exemption when it was, in fact, a

4    state exemption; is that what you are saying?

5       A.   Correct.

6       Q.   Is there anything else in the letter

7    that is incorrect?

8       A.   Yes.  In the last sentence of that

9    paragraph, it says on December 13, 2018, we

10   sent a check to Ronald Moses, City Marshal, in

11   the amount of.  That's not accurate.

12       Q.   Is the next sentence accurate, "We

13   are still holding 7269.68"?

14       A.   At that time, yes.  My research

15   showed me that, yes.

16       Q.   Your knowledge about what happened in

17   this case as to the restraints as to Mr.

18   Fadlevich, is that based only on the documents

19   that Wells Fargo has, or is that based on

20   something else?

21           MR. NOVIKOFF:  Objection to the form.

22       A.   Could you repeat that question?  I'm

23   sorry.

24       Q.   Sure.  I mean, is your conclusions

25   based on your research based only on the



```
 1                     K. Denaro

 2   document, or is it based on something else?

 3              MR. NOVIKOFF:  Same objection.

 4       A.    No.  This is based on my research.

 5       Q.    But is the research anything other

 6   than the documents that Wells Fargo has?

 7              MR. NOVIKOFF:  Objection.

 8       A.    Not -- I mean, no, because my

 9   research is done, you know, through our

10   computer system.

11       Q.    What I am trying to get at --

12       A.    So --

13              MR. NOVIKOFF:  Let him finish.

14       Q.    Go ahead.  Finish.  I didn't mean

15   to --

16       A.    I was just saying to try to be as

17   thorough as possible I went through our system

18   for each case and the correspondence and the

19   comments, so my conclusion is based on my

20   research this week.

21       Q.    I guess what I'm trying to basically

22   get at is, is your research also based on

23   conversations you have had with anyone?

24       A.    No.

25       Q.    And you don't have any personal
```



```
 1                      K. Denaro
 2    knowledge about what happened; it is just based
 3    on your review of the documents?
 4         A.    Correct.
 5         Q.    How long was Wells Fargo holding the
 6    7,269.68?
 7         A.    My research shows that it was
 8    released, I believe, in May.
 9         Q.    What year?
10         A.    Of 2019.
11         Q.    And that research, that goes in the
12    Wells Fargo case number, I guess I am calling
13    it, account notes?  Is that where you are
14    getting it from?
15         A.    The account notes -- correct.
16    Actually, it's the account notes because, if
17    memory serves me, the attorneys served another
18    legal order.  They served another legal order
19    in March, and then we ultimately received --
20    excuse me -- returned these funds to the
21    customer in May so the March case -- again,
22    because there's a one-year freeze on the
23    account -- our computer swept those funds back
24    up.
25              But they were released, I believe,
```



1                      K. Denaro

2       in May of 2019.

3            Q.   And the reason -- whatever the date

4       is, the reason that money was released back to

5       Mr. Fadlevich was because of a letter from

6       Gutman, Mintz; is that right?

7                 MR. NOVIKOFF:   Objection.

8            A.   That I don't know.

9            Q.   How would you determine the reasons

10      why money was released back to Mr. Fadlevich?

11           A.   So in one of the cases, there was a

12      comment that said, simply, you know, these

13      funds in the amount of 7200 and change were to

14      be refunded or transferred to -- well, I'm

15      sorry.  Can I get my note?

16           Q.   I was about to suggest.

17                MR. NOVIKOFF:   I was going to ask her

18      that so we might as well get right to it.

19           Q.   I think they are --

20           A.   It's in the case.  It's in the case

21      note, and it says --

22           Q.   What is the Bates stamp number you

23      are looking at?

24           A.   No.  It's just in my research.  I

25      can't put my fingers on it.  I would have to go



KIM DENARO                                      December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                            73

```
 1                       K. Denaro
 2   through case notes.
 3           But case notes did say clearly
 4   somebody reviewed, but I don't know what
 5   instigated the review.
 6        Q.   That's fine.  So the case notes that
 7   you are looking at that you are about to answer
 8   it, do those have a stamp as a Wells Fargo
 9   document?
10        A.   I would have to go through these 400
11   pages to see exactly what -- yeah.  I don't
12   know what -- I know it was in a case note.
13           MR. NOVIKOFF:  Ahmad, I would be
14   asking the same question so we might as well
15   just get to that document now.
16           MR. KESHAVARZ:  That's exactly what I
17   am trying to do.
18           MR. NOVIKOFF:  She should take
19   whatever time she needs to find that document.
20        Q.   Why don't you look at Wells Fargo
21   pages 429 to 435, which has been marked as
22   Exhibit 13, and when you get there, tell me
23   what that document is.
24        A.   I am sorry.  420?
25        Q.   472 -- give me one second.  Let me
```



```
 1                        K. Denaro

 2    pull up the document.  Maybe I will email this

 3    separate.

 4                MR. NOVIKOFF:  Have we looked at

 5    Exhibit 13 yet?

 6                MR. KESHAVARZ:  I don't know.

 7        Q.    According to my notes, Exhibits 12,

 8    13, and 14 are the various account notes.

 9                MR. NOVIKOFF:  Well, we have

10    Exhibit 14, and we have Exhibit 12.  I don't

11    see Exhibit 13 being introduced yet.

12        Q.    Why don't you pull out Wells Fargo

13    pages 372 to 375.  Can you tell me what those

14    pages are?

15                MR. NOVIKOFF:  I believe those were

16    part of a prior exhibit.

17                MR. KESHAVARZ:  I think that's

18    Exhibit 12.

19                MR. NOVIKOFF:  Let me just check.

20    Yes, that is Exhibit 12.

21        Q.    Can you identify what that is, ma'am?

22        A.    Yes.  372 is -- starts with a case

23    detail page for information subpoena and

24    restraining notice served on the bank on

25    November 21, 2018.
```

```
 1                     K. Denaro
 2         Q.   Do you have a pen there?
 3         A.   I do, yes.
 4         Q.   Can you just mark that as number 12?
 5    Because I am going to put that aside, those
 6    four pages.
 7              MR. NOVIKOFF:  372 to 375 we are
 8    putting aside now?
 9              MR. KESHAVARZ:  As Exhibit 12.  I
10    just have want to have all of the record
11    searches account notes together.
12         Q.   If you look at pages 429 through 435,
13    Exhibit 13.
14              MR. NOVIKOFF:  This is a new exhibit
15    that is coming in?
16              MR. KESHAVARZ:  I don't know if it's
17    new.
18              MR. NOVIKOFF:  It is.  429 to what?
19              COURT REPORTER:  435.
20              MR. NOVIKOFF:  This has not been
21    looked at yet.
22         Q.   Are these one of the sets of case
23    notes you looked at?
24         A.   No.
25         Q.   Have you seen those documents before?
```



```
 1                        K. Denaro
 2        A.   Well, only in our computer.  I mean,
 3   again, my research was done in the computer,
 4   not on paper.
 5        Q.   Do you know if Exhibit 13 was one of
 6   the -- I know it is on the computer screen, but
 7   do you know if what we said is Exhibit 13,
 8   pages 429 through 435, is the information that
 9   was on the screen that you based your testimony
10   on?
11             MR. NOVIKOFF:  Objection.
12        A.   No, I don't -- I don't see anything
13   in here.
14        Q.   Have you seen that document before, I
15   mean, even on the screen?
16        A.   Well, I must have because I went
17   through all the cases.
18        Q.   Those pages, 429 through 435, can you
19   just mark it on your end just as number 13 so
20   we can all be on the same page?
21             And then the third research record I
22   have is Exhibit 14.  On your end, it's Wells
23   Fargo 490 through 497.
24             MR. NOVIKOFF:  We have gone through
25   that one, but I'm pulling it out.
```



KIM DENARO                                          December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                                 77

```
 1                     K. Denaro
 2        A.    490 through what?
 3        Q.    497, if you could just write
 4   Exhibit 14 on the first page so we can keep
 5   them all straight.
 6              Now, it says on the top Research
 7   Record.  Is this what you were thinking about
 8   when I was saying account notes?
 9              MR. NOVIKOFF:  Objection.
10        A.    Yes.  I don't see the research
11   record.  You know, it doesn't look like what I
12   look at on the computer.
13        Q.    Well, the reason I say research
14   record is on the top of Exhibit 14, Exhibit 13,
15   and Exhibit 12, it all says Research Record.
16   Do you see that?
17        A.    Yes, I do see that.
18        Q.    Is the information that is
19   Exhibit 12, 13, and 14 the information that you
20   would have reviewed in preparation for your
21   testimony today?
22        A.    Yes.  I reviewed all of this, yes.
23        Q.    And each one of these are research
24   records, so each of them are different --
25              MR. KESHAVARZ:  Strike that.
```



```
 1                    K. Denaro

 2        Q.   When it says on the top of any one of

 3   those research records, where it says customer

 4   number, is that the case number, or where is

 5   the case number?

 6             MR. NOVIKOFF:  Objection to the form.

 7             You can answer.

 8        A.   In the middle of page 490 where it

 9   says for our case 115416218, you will see

10   directly below that it says case number, and

11   that's a matching case number, so that is what

12   we would go by as far as case number.

13        Q.   If you look at the top on the right,

14   the very first column, very first row says UW

15   ID numbers and has a series of numbers.  Are

16   those the Wells Fargo case numbers?

17        A.   I don't know what those numbers are.

18   Our case numbers end in the year, so, for

19   example, this case that we are looking at was

20   in 2018, so those case numbers, we haven't hit

21   2036 yet, and we are well past 2000, so I don't

22   know what those case numbers are.

23        Q.   But is that a case number, UW ID?

24   Are those case numbers?

25        A.   I have no idea.  I am not familiar
```



1                        K. Denaro

2    with them.

3         Q.    All right.  Well, is the information

4    that is listed on Exhibits 12, 13, 14, the

5    information that you would have looked at for

6    preparation for your testimony today?

7              MR. NOVIKOFF:   Objection.  Asked and

8    answered.

9         A.    Yes.

10        Q.    Let's get to this issue of the

11   marshal's check.  Where in Exhibits 12, 13, or

12   14 -- is there anything in there that is the

13   basis of your idea, of the testimony, that a

14   check was never mailed to the marshal?  Is

15   there anything in those documents that is the

16   basis of your opinion?

17             MR. NOVIKOFF:   Note my objection.

18             You can answer.

19             MR. ARTHUR:   What documents are we

20   talking about, again?

21             MR. KESHAVARZ:   Exhibits 12, 13, and

22   14.

23        A.    No.  My opinion is based on my

24   research.

25        Q.    This is basically what I am getting



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                          80

```
 1                      K. Denaro
 2    at.  Your research is all based on documents
 3    that Wells Fargo has, right?
 4              MR. NOVIKOFF:  Objection.
 5         A.   I don't know.  I mean, I go by the
 6    computer.  I don't -- I didn't look at these
 7    document until today, so I am going by the
 8    computer.
 9         Q.   Basically, what I am trying to get at
10    is that you say your testimony about whether
11    the Wells Fargo -- the check to the marshal was
12    ever mailed or cashed is based on your review,
13    your research for today's deposition, right?
14              MR. NOVIKOFF:  Objection.
15         A.   Yes.
16         Q.   I am just trying to find out what the
17    screen, that piece of paper or that screen,
18    said something that led you to that conclusion?
19              MR. NOVIKOFF:  Objection to the form.
20    She answered that repeatedly.
21              But once again, you can answer.
22              Plus the form of the question is
23    improper.
24         Q.   Go ahead.
25         A.   So for each case -- there are four
```



                              K. Denaro

 2   cases -- I just went right down the line, and I

 3   looked at the entire case.  I looked at the

 4   funds that were held, the exemption applied.

 5           I did look for any kind of checks,

 6   and the computer will tell me if there were

 7   any checks that were issued.

 8           The only check that was issued is

 9   this check number 1671904, and that was the

10   only check that transferred funds from the

11   information subpoena with restraint into the

12   marshal levy case.

13       Q.   Okay.

14       A.   I also reviewed every case to make

15   sure that the funds were released, and I

16   concluded that we didn't owe, you know, any

17   money to the customer, so that was a good

18   thing, but I looked at the whole case, each.

19       Q.   What I am trying to figure out, what

20   you looked at that I can look at, and I'm not

21   sure -- when you look at the screen, what are

22   you looking at?  Is there something that it is

23   called?

24       A.   Well, essentially --

25           MR. NOVIKOFF:  Hold on.  Note my



```
 1                      K. Denaro
 2    objection.
 3              You can answer.
 4        Q.   Go ahead.
 5        A.   Essentially, that's what we are
 6    looking at.  This screenshot is what we look
 7    at.
 8        Q.   So Exhibits 12, 13, and 14 is the
 9    information that you would be looking at that
10    led to your conclusion that the check was never
11    mailed or cashed by the marshal; is that
12    correct?
13              MR. NOVIKOFF:  Objection.
14              You can answer.
15        A.   No.  To answer your question, I had
16    to dig, because when I found this -- when I
17    found a copy of the check, I had to then dig to
18    find out if, in fact, it was ever mailed to the
19    marshal.
20              I determined that no, it wasn't
21    mailed to the marshal.  That was the only
22    check issued.
23        Q.   Was that something on a computer
24    screen that you saw?
25              MR. NOVIKOFF:  Objection.
```



```
 1                       K. Denaro

 2          A.   No.  It was not -- no.  Because once

 3    this check was explained to me, because I went

 4    to the person that did the payouts and

 5    releases -- excuse me.  Not the payouts and

 6    releases -- but the person who signed this

 7    check who endorsed the check to move the funds,

 8    I went to her and asked her about this check so

 9    I could be certain with my answers to you

10    today.

11          Q.   Who is that person?

12          A.   Her name is Susana Pacheco.

13          Q.   Can you spell?

14          A.   P-a-c-h-e-c-o.

15               MR. ARTHUR:  Her name is on the check

16    document, correct?

17               THE WITNESS:  Correct, yes.

18          Q.   So is your basis that the check was

19    never mailed or cashed based on your

20    conversation with her, or is it based on

21    anything else?

22               MR. NOVIKOFF:  Objection.  Asked and

23    answered repeatedly.

24               You can answer.

25          A.   It is based on my review of the
```



```
 1                    K. Denaro

 2    computer, because this was the only check that

 3    I saw was ever cut relating to any one of these

 4    cases.

 5         Q.    When did you speak with Ms. Pacheco?

 6         A.    Tuesday.

 7         Q.    What did Ms. Pacheco tell you?

 8         A.    Well, I asked her, you know, about

 9    this check and if she could explain the process

10    to me back then, and that's exactly what she

11    did.

12              She said that when they hold money

13    in the information subpoena with restraint

14    case, and we get a new marshal levy case, in

15    their way to move or transfer or allocate,

16    this physical check was printed, and then

17    there's a ticket that is completed at the top,

18    and it says general ledger on it, and it is

19    part of our ticket.  The manager, Sandy

20    Griffin, signed it and approved it, and that

21    allowed the funds to be moved from the

22    information subpoena case into the marshal

23    levy case.  That was their procedure.

24              I think it has changed since then.

25         Q.    What else did she tell you?
```



```
 1                          K. Denaro
 2       A.    That was it.  That's all I asked her.
 3       Q.    When you say it was your conclusion
 4    that the check wasn't mailed or cashed, when
 5    you say it is also based on your review of the
 6    computer, is that because the computer -- I
 7    guess what I trying to figure out is what about
 8    what you saw on the computer was part of that
 9    conclusion?
10            MR. NOVIKOFF:   Objection.
11       A.    Well, the check number -- the only
12    way I know if something has ever been paid out
13    is we go to the little check tab in our
14    computer, and our computer will tell us if a
15    check has gone out, when it went out, the check
16    number, the amount, who it was made payable to;
17    that sort of thing.
18            This was the only check that was
19    ever in any one of these files.
20            So just knowing that this check
21    transferred the funds from one case to
22    another, that makes sense because that's what
23    these marshal levies do for us.
24       Q.    I think I know what the answer to the
25    question is, but let me make sure.  Is there
```



```
 1                     K. Denaro
 2    anything in Exhibits 12, 13, and 14 that
 3    reflect what you just testified to?
 4              MR. NOVIKOFF:  Objection.
 5         A.   I don't think so.  I mean, I
 6    really -- I don't know at this point.
 7              I mean, the only -- the document is
 8    that check that shows it has the general
 9    ledger credit that is filled out by Susana and
10    signed by our manager.  That's what tells me
11    what happened with this check.
12         Q.   And that tells you what happened
13    about the check because that is what Ms.
14    Pacheco explained to you?
15              MR. NOVIKOFF:  Objection.
16         A.   That was the procedure back then.
17         Q.   What you said was the check tabs,
18    about whether checks go out.  What is the name
19    of that program or that screen that you would
20    be looking at?  What is it called?
21         A.    It is called 1LLG, and if you look on
22    Bates stamp 490, you will see the check tab
23    that I am talking about.
24         Q.   Okay, thank you.
25              MR. NOVIKOFF:  Let's get to that.
```



```
 1                        K. Denaro

 2        Q.    So that's Exhibit number 14, page

 3   Wells Fargo 490.  Is that right, 490?

 4        A.    That is where the check tab shows,

 5   yes.

 6             MR. NOVIKOFF:  I am lost.  Where on

 7   490 does it say that?

 8             THE WITNESS:  So in the bottom block,

 9   there is tabs.  It says case detail, document,

10   checks.  That check tab is where we would click

11   to open up the check information, and that's

12   where if a check was produced from this case,

13   then -- or paid out, because that's what it's

14   for, it would say in there, you know, the date,

15   the amount, to whom it was made payable to, so

16   that's what I did when I researched, and there

17   was only one case that had any information in

18   it showing this check to Ronald Moses.

19        Q.    Are you saying that is Bates stamp

20   Number 490?

21        A.    I am just explaining where the check

22   tab would be.

23             MR. ARTHUR:  It is on 491.  Proceed

24   to the next page.

25             MR. KESHAVARZ:  Thank you,
```



```
 1                    K. Denaro
 2   Mr. Arthur.
 3        Q.   So is that right, that's what you
 4   mean under page 491, check tab in the middle of
 5   the page?  That's what you mean?
 6        A.   Correct.
 7        Q.   It says check printed -- where in
 8   that tab -- I apologize because I didn't have
 9   that tab in front of me while you were
10   explaining it to me so I apologize.
11        A.   It's okay.  That's fine.
12        Q.   Tell me what that tab means to you.
13   What is it telling you?
14        A.   It tells me or shows us when a check
15   pays out on a case.
16        Q.   I see different columns.  Where would
17   it show if a check was cashed?
18        A.   That -- it wouldn't.  I have never --
19   I have never seen -- I don't dive deep into
20   getting proof of payment or anything, but the
21   way I got a copy of the check is I went into
22   our -- another imaging system.  I looked up the
23   check number and was able to determine, you
24   know, that it was cashed, so I don't know 1LLG
25   will show us when something is cashed or if it
```



KIM DENARO                                         December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                            89

```
 1                    K. Denaro
 2   was cashed.
 3        Q.   I think you might have misspoken.
 4   Did you say it was cashed or it wasn't cashed?
 5        A.   No.  The system is not going to tell
 6   me -- in 1LLG, the system is not going to tell
 7   us when a check or if a check was cashed.  We
 8   have to go to a different system.  We have to
 9   look up the check number.
10             MR. NOVIKOFF:  Could I ask one
11   question which is in line with this?
12             MR. KESHAVARZ:  Please.
13             MR. NOVIKOFF:  Did you look up to see
14   in any of these screens whether or not the
15   check was cashed?
16             Is that okay, Ahmad?
17             MR. KESHAVARZ:  Please.
18             THE WITNESS:  In any of these tabs,
19   no.  The system is not going to tell me that.
20             MR. NOVIKOFF:  Okay.  Thank you.
21        Q.   So is that a different system that
22   the documents that are Exhibits 12, 13, and 14?
23        A.   Oh, yes.
24        Q.   Is there just one screen with
25   multiple tabs in there?
```



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                          90

```
 1                   K. Denaro
 2      A.   Well, it's a whole system.  It's our
 3   imaging system so, you know, the processors
 4   have access.
 5           Sometimes we have to go back into --
 6   because we use multiple systems throughout the
 7   day, but when we look back for exemptions, the
 8   look-back period is 60 days, so if we have to
 9   go prior to the 60 days, you know, six months,
10   whatever, we have another system that we can
11   go into to look at images in order to see if
12   there were federally exempted funds or what
13   have you, so we do have another system where
14   we can dig deeper and go into older records,
15   so that's where I had to go.
16      Q.   What images do you recall seeing
17   related to Mr. Fadlevich?
18      A.   What I did, because I the check
19   number, I just entered in the check number and
20   date, give it a beginning and end kind of
21   thing, so it could search correctly, and I
22   found that canceled check.
23      Q.   You found a canceled check?
24      A.   The canceled check that is in your
25   exhibits, check number 1671904.  That's how I
```



1                K. Denaro

2    found that check.

3        Q.    But in the image did it say something

4    about it being canceled, or did it look just

5    like you have in front of you now?

6        A.    No, it didn't look like it was

7    canceled at all, because when you have a

8    canceled check, at the very bottom of the

9    right-hand corner it will tell you how much the

10   check was paid out for, so no, I know it was

11   cashed.

12            But, again, that was transferred

13   from one case to another.

14            MR. NOVIKOFF:  Ahmad, I am a little

15   confused because she just said it was cashed.

16            MR. KESHAVARZ:  Madam Court Reporter,

17   can you read back that answer, please?

18            (Record read.)

19            MR. NOVIKOFF:  Can I ask what she

20   means by cashed?

21            MR. KESHAVARZ:  Yes.

22            MR. NOVIKOFF:  What did you mean by

23   cashed?

24            THE WITNESS:  When you said cancel,

25   to me that sounded like the transaction was



```
 1                   K. Denaro

 2    canceled, so that was a word that I am confused

 3    about.

 4              No.  This check was negotiated.

 5        Q.   What do you mean negotiated?

 6        A.   It was -- it went through the system.

 7    It went through when Susana -- whatever she did

 8    with it, whatever she does with it, it got

 9    processed, so it was processed so it moved --

10    again, this is a paper trail moving funds from

11    one case into another.

12        Q.   But you used word cashed.  What do

13    you mean it was cashed?

14        A.   Negotiated, processed.  I have a copy

15    of a canceled check which means that it was

16    processed.

17              MR. NOVIKOFF:  But when you say

18    cashed, are you -- when you say cashed, are you

19    saying it was cashed internally between one

20    case, Wells Fargo case, and another case, or it

21    was cashed by Ronald Moses.

22              THE WITNESS:  Oh, no, no.  This is a

23    check that gets -- it's just a paper trail, so

24    it just takes money from one case and puts it

25    into another, so it was processed.  The check
```



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                          93

```
 1                    K. Denaro
 2   is -- it was -- it was negotiated.  It was
 3   processed, so it was completely moved.  That's
 4   how I would look at it.
 5           MR. NOVIKOFF:  Moved internally but
 6   not moved to Mr. Moses?
 7           THE WITNESS:  Correct.
 8           MR. NOVIKOFF:  Got it.  Okay.
 9       Q.   By "moved," you mean just the
10   designation of that check was from one internal
11   case number to another?
12       A.   Correct.
13       Q.   Did you see any other image other
14   than the check that is Exhibit -- that you have
15   in front of you?  Did you see any other images?
16       A.   No.  I wasn't looking for any other
17   images because there is no other check numbers.
18       Q.   Was there any other thing that you
19   looked at in that system other than the image?
20       A.   No.
21       Q.   The reason I ask is that you were
22   talking before about a button.  That's why I
23   was asking.
24       A.   No.
25       Q.   And it is just the face of that
```



1                    K. Denaro

2     document that is the check that shows to you

3     that the check was negotiated internally from

4     one account number to another; is that what you

5     are saying?

6          A.    Correct.

7               MR. NOVIKOFF:  Off the record.

8               (Discussion off the record.)

9          Q.    If we go through what has been marked

10    as Exhibit 16, which is Wells Fargo documents

11    Bates stamped 001 through 054, let me ask you a

12    couple of questions about that.

13         A.    Okay.

14              MR. NOVIKOFF:  So this is 16?

15              MR. KESHAVARZ:  Yes.

16              MR. NOVIKOFF:  Got it.  Thank you.

17         Q.    When Wells Fargo responds to an

18    information subpoena and bank restraint, first

19    of all, how does Wells Fargo receive them?

20    Does it receive them in the mail, by fax?  How

21    does it receive them?

22         A.    The letters are sent out via mail.

23         Q.    So when you receive the information

24    subpoena and bank restraint, you receive them

25    via the mail?



KIM DENARO                                        December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                            95

```
 1                    K. Denaro
 2       A.    I am sorry.  I thought you meant the
 3   customer's letter.
 4              You mean when we receive a legal
 5   order?
 6       Q.    Yes.  By legal order you mean an
 7   information subpoena and bank restraint, right?
 8       A.    Yes.  If it's a legal order served by
 9   the requester -- every state is different -- in
10   New York we can receive these by certified
11   mail, hand delivery, and I believe that's it
12   for this document type.
13       Q.    Is it typically one or the other?
14              MR. NOVIKOFF:  Objection.
15       A.    Sometimes.  Not always.
16       Q.    So Exhibit 16, why don't you scoot
17   over to Bates stamp Wells Fargo 06 through 11.
18       A.    Okay.
19       Q.    Was this one mailing that was sent to
20   Gutman, Mintz, that is the cover letter was
21   sent plus the answer information subpoena
22   restraining notice pages that are pages 7
23   through 11?
24              MR. NOVIKOFF:  When you refer to a
25   cover letter, what are you referring to?
```



 1                    K. Denaro

 2        Q.   This is what I am trying to get at:

 3   Is Wells Fargo pages 6 through 11, is that one

 4   mailing to Gutman, Mintz, or do you know?

 5        A.   Well, it looks to be, but I don't

 6   know that it's complete.

 7        Q.   And looking at page Wells Fargo 6,

 8   does that appear to be a response to the

 9   information subpoena and bank restraint?

10        A.   Yes.

11             MR. NOVIKOFF:  On 6?

12             MR. KESHAVARZ:  Bates stamp Wells

13   Fargo 6.

14             MR. NOVIKOFF:  Okay.

15        Q.   And the top of page Wells Fargo 7, it

16   has numbers and says legal.  Is that something

17   Wells Fargo would have put on, or do you know?

18        A.   I have no idea.

19        Q.   On the bottom of page Wells Fargo 8,

20   lower left-hand corner, there's a stamp there.

21   That's a stamp from Wells Fargo?

22        A.   That -- yes.  That is a stamp that

23   the processors use when they answer these

24   information subpoenas with restraints.

25        Q.   And that is what would be sent back



```
 1                      K. Denaro
 2    to Wells Fargo -- Gutman, Mintz?
 3         A.   Correct.
 4         Q.   And including that handwritten
 5    notation as to the amount, right?
 6         A.   Correct.
 7         Q.   And does that indicate -- the
 8    document that is page Wells Fargo 8 with the
 9    stamp from Wells Fargo Bank, that is a notation
10    from Wells Fargo to Gutman, Mintz that Wells
11    Fargo has held $23,964.89 of Mr. Fadlevich's
12    money, correct?
13         A.   Correct.
14         Q.   Do you know how much of that 23,000
15    and change consisted of Social Security
16    deposits?
17         A.   I wouldn't know until I looked at the
18    computer.  I wouldn't be able to tell by this,
19    no.  I mean, our answer is supposed to be going
20    out, you know, after.  We have to show that we
21    are holding funds after any exemptions were
22    applied, but it doesn't -- it's not going to
23    say that.
24         Q.   It doesn't necessarily say what here?
25         A.   So look at the top of 08, where it
```



```
1                    K. Denaro
2   says it's a checking account, it shows the date
3   open, it shows the amount on deposit.  That's
4   the amount that was in the bank account on the
5   date of service, and the amount that we held,
6   the 23,964.89 would be after any exemptions
7   were applied.
8            But on this document, it does not
9   say we held X amount in Social Security or
10  state exemptions or anything like that.
11       Q.   But it does mean, the document Wells
12  Fargo 8, does mean that -- well, it means what
13  it says, the 23,964.89 was actually restrained
14  by Wells Fargo, right?
15       A.   Correct.
16       Q.   Does Wells Fargo take any steps to
17  determine how much money in the bank account is
18  direct deposits from Social Security?
19       A.   Absolutely.  Only the last two
20  months.  It's only for the last two months that
21  the Social Security is going to be protected.
22            So, again, when the processor
23  sees -- when the processor gets the case, they
24  are processing it.  We have a system, the ACH
25  screen, in our computer system.
```



```
 1                    K. Denaro
 2              When we click on that button, it
 3    will tell us any direct deposits; Social
 4    Security, it could be from the state, it could
 5    be a tax refund.  It's going to show us those
 6    deposits from the last 60 days.
 7         Q.   So if the last 60 days show direct
 8    deposits from Social Security Administration,
 9    you would not -- the bank in the ordinary case
10    would not restrain those two months of Social
11    Security deposits, right?
12         A.   Correct.  They would be protected.
13         Q.   Does Wells Fargo look prior to 60
14    days to see if there are any other Social
15    Security deposits?
16         A.   No.
17         Q.   Why not?
18         A.   Bank procedures say the look-back is
19    60 days.
20         Q.   What if for the prior 12 months there
21    was Social Security direct deposits?  If you
22    only look at the last two months, couldn't you
23    be restraining that money?
24         A.   Well, I mean, if our bank procedures
25    tell us to look back 60 days, then we are going
```



1                        K. Denaro
2    to look back 60 days.
3              I think that's why the exemption
4    claim forms go out, because if the customer
5    feels there are exempt funds in that account,
6    they can certainly file -- complete that
7    exemption claim form and then send it off to
8    the attorney and kind of start that full
9    action, but we don't know.  We only look back
10   60 days.
11        Q.   If Wells Fargo were to look back,
12   say, a year and would see only direct deposits
13   by Social Security -- I know that's not a
14   process, but my question is, if Wells Fargo
15   actually did go back and look 12 months back
16   and see only deposits by Social Security, would
17   it be Wells Fargo's position that all of those
18   deposits are exempt, or only the last two
19   months?
20             MR. ARTHUR:  Objection.  Can you --
21        A.   Only the last two months.
22        Q.   Is there any way -- so if Mr.
23   Fadlevich sent you --
24             MR. KESHAVARZ:  Strike that.
25        Q.   If the consumer like Mr. Fadlevich



```
 1                    K. Denaro

 2   sends you an exemption claim form and bank

 3   statements showing that, you know, 12 months of

 4   the money is Social Security and it's all

 5   exempt, would you still wait for the law firm

 6   to send you a fax or letter telling you to

 7   release the account?

 8            MR. NOVIKOFF:  Hold on.  Before I

 9   object, could you read that question back,

10   Madam Court Reporter?

11            (Record read.)

12            MR. NOVIKOFF:  No objection.

13        A.   So the exemption claim forms are sent

14   off to our Payouts and Release Department, so

15   they process those, and they have a procedure

16   for when they receive these documents.

17        Q.   But it's your department who

18   determine when to release a restraint, right?

19        A.   Well, I mean, no.  We -- so if the

20   release comes in from an attorney, that release

21   goes to the Payouts and Release Department.  I

22   mean, if it filters through our office, our

23   department, great.  We forward it along to P&R,

24   or to Payouts and Release, and they process the

25   release.
```



KIM DENARO                                          December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                            102

```
 1                      K. Denaro
 2        Q.   Correct me if I am wrong.  I thought
 3    that when a bank account was restrained, that
 4    the only way that Wells Fargo would release the
 5    money is either a court order or letter from
 6    the debt collection attorney.  Is that correct?
 7              MR. NOVIKOFF:  Objection.
 8        A.   The only way -- well, no.  If -- I
 9    mean, in my world, in my department, yes, but
10    in Payouts and Release, they have their own
11    procedures.
12              So when it comes to the exemption
13    claim forms, that's something that they
14    handle.
15              So I don't know how it's determined,
16    you know -- the Payouts and Release Department
17    talks to the attorneys when we get these
18    exemption claim forms.
19              MR. NOVIKOFF:  Can you read that
20    answer back?
21              (Record read.)
22              MR. KESHAVARZ:  Were you done?  I
23    don't know if you were done with your answer.
24        A.   I will repeat.  When we get these
25    completed exemption claim forms with any kind
```



```
 1                    K. Denaro
 2   of bank statements, that documentation goes to
 3   the Payouts and Release Department, and they
 4   review it, and then they have their own
 5   procedure, you know, to handle that.
 6        Q.   Do you have any --
 7        A.   To them, if they want -- whatever
 8   they do, it's up to them.  They have the
 9   conversations with the attorney, and I guess,
10   you know, they are going to figure out if there
11   is a release that needs to be done, but, again,
12   that's a different department.
13        Q.   When you say a conversation with the
14   attorney, you mean a conversation with the debt
15   collection attorney; is that right?
16        A.   Correct.
17        Q.   In your years of experience, are you
18   aware of any instance where Wells Fargo has
19   released an account based on something other
20   than a letter from a debt collection attorney
21   or court order?
22             MR. NOVIKOFF:  Note my objection.
23        A.   Yes.  The other time when we would
24   release an account is if the processor made an
25   error or if the bank made an error with, you
```



```
 1                      K. Denaro
 2    know -- yeah.  If the bank or processor made an
 3    error, we would release the case.
 4         Q.   Any other reason?
 5              MR. NOVIKOFF:  Objection.
 6         A.   Not that I can think of.
 7         Q.   When you say "error," what do you
 8    mean?
 9         A.   Well, if we attach the wrong
10    customer, for example, or if we didn't apply,
11    or maybe we applied too much of an exemption or
12    not enough, is a way for us to release funds if
13    we make the error.
14         Q.   Any other type of errors that you
15    meant, or is that pretty much it?
16         A.   I mean, it's a bank error, processor
17    error, release from an attorney, whatever P&R
18    does with exemption forms, court order.  That's
19    all I can think of.
20         Q.   But basically -- how long have you
21    worked at Wells Fargo?
22         A.   I will be here it's four and a half
23    years right now.
24         Q.   Did you say two and a half?
25         A.   Four and a half years, almost five
```



```
 1                     K. Denaro
 2   years.
 3        Q.   And you are the supervisor for --
 4   tell me one more time what you do.  I remember,
 5   but I just don't want to get it wrong.
 6        A.   I am a team lead.
 7        Q.   Tell me what that means again.
 8        A.   I support processors, so if the
 9   processors have questions about exemptions or
10   was this served correctly, is this a valid
11   document, if this was served a year ago, you
12   know, kind of the problem -- you know, the
13   person that hopefully provides the answer to
14   the problems that the processors are seeing.
15        Q.   So the processors are processing the
16   information pertaining to bank restraints?
17        A.   Correct.
18        Q.   And those four people and yourself
19   are all the people at Wells Fargo that do this?
20             MR. NOVIKOFF:  Objection.
21        Q.   That process the information
22   subpoenas pertaining to bank restraints?
23        A.   Oh, gosh.  We have a whole bunch.  I
24   don't know how many employees, but we have a
25   lot.
```



1                    K. Denaro

2        Q.    And that has been your role there for

3    the last four and a half years?

4        A.    No.   I started out as a legal order

5    processor, so I have been a team lead for two

6    years next month.

7        Q.    Roughly, how many information

8    subpoena and bank restraints does your team get

9    in a day, a week, a month?  Just roughly.

10        A.    I mean, I am going to guess, but

11    probably in a week, I would probably bet from

12    all the attorneys -- I mean, it -- I couldn't

13    even guess.  I mean, it's a lot.  Probably -- I

14    don't know.  It could be 500 per week.  I mean,

15    we get a lot.

16        Q.    So would that be a rough estimate as

17    far as you can recall, that your team would get

18    about on average roughly about 500 information

19    subpoenas and bank restraints to process in a

20    week?

21        A.    Sure, absolutely.  Sometimes more,

22    sometimes less, yes.

23        Q.    From your own experience for these

24    last four and a half years, as far as you can

25    recall, do you recall an instance where you



```
 1                      K. Denaro
 2   have released a restraint on a bank account for
 3   a reason other than a letter from the law firm
 4   or the debt collector, an order from the court,
 5   or one of these errors?
 6          MR. NOVIKOFF:  Note my objection.
 7       Q.   Can you think of any other time that
 8   that has happened?
 9          MR. NOVIKOFF:  Note my objection.
10       A.   No.
11       Q.   And how do the information subpoenas
12   and bank restraints get to your team?
13       A.   They are submitted by Doc.Capture, I
14   believe.  So, for example, I don't know all the
15   details, but if a legal order is delivered to a
16   branch, for example, the branch will submit it
17   electronically and let us know when it was
18   served, how it was served, et cetera.
19          And then that image gets scanned and
20   a case gets set up and then gets forwarded to
21   the Legal Order Processing Department for
22   processing.
23       Q.   If you go to pages Wells Fargo 12
24   through Wells Fargo 13 -- I apologize if this
25   is one of the documents we have already looked
```



```
 1                      K. Denaro
 2    at.
 3              MR. NOVIKOFF:  Isn't that within this
 4    last exhibit?
 5              MR. KESHAVARZ:  It's all within
 6    Exhibit 16.
 7              MR. NOVIKOFF:  What pages?
 8              MR. KESHAVARZ:  I don't know if that
 9    was a separate letter we have seen in another
10    exhibit.
11        Q.   In any event, if you look at
12    Exhibit 16, pages Wells Fargo 12 to Wells Fargo
13    13, let me know when you are done reviewing it.
14              (Pause in the proceedings.)
15        A.   Okay.  I have read it.
16        Q.   Are all of the statements in that
17    document correct?
18              MR. NOVIKOFF:  Objection.  Asked and
19    answered, and we did go through this one.
20        A.   It looks to be, yes.
21        Q.   Now, it talks about a garnishment
22    fee.  In the ordinary course of Wells Fargo's
23    process, are garnishment fees ever returned to
24    the customer?
25        A.   Yes, they can be.
```



```
 1                        K. Denaro
 2        Q.   In all the years that you have been
 3   there, how many times, roughly, do you think
 4   that has ever happened in your experience?
 5        A.   Well, it only happens when the bank
 6   has made an error.
 7             So you are asking how many errors do
 8   we make?  I mean, I --
 9        Q.   By errors, you mean things like
10   restraining the wrong person?
11        A.   Exactly.  It was the wrong
12   attachment, the wrong calculation, the wrong
13   dollar amount, the wrong -- but, no.  If a
14   legal order has been processed in accordance
15   with the legal order and the instructions on
16   the order, we don't return bank fees.  It's a
17   processing fee.
18        Q.   If it's determined later that the
19   money in the account was exempt and shouldn't
20   have been restrained, in that instance does
21   Wells Fargo have a policy about returning the
22   garnishment fee?
23        A.   Yes.  If that was a bank error, then
24   yes.  If the account number, the account
25   shouldn't have been restrained and we charged
```



1              K. Denaro

2     that fee, then yes, we would refund the

3     customer.

4          Q.    Have you ever seen that happen as far

5     as you can remember?

6              MR. NOVIKOFF:  Note my objection.

7              I am just not sure --

8          Q.    I mean, in your recollection, do you

9     recall ever an instance where a bank fee has

10    been returned?

11             MR. NOVIKOFF:  I am not sure that was

12    a topic, but note my objection.

13         A.    Well, I do.  I mean, I don't know

14    everybody's, but I do -- it happens when we

15    make a bank error.  When the bank has -- when

16    the legal order processor has made an error and

17    we restrain funds and charge the customer in

18    error, then yes, we will return the fees.

19         Q.    Go to Exhibit 16, Wells Fargo

20    page 19.  Let me know when you are done.

21             MR. NOVIKOFF:  Good.  You are hitting

22    some of my documents, Ahmad.  Thank you.

23         Q.    Let me know when you are there,

24    ma'am.

25         A.    I am there.



```
 1                    K. Denaro

 2       Q.   Do you know what some of those

 3  handwritten notations on the upper right-hand

 4  side mean?

 5       A.   I would have to look at my screen --

 6  I would have to look at my screen to know how

 7  we received it.  I don't know if that's

 8  something that happened during discovery or

 9  not.  I don't know.

10       Q.   Generally speaking, if there are

11  handwritten notes on top of a levy and final

12  demand, as a general rule, does that mean

13  anything in particular, or could it mean

14  anything?

15       A.   Well, back then I can tell you that

16  12/10/18 would be the date it was received, the

17  serve date, and it was received in person so

18  that tells me that the marshal walked into a

19  branch.

20            It looks like Jim Burito accepted

21  service.

22       Q.   So Marshal Moses is in New York, and

23  it is addressed to someone in North Carolina.

24  Does that mean Moses brought it to a branch in

25  New York even though it says North Carolina?
```



```
 1                      K. Denaro

 2             MR. NOVIKOFF:   Objection.

 3        A.   Typically, because the marshal levies

 4   can only be served in hand, so they would have

 5   to go to either a branch or a CSC, which is the

 6   registered agent for Wells Fargo.

 7        Q.   In the middle of page 19, there is a

 8   handwritten notation with, if I am reading this

 9   right, $16,570.21 into case number 121562416.

10   Did I read that correctly?

11        A.   Almost.  The case number is

12   121562418.

13        Q.   Do you know what that handwritten

14   notation means?

15        A.   No.  That's something probably P&R

16   did, but I can't answer for that.

17        Q.   Is that the Payout Department, P&R?

18        A.   Payouts and Releases, yes.

19        Q.   Who would have written that?  Do you

20   have and idea?  Would it have been the bank or

21   someone else?

22        A.   Well, I mean, I can only assume

23   because it says into a case number that it

24   would be somebody in Payouts and Releases, but,

25   again, I can only assume that.  That's what it
```



                           K. Denaro

 1    looks like to me.

 2         Q.    Would this be an example of a levy

 3    coming in and then Wells Fargo internally

 4    moving the case number from the levy -- from

 5    the restraint case number to a levy case

 6    number, or do you know?

 7         A.    Yes and no.  Because these legal

 8    orders come to the processors first, our

 9    document would not look like this.

10              So once we email it to the Payouts

11    and Releases Department, they are going to

12    work on it however they see fit.  That's why I

13    am thinking those comments are from Payouts

14    and Releases.

15         Q.    Going to page Wells Fargo 47, are you

16    there?

17              MR. NOVIKOFF:  47?

18              MR. KESHAVARZ:  Wells Fargo,

19    Exhibit 16.

20              MR. NOVIKOFF:  Okay.  I see it.

21         Q.    Do you know what that is?

22         A.    It looks like a cover page from the

23    requester, the Gutman, Mintz firm, dated

24    July 17 of 2019, and it's faxed into Wells



1                    K. Denaro

2      Fargo, and it looks like we have previously

3      served a restraining order.  It looks like they

4      are providing a full release.

5          Q.   Now, prior to receiving this from,

6      say, November 1st, 2018, through July 17, 2019,

7      Wells Fargo had restrained some amount of Mr.

8      Fadlevich's money for that whole time, right?

9              MR. NOVIKOFF:  Objection.

10         A.   Well, yes, because -- yes.  We saw

11     previous cases where we withheld funds, yes.

12         Q.   Why didn't Wells Fargo release all of

13     the money in Mr. Fadlevich's account after,

14     say, January 1, 2019?

15         A.   Which funds are you talking about?

16         Q.   In the bank account.

17         A.   The only -- I don't know the answer

18     why or what somebody else did or didn't do, but

19     I believe there was $7,000 that was refunded or

20     returned, released, back to the customer in

21     May.

22         Q.   What makes you say that?

23         A.   In my research.  There was a release

24     in May.

25             MR. NOVIKOFF:  I don't mean to



```
 1                      K. Denaro
 2    interrupt you, but can we perhaps look through
 3    the documents and see if there is a release in
 4    May?  Because I don't recall seeing it.
 5              MR. KESHAVARZ:  I don't recall seeing
 6    one either.
 7         Q.   But do you know why approximately
 8    $7,000 was released back to Mr. Fadlevich
 9    around May of 2019?
10         A.   In my research, it looks like we held
11    the $7,200 for a period of time, and it had to
12    do with the exemption claim form, but I believe
13    the customer was saying that the $7,200 was
14    exempt funds, so I believe once somebody
15    reviewed the case and reviewed the file, they
16    processed the refund for him.
17         Q.   Do you know how much Mr. Fadlevich's
18    account was restrained from January 1, 2019, to
19    January 17, 2019?  Do you know how much was
20    restrained for any period of that time?
21         A.   No, I don't.  It would be in the
22    letters, but I don't know.  I did not add them
23    up.
24         Q.   Going to Wells Fargo 48 to 49,
25    Exhibit 16, letter of July 22, 2019, let me
```



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                        116

```
 1                    K. Denaro
 2    know when you are done.
 3              (Pause in the proceedings.)
 4         A.   Okay.  I am done.
 5         Q.   Are all the statements in this
 6    document, pages Wells Fargo 48 through 49,
 7    true?
 8              MR. NOVIKOFF:  Objection to the form.
 9         A.   Looks to be, yes.
10         Q.   It says in the first paragraph the
11    amount of the garnishment order was for
12    $17,352.90; is that correct?
13         A.   Yes.
14         Q.   It says the amount subject to
15    garnishment now frozen or removed was
16    $2,055.67.  Is that correct?
17         A.   Yes.
18         Q.   Was the $2,055.67 actually taken out
19    of Mr. Fadlevich's bank account?
20         A.   Yes.  That's what this letter would
21    indicate.
22         Q.   And did that go into Wells Fargo's
23    general account, or do you know?
24         A.   Yes, sir.
25         Q.   And when that $2,055.67 went from Mr.
```



```
 1                    K. Denaro
 2    Fadlevich's account to Wells Fargo's account,
 3    that was no longer Mr. Fadlevich's money,
 4    correct?
 5            MR. NOVIKOFF:   Objection.
 6        A.    Correct.
 7        Q.    And the basis for the protected
 8    amount of $1,606, was that based on the last
 9    two direct deposits from the Social Security
10    Administration, or do you know?
11        A.    I would have to look at the case, but
12    that's what this letter would indicate to me.
13        Q.    What is the document that you are
14    calling the garnishment order for 17,352.90
15    that caused Wells Fargo to hold or remove funds
16    in the account?
17        A.    That would be at the top of the page
18    where it says -- it's a new case, basically.
19    So on July 15, we received an order, so that
20    would be Wells Fargo case number ending in
21    4919.
22        Q.    That would have been an information
23    subpoena and bank restraint by Gutman, Mintz,
24    right?
25        A.    Yes, correct, because the requester
```



1                        K. Denaro

2    is on the page 49.

3        Q.   And do you know if Wells Fargo ever

4    sent any money to Gutman, Mintz, directly to

5    Gutman, Mintz?

6        A.   I do not know.  I did not see any

7    checks.  I didn't -- no.  So I have not seen

8    anything.

9             It looked to me like all the funds

10   were returned to the customer.

11       Q.   By July 15, 2019, all the funds were

12   returned to the customer?

13            MR. NOVIKOFF:  Objection.

14       A.   I don't know -- when I looked at the

15   four cases.  That's all I can say.

16            MR. ARTHUR:  What case are we

17   referring to, or what document are we referring

18   to?

19       Q.   My question was, you said money was

20   eventually released to Mr. Fadlevich; is that

21   what you said?

22       A.   Yes, in all of these cases; yes.

23       Q.   But there was money restrained by

24   Wells Fargo for some period of time

25   continuously that was never released for a



```
 1                      K. Denaro
 2    period of time from January 1, 2019, through
 3    July of 2019, correct?
 4            MR. NOVIKOFF:  Note my objection.
 5        A.   If the account is above threshold,
 6    then yes, the funds would have been held, and
 7    the account would have been restrained.
 8        Q.   But do you know if money was actually
 9    restrained for the entire time period from
10    January 1, 2019, to July of 2019?
11            MR. NOVIKOFF:  Objection.
12        A.   I would have to look at each case.
13        Q.   Fair enough.  Now, looking at --
14            MR. KESHAVARZ:  Strike that.
15        Q.   Going back to pages 48 through 49,
16    the July 22, 2019, letter to Mr. Fadlevich,
17    would the information subpoena response on
18    pages 50 to 51 have been sent to Mr. Fadlevich?
19        A.   Well, to the customer, I would have
20    to look at -- this letter is addressed to the
21    customer, so yeah.
22            Page 50 would have been included
23    with the cover letter page 48.
24        Q.   How do you know that?
25        A.   Well, because we send out a copy of
```



          1                        K. Denaro
          2      the legal order with our cover letter and our
          3      answer, so we let the customer know what we
          4      sent off to the attorney.
          5          Q.   Okay.  Is there anything in the
          6      July 22, 2019, letter that indicates to you
          7      that the information subpoena response was
          8      mailed to Mr. Fadlevich?
          9               MR. NOVIKOFF:  Note my objection.
         10          A.   Could you repeat that?
         11          Q.   Sure.  Is there anything in the
         12      letter of July 22, 2019, from Wells Fargo to
         13      Mr. Fadlevich, Bates stamped Wells Fargo 48 to
         14      49, anything in that letter that indicates to
         15      you that the response to the information
         16      subpoena was actually mailed to Mr. Fadlevich?
         17               MR. NOVIKOFF:  Same objection.
         18               Go ahead.
         19          A.   Well, kind of.
         20          Q.   What do you mean?
         21          A.   In the first paragraph, it says, "We
         22      are sending you this notice to let you know
         23      that we have -- what we have done in response
         24      to this garnishment."
         25               So the attachment is a copy of the



KIM DENARO                                        December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                            121

```
 1                      K. Denaro
 2    legal order with our answer, so I guess it
 3    doesn't come right out and say it, but it
 4    implies that --
 5          Q.    Sitting here today, you don't know --
 6          MR. NOVIKOFF:  Ahmad, please let her
 7    finish the answer.
 8          Q.    I'm sorry.  Were you done?
 9          A.    Well, I just -- I think that the
10    cover letter kind of implies, especially when
11    it's included, that it was provided, because we
12    are not going to send out a copy of a blank
13    legal order to the customer.  We are going to
14    forward a copy of the answers that were
15    provided to the attorney to the customer.
16          Q.    But do you know that from your own
17    experience, or are you just concluding that
18    based on the first paragraph of the July 22,
19    2019, letter?
20          MR. NOVIKOFF:  Objection.
21          A.    I mean, I think it's implied, but
22    that's just -- that's just me.
23          Q.    So the reason you think that the
24    information subpoena response was included in
25    the July 22 letter was because of the
```



```
1                    K. Denaro
2    implication on the first paragraph of Wells
3    Fargo 48, right?
4            MR. NOVIKOFF:  Objection.
5        A.   Yes.
6        Q.   Any other reason?
7        A.   Well the other reason too is because
8    the exemptions form is supposed to be provided
9    to the customer as well so they can do what
10   they need to do if they want to do anything.
11       Q.   I understand that, but is there
12   anything that indicates to you that an
13   exemption -- in any of the documents we looked
14   at -- that an exemption claim form was ever
15   mailed by Wells Fargo to Mr. Fadlevich?
16           MR. NOVIKOFF:  Objection.
17       A.   On page 49 it says you can fill out
18   an exemption form and submit it to the court,
19   so there's direction to them on the back.
20       Q.   Wells Fargo 49?
21       A.   Correct.  Fifth bullet on the left.
22       Q.   Right.  It says you can fill out an
23   exemption claim form.  There is no exemption
24   claim form in the pages after the letter,
25   right?
```



1                      K. Denaro

2             MR. NOVIKOFF:  Objection.

3      A.   Correct.  I don't see any.

4      Q.   I haven't seen an exemption claim

5  form from a letter mailed to Mr. Fadlevich in

6  any of the letters we have gone through.  Do

7  you remember seeing any exemption claim form

8  related to any of the letters Wells Fargo sent?

9             MR. NOVIKOFF:  Objection.

10     A.   I would have to go through each one.

11     Q.   But sitting here right now, you don't

12 remember seeing one, do you?

13            MR. NOVIKOFF:  Objection.

14     A.   No, not in this particular case.

15     Q.   "This case" being what?

16     A.   The case that page 48, 49, and 50 to

17 51.  I do not see an exemption claim form in

18 here.

19     Q.   Anything in Wells Fargo case number

20 ending in 4919, there was no exemption claim

21 form sent to Mr. Fadlevich in that cases

22 number?

23            MR. NOVIKOFF:  Note my objection.

24     A.   This is paper.  I go by the computer.

25 In the paper, I don't see an exemption claim



```
1                      K. Denaro
2    form.
3         Q.   Looking at Wells Fargo 52, can you
4    tell me what that is?
5         A.   52 is a letter to Gutman, Mintz.  We
6    are providing -- we are providing them an
7    answer to a legal order that it was dated,
8    issued, on July 10.  It does not have the serve
9    date on it.
10             And then it also shows a copy of the
11   legal order that we completed and reported
12   that the account was under threshold, so it
13   looks like no funds were held and the account
14   wouldn't have been restrained under this
15   order.
16             It may have been restrained under
17   another order, but this order did not restrain
18   that account.
19        Q.   I can't tell when Wells Fargo
20   executed its answer to the information subpoena
21   questions.  Are you able to tell?
22             MR. NOVIKOFF:  Note my objection.
23        A.   When they executed these answers?
24   No.  I don't see a notary, I don't see -- this
25   is not the final document.  This is not
```



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                         125

1

2   notarized, so no.  This is -- no.  It does not

3   say when it was executed.

4        Q.   Do you know from your own knowledge

5   whether information subpoena responses are

6   notarized?

7        A.   If the document requires it to be

8   notarized, yes, they are notarized.

9        Q.   But as far as you recall from your

10  own knowledge, are the information subpoena

11  responses notarized, as far as you know?

12       A.   Yes.  If they are required to be

13  notarized, we have a different department that

14  these documents go to for the notaries to

15  complete and then mail out and so forth.

16       Q.   I am done.  I am passing the witness.

17            MR. NOVIKOFF:  Off the record.

18            (Discussion off the record.)

19            (Time noted:  4:02 p.m.)

20

21

22

23

24

25



```
 1

 2                    INDEX TO TESTIMONY

 3    WITNESS                BY                    PAGE

 4    Kim Denaro             Mr. Keshavarz           5

 5                    INDEX TO EXHIBITS

 6    NUMBER             DESCRIPTION               PAGE

 7    Exhibit 1      (Letter dated 11/26/19, Bates    4

 8                   WF000074 - 75

 9    Exhibit 2      Letter dated 12/11/18, Bates     4

10                   WF000026

11    Exhibit 3      Letter dated 12/12/18, Bates     4

12                   WF000089 - 90

13    Exhibit 4      Letter dated 12.24.18, Bates     4

14                   WF000330

15    Exhibit 5      Letter dated 1/8/19, Bates       4

16                   WF000328 - 29

17    Exhibit 6      Letter dated 2/6/19, Bates       4

18                   WF000377

19    Exhibit 7      Letter dated 2/25/19, Bates      4

20                   WF000376

21    Exhibit 8      Letter dated 3/18/19             4

22    Exhibit 9      Letter dated 3/20/19, Bates      4

23                   WF000253 - 55

24    Exhibit 10     Letter dated 4/19/19, Bates      4

25                   WF000436
```



```
1
2                   INDEX TO EXHIBITS (continued)
3     NUMBER              DESCRIPTION              PAGE
4     Exhibit 11    Letter dated 7/22/19, Bates      4
5                   WF000048 - 49
6     Exhibit 12    Research record, Bates WF372 -   4
7                   375
8     Exhibit 13    Research record, Bates           5
9                   WF429 - 435
10    Exhibit 14    Research record, Bates WF490 -   5
11                  497
12    Exhibit 15    Copy of check, Bates WF151       5
13    Exhibit 16    Letter dated 12/13/19 with       5
14                  enclosures
15    Exhibit 17    Subpoena                         5
16    Exhibit 18    Letter dated 12/13/19            5
17    Exhibit 19    Business records declaration     5
18    (Exhibits retained by Mr. Keshavarz)
19
20
21
22
23
24
25
```



1

2                        CERTIFICATION

3              I, HELENE GRUBER, a New York State

4    certified shorthand reporter, hereby certify that

5    the foregoing transcript is a complete, true and

6    accurate transcript in the matter of Fadlevich v.

7    JD 34th Street Realty et al held on December 18,

8    2025.

9              I further certify that this

10   proceeding was reported by me and that the

11   foregoing transcript was prepared under my

12   direction.

13

14

15

16   Date: December 30, 2025

17

18

19

20

21

22

23   _____

24              HELENE GRUBER

25



1

2  Our Assignment No.  J13975194

3  Case Caption:  Fadlevich

4  vs.  JD 34th Street Realty et al

5  DECLARATION UNDER PENALTY OF PERJURY

6       I declare under penalty of perjury

7  that I have read the entire transcript of

8  my Deposition taken in the captioned matter

9  or the same has been read to me, and

10  the same is true and accurate, save and

11  except for changes and/or corrections, if

12  any, as indicated by me on the DEPOSITION

13  ERRATA SHEET hereof, with the understanding

14  that I offer these changes as if still under

15  oath.

16  _____

17

18  Subscribed and sworn to on the _____ day of

19  _____, 20_____ before me,

20

21  _____

22  Notary Public,

23  in and for the State of _____

24

25



KIM DENARO                                          December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                          130

1

2                   DEPOSITION ERRATA SHEET

3      Page No._____Line No._____Change to:_____

4      _____

5      Reason for change:_____

6      Page No._____Line No._____Change to:_____

7      _____

8      Reason for change:_____

9      Page No._____Line No._____Change to:_____

10     _____

11     Reason for change:_____

12     Page No._____Line No._____Change to:_____

13     _____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20

21

22     SIGNATURE:_____DATE:_____

23

24

25



KIM DENARO                                    December 18, 2025
FADLEVICH vs JD 34TH STREET REALTY                        131

1

2                   DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21

22   SIGNATURE:_____DATE:_____

23   Kim Denaro

24

25

