1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------------x

4   MARK FADLEVICH,

5                              Plaintiff,

6              -against-            Case No.:
                                   1:19-cv-04227
7   JD 34TH STREET REALTY LLC,
    GUTMAN, MINTZ, BAKER & SONNENFELDT,
8   LLP, and ERIC KEILBACH,

9                              Defendants.

10  ----------------------------------x

11                 VOLUME II

12        CONTINUED REMOTE DEPOSITION of KIM DENARO,

13  a nonparty witness herein, witness located in

14  North Carolina, held on December 19, 2025,

15  commencing at 8:17 a.m., and before Helene Gruber,

16  a certified shorthand reporter and notary public

17  within and for the state of New York.

18

19

20

21

22

23

24

25



```
1
2  A P P E A R A N C E S :
3  LAW OFFICES OF AHMAD KESHAVARZ
4  Attorneys for Plaintiff
5       16 Court Street, 26th Floor
6       Brooklyn NY 11241
7  BY:   AHMAD KESHAVARZ, ESQ.
8        KEVIN KEELTY GARTLAND, ESQ.
9  ahmad@NewYorkConsumerAttorney.com
10
11 RIVKIN RADLER
12 Attorneys for Gutman, Mintz, Baker, & Sonnenfeldt,
13 LLP, and Eric Keilbach
14      926 RXR Plaza
15      Uniondale, NY 11556-0926
16 BY:   KEN NOVIKOFF, ESQ.
17 Ken.Novikoff@rivkin.com
18
19 ZEICHNER ELLMAN & KRAUSE LLP
20 Attorneys for Wells Fargo
21      730 3rd Ave
22      New York, NY 10017
23 BY:   ANDREW ARTHUR, ESQ.
24 aarthur@zeklaw.com
25
```



```
 1                      K. Denaro
 2                      KIM DENARO,
 3   Having first been duly sworn, was examined and
 4   testified as follows:
 5                      EXAMINATION
 6   BY MR. KESHAVARZ:
 7        Q.   Thank you, ma'am, for this morning
 8   today.
 9             Just following up on our
10   conversation yesterday about this other --
11   correct me what the phrasing is.  I might get
12   it wrong -- this other computer system you
13   were looking at the screens for, and that had
14   scanned images that was part of your review to
15   determine whether money was actually sent to
16   Mr. Moses.  Do you remember that discussion
17   yesterday?
18        A.   I think it was regarding my research
19   when I found the check and I wanted to make
20   sure -- well, I wanted to see if the check was
21   or wasn't cashed.
22        Q.   Okay.
23        A.   That's the process, yeah.
24        Q.   Are you able to access what you saw
25   to make that determination from your computer
```



                          K. Denaro

1

2    right now?

3        A.    Not this way.  Not this way.

4        Q.    About how many screens are we talking

5    about?

6        A.    Well, it's one screen.  I mean, it's

7    software, but I don't know how -- I don't know

8    how to do this with a phone.

9        Q.    No, no, no.  Basically, Andrew and I

10   were talking before the deposition, and I am

11   just trying to get an idea about the universe

12   of what we are talking about.

13           Is this like one screen that's the

14   issue, or multiple screens, or what is it you

15   were looking at?

16       A.    It's just sharing -- if you want to

17   see the screen, I don't know how to share it

18   with you.

19       Q.    That's fine.  I am not asking for

20   that.  I guess what I am asking, when you look

21   at it, how many screens are you looking at that

22   got that information that led to your

23   determination?

24       A.    How many screens?  Well, I enter in

25   the account number, the check number, and the



```
 1                    K. Denaro
 2    date that I think it was processed, and the
 3    image comes up.
 4        Q.   I thought there was --
 5        A.   It's just a search because I wanted
 6    to know if that check was cashed.  It is like
 7    your personal account.  If you want to know if
 8    your check was cashed, you go to your personal
 9    account and see if it was negotiated.
10        Q.   Is that the same check that we have
11    as an exhibit today the one you saw in your
12    deposition yesterday?
13        A.   Yes.
14        Q.   The images are exactly the same?
15        A.   Yes.
16        Q.   Correct me if I am wrong, because I
17    might have misunderstood.  It was a long
18    deposition, and I am sure longer for you --
19             MR. NOVIKOFF:  Ahmad, are you now
20    reopening your question?
21             MR. KESHAVARZ:  No.  I am just trying
22    to get if there's another piece of paper on the
23    screen, is what I'm trying to figure out.
24        Q.   Was there something else other than
25    that check that you looked at as part of your
```



```
 1                    K. Denaro
 2   investigation that is not part of the documents
 3   here?
 4           MR. NOVIKOFF:  Now you are asking
 5   questions so I am going to object to that.
 6           MR. KESHAVARZ:  Just that one
 7   question, I guess.
 8           MR. NOVIKOFF:  I don't know what that
 9   means.  That would require this witness to go
10   through every single page.  If you want her to
11   do that, then you are --
12           MR. ARTHUR:  It was asked and
13   answered too.
14           MR. NOVIKOFF:  Ahmad, I understand
15   why you wanted to ask the witness about a
16   screen drop-down box.
17           MR. KESHAVARZ:  That is what I am
18   asking.
19           MR. NOVIKOFF:  But I think she
20   answered that.  Now you are going over stuff we
21   went over yesterday.
22           MR. KESHAVARZ:  I thought it was a
23   screen in addition to the document, but maybe I
24   am wrong.
25           MR. NOVIKOFF:  I think the record is
```



                           K. Denaro

1
2    pretty clear on what this witness looked at and
3    her answers as to whether or not the check was
4    ever cashed by Mr. Moses, but I will be asking
5    those questions again.
6             MR. KESHAVARZ:  I tried to get that
7    knocked out early.
8                  EXAMINATION
9    BY MR. NOVIKOFF:
10       Q.   Ms. Denaro, thank you for
11   accommodating my schedule.  I represent the
12   Defendants Gutman, Mintz and Erik Keilbach in
13   this action.  I am going to be asking you a
14   series of questions today.  I will try to make
15   them as efficient and in as less time as
16   possible.
17            MR. KESHAVARZ:  I would like to start
18   by just marking as Defendants' Exhibit A the
19   entirety of the Wells Fargo document
20   production, which is from WF0001 to WF000497,
21   inclusive of Ms. Shakiah F. Jones's business
22   record declaration on December 13, 2019, with
23   regard to Wells Fargo documents 1 through 54,
24   and Ms. Jones's business records declaration
25   executed on January 17, 2020, for documents 55



```
 1                     K. Denaro
 2   through 497.
 3             (Exhibit subsequently withdrawn;
 4   previously marked as Exhibits 16 and 19.)
 5        Q.   I will be asking -- the beginning of
 6   my deposition will be just with regards to, for
 7   the most part, the Bates stamp numbers, and
 8   then I may get into some of the exhibits that
 9   Mr. Keshavarz asked you about yesterday.
10             MR. KESHAVARZ:  Might I make a
11   suggestion or a request?  Those two sets were
12   already marked as a deposition exhibit, just so
13   our record is clear, because you are going to
14   call it Exhibit A and I have already called it
15   Exhibit 16.
16             MR. NOVIKOFF:  That's fine.  I am
17   going to be referring to Bates stamp numbers.
18             MR. KESHAVARZ:  That's fine.
19             MR. NOVIKOFF:  Unless it is your
20   exhibit, then I will refer to your exhibit
21   number.
22             MR. KESHAVARZ:  Because those two
23   were documents --
24             MR. NOVIKOFF:  I understand.  I just
25   want to make sure it is in as an exhibit.
```



```
1                      K. Denaro
2        Q.   Ms. Denaro, I am going to show you
3    Exhibit 17 from yesterday's deposition.  It's
4    the subpoena, and I am going to turn your
5    attention to Depo 006.  It is the fifth page of
6    the subpoena, and tell me when you are there.
7        A.   Unfortunately, things printed out on
8    double-sided paper so that has been my
9    struggle.
10       Q.   It would be the page that has
11   1 through 8 on it.
12       A.   Got it.
13       Q.   I am going to turn your attention to
14   number 5.
15       A.   Okay.
16       Q.   This is Mr. Keshavarz's subpoena on
17   behalf of his client, and it says check number
18   167194 mailed to New York City Marshal Ronald
19   Moses on December 13, 2018, attached.
20            That check number, is that the check
21   we looked -- you were talking about yesterday?
22       A.   Yes.
23       Q.   And Mr. Keshavarz is making some
24   representation here that it was perhaps mailed.
25            Based upon your investigation
```



```
 1                    K. Denaro
 2   pursuant to the subpoena as well as your
 3   conversation with Ms. Pacheco, you came to the
 4   conclusion that this check was never mailed to
 5   Marshal Moses, correct?
 6        A.   Correct.
 7        Q.   Likewise, Mr. Keshavarz in the next
 8   sentence said, "Was the check cashed?"  Same
 9   question.  Based upon your investigation
10   pursuant to this subpoena and your discussions
11   with Ms. Pacheco, the check was never cashed by
12   Mr. Moses; is that correct?
13        A.   Correct.
14        Q.   I am going to go down to the third
15   line on number 5 where Mr. Keshavarz says in
16   the subpoena, "Where is the back of the check,"
17   question mark?  Do you see that?
18        A.   Yes.
19        Q.   Based upon your investigation
20   pursuant to the subpoena, you never saw any
21   document reflecting the back of that check,
22   correct?
23        A.   No.  I saw the back of the check.
24        Q.   Okay.
25        A.   That's why I went to the OIB system,
```



```
 1                      K. Denaro
 2   because when I saw that question, I immediately
 3   went to see if the check was cashed and if it
 4   was processed, so that's where I went.
 5        Q.   Based on your investigation, when you
 6   looked at the back of the check, you came to
 7   the conclusion that there was no evidence that
 8   check was ever cashed?
 9             MR. KESHAVARZ:  Object to form.
10        A.   I don't know what you mean by cashed.
11        Q.   Cashed by Mr. Moses.
12        A.   No, it was not, and correct, because
13   it was signed by an employee, a bank employee,
14   and on the top of your exhibit it shows the
15   transfer.  That's how they used to transfer
16   funds and the manager would sign that to
17   approve it, so correct, it was all internal.
18        Q.   Well, then, let's go to number 16 on
19   the next page.  Tell me when you are there.
20        A.   I am there.
21        Q.   Okay.  16, whether any funds were
22   ever paid out by Wells Fargo to the Gutman
23   defendants or Marshal Ronald Moses pursuant to
24   a garnishment order associated with the
25   above-referenced Wells Fargo case numbers, and
```



                          K. Denaro
 1
 2    if so, when and how.
 3             Based upon your investigation
 4    pursuant to the subpoena, as well as your
 5    conversations with Ms. Pacheco, it is Wells
 6    Fargo's position that no funds were ever paid
 7    out to Gutman, Mintz or to Marshal Moses; is
 8    that correct?
 9        A.    Correct.
10        Q.    I am going to come back to this in a
11    little bit, but let's go to Exhibit 18.  Tell
12    me when you are there.
13        A.    What Bates stamp is that?
14        Q.    It is not a Bates stamp.  It would
15    have been Mr. Keshavarz's exhibit from
16    yesterday, Exhibit 18.  It's a letter -- sorry.
17    Go ahead.
18        A.    I just wanted to confirm.  I marked
19    it myself, but I want to make sure.
20    December 13, 2019, letter to Emma?
21             MR. ARTHUR:  What Depo number is
22    that?
23             MR. NOVIKOFF:  Exhibit 18.
24             MR. ARTHUR:  It was a Bates stamped
25    Depo --



1                    K. Denaro

2                    MR. NOVIKOFF:  No.  Again, the

3       exhibit that was marked was the December 13,

4       2019, letter from James Power, counsel for

5       Wells Fargo, to Emma Cateribne, and the third

6       page of this exhibit is the Shakiah Jones

7       business record declaration dated December 13,

8       2019.

9            Q.   I am going to refer your attention to

10      the bottom of this page and then the top half

11      of the second page.

12               With regard to when it says amount

13      held, what is your understanding as to what

14      that means?

15           A.   When we hold any funds in a New York

16      marshal levy or information subpoena with

17      restraint case, we are holding funds that would

18      be above the threshold.

19           Q.   When you say "above the threshold,"

20      what do you mean by threshold?  Well, what does

21      Wells mean by threshold?

22           A.   There is a state exemption or federal

23      exemption, so we have to, you know, apply the

24      exemption.  If the account is below the state

25      exemption, then we are not restraining, nor are



```
 1                      K. Denaro
 2    we taking any funds.
 3         Q.   Got it.  It says amount paid out to
 4    marshal, 16,570.21.  Now, again, you didn't
 5    write this.
 6         A.   Correct.
 7         Q.   So to the extent that Mr. Power,
 8    based upon whatever information he received,
 9    means by this that the marshal received
10    16,570.21.  Your investigation concluded that
11    that would have been wrong, correct?
12         A.   Correct.
13         Q.   And then amount returned to customer,
14    what does that mean, or what do you think --
15         A.   I don't -- I don't know.
16         Q.   Okay.  Let's go then to the next
17    three columns.  At least according to
18    Mr. Power, on these three other cases, no money
19    was paid out to Gutman, Mintz or Marshal Moses,
20    correct?
21         A.   Correct.
22         Q.   Okay.
23         A.   Correct.
24         Q.   And you would have to look -- in
25    order for you to ascertain information about
```



```
1                    K. Denaro
2   each of these case numbers, you would have had
3   to have gone into your system and reviewed the
4   files, correct?
5        A.   Correct.  1LLG.
6        Q.   I am going to move on from this, and
7   I am going to turn my attention to the Bates
8   stamp numbers, and I am going to go through --
9   oh, one last question.  In this action, and you
10  would not know this, I am representing that
11  Marshal Moses submitted a declaration dated
12  December 11, 2023, where he says the following:
13  "I never received monies from Wells Fargo
14  concerning plaintiff."
15           Based upon your investigation and
16  discussions with Ms. Pacheco, that would be a
17  truthful statement, correct?
18       A.   Correct.
19       Q.   Thank you.  Now -- actually, before I
20  get to there, you testified yesterday that it
21  was Wells Fargo's policy upon getting an
22  information subpoena and restraining notice
23  that if any monies were restrained -- I'm
24  sorry -- that if you got an information
25  subpoena and restraining notice, that
```



```
 1                        K. Denaro
 2    information and restraining notice would last a
 3    year such that if any monies came in that
 4    weren't otherwise exempt or below the
 5    threshold, you would then restrain that money?
 6              MR. KESHAVARZ:  Objection to form.
 7         A.   Correct.
 8         Q.   Are you aware of any New York State
 9    law that requires Wells Fargo to have such a
10    policy?
11              MR. KESHAVARZ:  Objection to form.
12         A.   I would have no idea.
13         Q.   Okay.  Did you ever advise --
14              MR. NOVIKOFF:  Well, withdrawn.
15         Q.   You are here as a corporate witness
16    so I will ask the questions more appropriately.
17              In your investigations pursuant to
18    the subpoena, did you come across any
19    communications between Wells Fargo and Gutman,
20    Mintz that advised Gutman, Mintz that the
21    information subpoena and restraining notice
22    was in effect for a year?
23              MR. KESHAVARZ:  Objection to form.
24         Q.   Pursuant to your policy?
25              MR. KESHAVARZ:  Objection to form.
```



```
 1                     K. Denaro
 2   Did you come -- could you say that again?
 3        Q.   In your review of any information you
 4   did pursuant to the subpoena, did you see any
 5   communications from Wells to Gutman, Mintz
 6   saying, with regard to this particular
 7   information subpoena and restraining notice,
 8   "We have put a year time period on it to
 9   restrain monies"?
10             MR. KESHAVARZ:  Objection, form.
11        A.   No.
12        Q.   In your experience, that would not be
13   something that Wells Fargo would communicate
14   with a law firm?
15             MR. KESHAVARZ:  Objection, form.
16        A.   I really -- I don't know.  We rely
17   on -- we don't give legal advice so we rely on
18   the lawyers to know what they are doing, but I
19   don't see letters that go out giving them any
20   kind of deadlines or -- no.
21        Q.   Got it.  Okay.  Perfect.
22             Mr. Keshavarz asked you a question,
23   a number of questions yesterday, concerning
24   whether or not Mr. Fadlevich sent exemption
25   claim forms to Wells Fargo, and you gave
```



```
 1                    K. Denaro
 2   whatever answer you gave.
 3            As you sit here today, based upon
 4   your research, is it your opinion that Wells
 5   Fargo did, in fact, receive exemption claim
 6   forms from Mr. Fadlevich?
 7            MR. KESHAVARZ:  Objection, form.
 8       A.   I did see communication I believe in
 9   case comments, I believe, that talked about
10   receiving exemption claim forms.
11       Q.   Is there a policy at Wells Fargo that
12   when they get an information subpoena and
13   restraining notice from, in this case, Gutman,
14   Mintz, that Wells Fargo would send out an
15   exemption claim form to the judgment debtor?
16   Is that a policy of Wells Fargo?
17            MR. KESHAVARZ:  Objection, form.
18            Ma'am, if you could pause between the
19   question and answer.
20            THE WITNESS:  So sorry.
21            MR. KESHAVARZ:  Don't be sorry.
22       Q.   I will rephrase the question.  Does
23   Wells Fargo have a policy with regard to when
24   they receive an information subpoena and
25   restraining notice from a law firm, as well as
```



```
1                      K. Denaro
2    an exemption claim form that would accompany
3    that information subpoena and restraining
4    notice, that it would then send the exemption
5    claim form to the judgment debtor?
6              MR. KESHAVARZ:  Objection.  Form.
7         A.   I really don't know because I am not
8    involved.  That's why I would have to go into
9    the computer system to see what was actually
10   mailed out, so I am not aware of any procedure
11   or -- I don't know for sure.
12        Q.   That is not within your universe of
13   duties and responsibilities; is that correct?
14        A.   Correct, right, and I know the
15   exemption claim forms come in with the legal
16   orders, but I don't know, you know, what
17   happens after that.
18        Q.   And the legal orders would be the
19   information subpoena and restraining notice?
20        A.   Correct.
21        Q.   I will not bother you with regard to
22   your knowledge of policy ever again, but I will
23   be showing you some documents.
24        A.   Okay.
25        Q.   Let's look at Bates stamp WF63.
```



```
 1                    K. Denaro

 2        A.    Okay.

 3        Q.    Are you familiar with what this

 4   document is?

 5        A.    I am, yes.

 6        Q.    Could you please describe what this

 7   document is?

 8             MR. KESHAVARZ:  Sorry.  What was the

 9   Bates stamp number?

10             MR. NOVIKOFF:  63.

11             MR. KESHAVARZ:  Sorry for the

12   interruption.

13             MR. NOVIKOFF:  No problem.  Don't

14   worry about it.

15        A.    What this document is, it's a cover

16   sheet from CSC.  They provide the sheet with

17   the legal order that they received, so we know

18   when they received it, how it was served, and,

19   of course, there's other information on there

20   as well.

21        Q.    What is CSC?

22        A.    CSC is our registered agent.

23        Q.    So if I am reading this correctly on

24   WF63, CSC received via certified mail by Mark

25   H. Fadelvich on April 8, 2019, a letter re:  A
```



```
 1                    K. Denaro
 2   demand for release of freeze.  Did I read that
 3   correctly?
 4        A.   Yes, you did.
 5        Q.   Now, you can't tell from this
 6   document what was within this letter, right?
 7             MR. KESHAVARZ:  Objection to form.
 8        A.   Correct.
 9        Q.   I am just going to go in the order of
10   the Bates stamp numbers, so forgive me.  I will
11   be coming back to similar documents like this,
12   but I just think it's easier to go through the
13   numbers in the order that they appear.
14             Now let's go to WF66.
15        A.   Okay.
16        Q.   This was produced by Wells Fargo,
17   obviously, and 67.  This is a Wells Fargo Bank
18   statement for Mark Fadlevich for the time
19   period of December 12, 2018, and January 10,
20   2019.  I am turning your attention to WF67.
21        A.   Okay.
22        Q.   Am I correct when I am looking at a
23   12/20 entry for deposit addition of 17,522.40
24   that this reflects that Wells Fargo reversed
25   the withdrawal of 17,522.40 that they had
```



```
 1                    K. Denaro
 2   previously done with regards to the information
 3   subpoena and restraining notice?
 4            MR. KESHAVARZ:  Objection, form.
 5       A.   I can't say which case it was
 6   regarding because it doesn't say, but it just
 7   shows that a refund was given to the customer.
 8       Q.   It does say case number 121562418.
 9       A.   It does.  Sorry.  So whatever that
10   case number is.
11       Q.   Would it surprise you that based upon
12   your investigation and your testimony
13   yesterday, that the 17,522.40 reflects the
14   16,570.21 that was on that check that was cut
15   internally, as well as the 952.19 that had been
16   restrained pursuant to a Ronald Moses
17   communication?
18            MR. KESHAVARZ:  Objection to form.
19       A.   I mean, I would have to go through
20   the cases.
21       Q.   Fair enough.
22       A.   Sorry.
23       Q.   Don't apologize.  The number is what
24   the number is, and the math will be what the
25   math will be, so that's fine.
```



```
 1                      K. Denaro
 2             Let's go now to WF71.  It is WF71 to
 3      WF72, so I am going to let you read this.
 4      Tell me when you are done reading it.
 5             (Pause in the proceedings.)
 6        A.   Okay.  It's just the one page,
 7      because the next page -- oh, I'm sorry.  Bank
 8      statement is the next page.  Sorry.  Yes, I
 9      have read it.
10        Q.   71 and 72 is a letter, a two-page
11      letter, and it is dated December 14, 2018, via
12      certified mail, return receipt requested, and
13      it is purportedly from Mark H. Fadelvich.  Do
14      you see that?
15        A.   Yes.
16        Q.   This was produced by Wells Fargo, as
17      you note from the bottom and from the
18      statements of Shakiah F. Jones.  You would
19      agree with me?
20        A.   If that's what she produced.  I would
21      have to look at her production, but if that's
22      what she produced.
23        Q.   My question to you, if she produced
24      this letter -- sorry.  If Wells Fargo produced
25      this letter, then at some point in time it
```



```
 1                    K. Denaro
 2   would have had to have been in the possession
 3   of Wells Fargo, correct?
 4        A.   Yes.
 5        Q.   You know, sometimes the most simplest
 6   question causes the witness confusion.  I
 7   apologize.
 8             Now, this letter was sent via
 9   certified mail, at least according to this
10   letter, to, among others, Wells Fargo Bank NA.
11   Do you see that?
12        A.   Yes.
13        Q.   Would you agree with me in this
14   letter Mr. Fadlevich is emphasizing, by virtue
15   of putting the language in bold and caps, that
16   "All of the money in my Wells Fargo Bank
17   account is exempt money I have received for
18   Social Security Disability"?  Do you see that?
19        A.   I do see that, yes.
20        Q.   Would you have received this letter
21   as part of your duties and responsibilities?
22        A.   No, sir.
23        Q.   Who at Wells would have received this
24   letter?
25             MR. KESHAVARZ:  Objection, form.
```



```
 1                    K. Denaro
 2       Q.   What department would this letter
 3   have been sent to?
 4            MR. KESHAVARZ:  Objection, form.
 5       Q.   Go ahead, ma'am.
 6       A.   Payouts and Releases.
 7       Q.   And you don't know as you sit here
 8   what their procedures are as they receive a
 9   letter like this, correct?
10       A.   Correct.
11       Q.   Okay.  Now, let's look at the second
12   page, first full paragraph.  This is what Mr.
13   Fadlevich wrote.  "On December 7th, 2018, I
14   completed and signed the attached exemption
15   claim form stating under penalty of perjury
16   that the money in my account was from Social
17   Security and thus was exempt.  I promptly
18   mailed the completed exemption claim form and
19   bank statement to Wells Fargo."
20            Did I read that correctly?
21       A.   Yes, sir.
22       Q.   Again, this is not your department,
23   but at least based upon what I just read, what
24   Mr. Fadlevich is telling, among other entities,
25   Wells Fargo is that "On that date, December 7,
```



```
1                      K. Denaro
2    I completed my exemption claim form.  I said
3    under the penalty of perjury that the money
4    that was restrained is exempt, and I mailed to
5    Wells Fargo the exemption claim form and bank
6    statements," right?
7        A.   According to this letter, yes.
8        Q.   According to that letter.  So let's
9    assume this letter is true, that it was sent
10   and that Mr. Fadlevich did, in fact, send the
11   exemption claim form to Wells.  That also would
12   have gone to that other department, right?
13           MR. KESHAVARZ:  Objection, form.
14       Q.   Well, where would an exemption claim
15   form for Mr. Fadlevich go to upon receipt by
16   Wells Fargo?
17           MR. KESHAVARZ:  Objection to form.
18           Go ahead.
19       A.   Payouts and Releases.
20       Q.   Are you aware of any New York State
21   law that requires a banking institution to
22   release restraints upon receipt of an exemption
23   claim form unless the judgment creditor makes a
24   motion in court?
25           MR. KESHAVARZ:  Objection to form.
```



                           K. Denaro

1           A.    I am not aware of a law.  I mean, I

2     just know what I have read about our

3     procedures, but I don't know -- I have never

4     done research in New York law.

5           Q.    But you have read procedures, but I

6     think what you just testified earlier was that

7     you don't know the procedures of -- what is

8     that department again?  I apologize.

9           A.    Payouts and Releases.

10          Q.    So you don't know what their

11    procedure is once they get an exemption claim

12    form?

13          A.    I really -- I really don't.  I mean,

14    I read them, but I can't testify because I

15    don't work in it.

16          Q.    Perfect.  Okay.  Thank you.

17                Let's go to 78, WF78.  This is a

18    similar document to Wells Fargo 63, right?

19          A.    Yes.

20          Q.    On this one, and tell me if I am

21    reading it correctly, CSC received via

22    certified mail by Eric Keilbach on July 15,

23    2019, an information/appearance request.  Is

24    that right?



```
 1                    K. Denaro
 2        A.   That is what the document says.
 3        Q.   Do you have an understanding as to
 4   what appearance request meant?
 5        A.   No.
 6        Q.   It says answer or appearance due
 7   seven days.  Do you have an understanding as
 8   you sit here today what that means?
 9        A.   No, I do not.
10        Q.   Fair enough.  Let's go to WF81.
11   Actually, let's go 79 to 81.
12        A.   Okay.
13        Q.   Are familiar with what this document
14   is?  I don't mean as it pertains to Mr.
15   Fadlevich.  I just mean in general.
16        A.   It's an information subpoena with
17   restraining notice, so yes, I am.
18        Q.   The date of this is 7/10/2019.  Do
19   you see that?
20        A.   Correct, yes.
21        Q.   Now, if I understand it correctly,
22   you tell me if I am wrong, this is what CSC
23   would have received, these three pages, on
24   7/15/2019 via certified mail from Mr. Keilbach?
25        A.   I don't know.  I would have to look
```



```
 1                     K. Denaro
 2    in our system.  I don't know.
 3         Q.   Fair enough.
 4         A.   I am not going to say this is
 5    complete.
 6         Q.   Fair enough.  Actually, you know
 7    what?  I should be looking at 79 through 82,
 8    but let's go to 81.
 9              Have you in your normal practice as
10    part of your duties and responsibilities, have
11    you ever reviewed what appears on WF81?
12         A.   Yes.  I read them before, yes.
13         Q.   For what reason would you have read
14    this type of document?
15         A.   Well, because in my job, I like to
16    know -- I like to know everything about what I
17    do, so I would have read these documents when I
18    first started just to see what they meant.
19         Q.   You testified yesterday that Wells
20    has a procedure that when they get an
21    information and restraining notice and they see
22    that there is Social Security payments, that
23    the policy is to go back 60 days, and if there
24    are Social Security deposits within 60 days of
25    the information subpoena, those funds do not
```



```
 1                    K. Denaro
 2   get restrained.  Is that correct?
 3         A.   Correct.
 4         Q.   Are you aware of any New York State
 5   law that requires only the 60 day look-back?
 6              MR. ARTHUR:  Objection.
 7         A.   No, I am not.  I don't know -- I have
 8   never done research in New York for any laws.
 9         Q.   That's fine.  And I am not asking --
10   I know you are not a lawyer.  I just wanted to
11   know what your general knowledge was, so I will
12   move on.
13              Let's go to 85 and 86.  We went over
14   them, I believe, with Mr. Keshavarz yesterday.
15   He asked you some questions about a similar
16   document.  Maybe not these Bates stamp
17   numbers, but the same document.  Tell me when
18   you get there.
19         A.   I am there.
20              MR. ARTHUR:  What Bates number are we
21   referring to, counsel?
22              MR. NOVIKOFF:  85 and 86.
23         Q.   So would you agree with me that this
24   is a response to an information subpoena with
25   restraining notice that was served on Wells
```



```
 1                      K. Denaro
 2    Fargo by Gutman, Mintz dated 11/16/2018 -- that
 3    was the date of the information subpoena --
 4    regarding Mr. Fadlevich?
 5         A.    Page 86 is our answer.
 6         Q.    Thank you.  So let's stick now to
 7    page 86.  I think Mr. Keshavarz asked you some
 8    questions about the stamp.  So I read this
 9    stamp correctly, in conjunction with answers to
10    number 1, if Gutman, Mintz received this from
11    Wells Fargo, it would have told them that funds
12    are, in fact, being held, and the amount being
13    held is 23,964.89; is that correct?
14         A.    Yes.
15         Q.    And the date of this response is
16    November 27, 2018, based upon the stamp?
17         A.    Yes.
18         Q.    Am I also correct in understanding
19    this response correctly that at least according
20    to Wells Fargo, in response to question number
21    2 -- sorry -- question number 3, Mr. Fadlevich
22    was employed by a Printfresh Studios with the
23    phone number (205) 422-1818?
24              MR. KESHAVARZ:  Objection to form.
25              MR. ARTHUR:  Objection.
```



```
 1                      K. Denaro
 2         A.    Correct.
 3         Q.    And that's what Gutman, Mintz would
 4    have come to the conclusion of based upon this
 5    response, right?
 6               MR. KESHAVARZ:  Objection, form.
 7         Q.    You can answer.
 8         A.    Correct.
 9         Q.    Let's go to 96.  Tell me when you are
10    there.
11         A.    I am there.
12         Q.    This is a similar document to 63 and
13    78.  It is a notice of service of process by
14    CSC that was sent by them to Wells, correct?
15         A.    Correct.
16         Q.    How would this document get to Wells?
17    Is it electronically transferred, is it by
18    mail?
19         A.    I do not know.
20         Q.    Fair enough.  Now, according to this
21    document, and tell me if I am reading it
22    incorrectly, CSC was served on February 13,
23    2019, with a certified letter from Mark
24    Fadlevich, and it is identified as a demand
25    letter, right?
```



                          K. Denaro

1
2       A.    Correct.

3       Q.    Now, again, based upon this letter,

4   you don't know what was contained within the

5   letter itself or what was attached to the

6   letter, right?

7             MR. KESHAVARZ:  Objection.  Form.

8       A.    Correct.

9       Q.    Got it.  Again, based upon your prior

10  answer, when it says appearance,

11  answer/appearance due 2/2/2019, you don't know

12  what that means, right?

13      A.    Correct.

14      Q.    Now, let's look at 97.

15      A.    Okay.

16      Q.    This is a letter that was produced by

17  Wells Fargo purportedly from Mr. Fadlevich

18  dated January 24, 2019, correct?

19      A.    Correct.

20      Q.    And at least according to this

21  letter, Wells Fargo was mailed this letter

22  along with Gutman, Mintz, Marshall Moses, and

23  Wells Fargo Processing, right?

24      A.    Right.

25      Q.    To the extent there is, what is the



```
 1                    K. Denaro
 2   difference between Wells Fargo Bank NA care of
 3   Corporation Services Company, 80 State Street,
 4   and Wells Fargo Processing, PO Box 416,
 5   Charlotte, North Carolina?
 6       A.   What is the difference?  I don't
 7   know.  I think that they are -- I don't know.
 8   I really don't know.
 9            I mean, I can tell you that the
10   processing department is in Charlotte.  That's
11   where I am located so that's our address, so
12   it looks like they wanted to send the letter
13   to the CSC as well.
14       Q.   Got it.  So the top address would be
15   CSC, which is Wells's agent, and Wells Fargo
16   Processing is a department, for lack of a
17   better word, at Wells Fargo in Charlotte, North
18   Carolina?
19       A.   Correct.
20       Q.   Got it.  Now, in this letter, Mr.
21   Fadlevich is saying to Wells and Gutman and
22   Marshal Moses in the third paragraph, "It
23   appears from your letter that you did not read
24   any of the documents I previously sent.  These
25   documents establish that the funds were Social
```



```
 1                      K. Denaro
 2    Security specifically from the 33,626.00 which
 3    I was awarded by Social Security Administration
 4    because it had 'withheld money from [my]
 5    benefits.'"
 6              Did I read that accurately?
 7         A.   Yes.
 8         Q.   So based upon the December letter
 9    that we went over -- do you want me to get you
10    that document number for your benefit?
11         A.   Yes.  That way I can look at.
12         Q.   It was 71, 72.
13              So based upon this letter, what Mr.
14    Fadlevich -- tell me if I am reading this
15    incorrectly -- is saying is that I sent you
16    documentation on December 14, 2018, or in that
17    time period, showing to you that my funds were
18    exempt because of disability payments,
19    correct?
20         A.   Correct.
21         Q.   And included in that would have been
22    the exemption claim form?
23              MR. KESHAVARZ:  Objection.  Form.
24         A.   I don't know what he would have
25    mailed in.
```



```
 1                    K. Denaro

 2        Q.   Okay, that's right.

 3        A.   Again, I would have to go into the

 4   computer.  I don't know if this is the complete

 5   mailing.

 6        Q.   Fair enough.  Let's go to 136.

 7        A.   Okay.

 8        Q.   And 137.  Now, this was produced by

 9   Wells Fargo because of the Bates stamp number,

10   and Ms. Jones's representation or declaration.

11             Are you familiar with what this type

12   of document is?

13        A.   Yes.

14        Q.   What is this document?

15        A.   This is a letter from the Social

16   Security Administration to Mr. Fadlevich, care

17   of somebody else's name, and possibly address,

18   but it's showing that they are going to be

19   sending in a check in the amount of 33,626.

20        Q.   And you don't know as you sit here

21   today whether --

22             MR. NOVIKOFF:  Withdrawn.

23        Q.   Would you agree with me that the fact

24   that Wells Fargo produced this document

25   reflects that Wells Fargo came into possession
```



```
 1                      K. Denaro
 2   of this document at some point in time?
 3        A.   Yes.  If Wells produced it, yes.
 4        Q.   So now let's look at 138 and 139.  To
 5   your knowledge, is 138 a document that Wells
 6   created?  I am not talking about 139 yet.  I am
 7   only talking about 138.
 8        A.   I don't think that we would have
 9   produced this.  It looks like the customer
10   created this.
11        Q.   Created, right.  You did produce it,
12   but you are testifying this is not a
13   Wells-created document?
14        A.   Correct.
15        Q.   It is your position, based upon
16   whatever knowledge and experience you have,
17   that in all likelihood Mr. Fadlevich would have
18   created this document?
19        A.   Sorry.  My earbuds.
20        Q.   It is your testimony as you sit here
21   today based upon your knowledge, your
22   experience, that this would have been created,
23   this one document, 138, by Mr. Fadlevich?
24        A.   This exemption claim form?
25        Q.   It says my --
```



```
 1                     K. Denaro
 2      A.   Yes.  I would assume.  I don't know.
 3      Q.   Let's look at 139.
 4      A.   Okay.
 5      Q.   This is an exemption -- I am sorry.
 6  Do you recognize what this document is based
 7  upon your knowledge and experience and/or your
 8  investigations pursuant to the subpoena?
 9      A.    It looks like it is an exemption
10  claim form that the customer would have filled
11  out and signed.
12      Q.   And the customer would have been Mark
13  Fadlevich?
14      A.   Correct.
15      Q.    If I am reading this correctly, he
16  would have executed this on December 7, 2018?
17      A.   Yes, that's what it looks like, yes.
18      Q.   Would I be correct that given that
19  Wells produced this, that at some point in time
20  Wells became in possession of this document?
21      A.   Yes.
22      Q.   And would you agree --
23           MR. NOVIKOFF:  Well, withdrawn.
24           MR. ARTHUR:  Can we take a pause?
25           MR. NOVIKOFF:  Absolutely.
```



1                        K. Denaro

2               (Pause in the proceedings.)

3               (Discussion off the record.)

4               MR. KESHAVARZ:   We have a stipulation

5       that Exhibit number 16 from yesterday is Wells

6       Fargo document production 01 through 54, and

7       Exhibit Number 19 is Wells Fargo's document

8       production 55 through 497, and we that are

9       going to use those exhibits just to clarify.

10              Exhibit 16 includes the December 13,

11      2019, letter from Wells Fargo to Emma

12      Cateribne, two pages, as well as the business

13      record declaration in the matter ending in

14      4509.

15              Exhibit 19, the first page has a

16      business records declaration with the last four

17      digits of 4509.

18              When we are referencing those Bates

19      stamp numbers in Wells Fargo's production,

20      that's a reference to those exhibit numbers.

21              (Discussion off the record.)

22        Q.   We are back on the record, and you

23      indicated that there may have been some sound

24      issues.  Do you think you are were unable to

25      hear any of my questions?



1                    K. Denaro

2        A.    I did not hear the last question

3   because my -- I was on the floor in the middle

4   of everybody, and I had earbuds, and they just

5   stopped working so I did not hear your last

6   question.

7              MR. NOVIKOFF:  Madam Court Reporter,

8   please read back my last question.

9              (Record read.)

10       A.    The answer would be yes.

11       Q.    Let's move on to WF146.

12       A.    Okay.

13       Q.    Now, would you agree with me that

14  this document appears on its face to be a

15  photocopy of an envelope sent by Mr. Fadlevich

16  to Wells Fargo Bank care of Corporation Service

17  Company via certified mail on or about -- and

18  it was mailed out on February 8, 2019?

19       A.    Correct.

20       Q.    Let's look at 147.  Would you agree

21  with me that similar to Wells 63, 78 and 90 is

22  a notice of service of process by CSC

23  indicating that CSC was served on November 21,

24  2018, by Eric Keilbach with an information

25  subpoena with restraining notice?



```
 1                         K. Denaro
 2         A.    Correct.
 3         Q.    We'll move on.  Let's go to -- if I
 4    asked you what your universe of knowledge and
 5    responsibilities are, you have already answered
 6    it.
 7               Let's go to WF191.
 8         A.    Okay.
 9         Q.    Would you agree with me that this
10    document reflects a photocopy of an envelope
11    from Mr. Fadlevich to Wells Fargo Bank NA care
12    of Corporation Services Company which was
13    mailed out on December 15, 2018?
14         A.    Yes, sir.
15         Q.    By certified mail?
16         A.    Yes, sir.
17         Q.    Let's look at 192.  Again, since we
18    have gone over similar documents, would you
19    agree with me that this is a document that was
20    in possession of Wells Fargo since it was
21    produced by Wells Fargo?
22         A.    Yes.
23         Q.    And that this reflects a CSC notice
24    of service of process dated -- sorry -- that
25    was served on CSC on December 20, 2018, by Mark
```



```
 1                   K. Denaro
 2    Fadlevich, and the document type is described
 3    as letter exempt money notice?
 4         A.   Yes.
 5         Q.   Let's look at the next document.  I
 6    am struggling to see where it's Bates stamped,
 7    but it is within the production between 192 and
 8    194.  Do you see it says customer complaints?
 9         A.   Yes, sir.
10         Q.   Are you familiar with this type of
11    document?
12         A.   No, sir.
13         Q.   Let's move on to Wells WF240.
14         A.   Okay.
15         Q.   Again, would you agree with me that
16    this appears to be a document that was in the
17    possession of Wells Fargo since it was part of
18    its production?
19         A.   Yes, sir.
20         Q.   And the document reflects a photocopy
21    of an envelope from Mr. Fadlevich to Wells
22    Fargo Processing via certified mail mailed out
23    on February 6, 2019?
24         A.   Yes, sir.
25         Q.   Let's look at 241.  Now, 241, would
```



```
 1                       K. Denaro
 2    you agree with me that this would be a document
 3    that was in Wells' possession since it was
 4    produced by Wells?
 5         A.   Yes, sir.
 6         Q.   And that this document -- correct me
 7    if I am wrong -- is a notice of service of
 8    process by CSC reflecting a letter by certified
 9    mail from Mr. Fadlevich served on CSC on
10    4/29/2019, document type being demand her
11    nature of action, garnishment/withholding?
12         A.   Yes.
13         Q.   Do you have an understanding as to
14    what garnishment/withholding refers to on this
15    document?
16         A.   Honestly, no.
17         Q.   Fair enough.  This document also says
18    Client Requested Information:  Matter
19    Management User Groups:  Garnishments Customer
20    LOP East.
21              Do you have an understanding as to
22    what that means?
23         A.   No.
24         Q.   Let's look on the upper right-hand
25    part of this letter.
```



```
 1                    K. Denaro
 2            MR. KESHAVARZ:  Which Bates stamp,
 3     please?
 4            MR. NOVIKOFF:  Same thing, 241.  We
 5     are still on it.
 6        Q.   It looks like some type of stamp that
 7     says 115416218 MISC, and beneath that Best
 8     Copy.
 9            Do you have an understanding as to
10     what the 115 MISC references?
11        A.   Well, since it ends in 18, I would
12     assume it's a case number, so that's a Wells
13     Fargo case number.
14        Q.   What is the reference to MISC, if you
15     have an understanding?
16        A.   I really -- I don't.  I know what
17     MISC means, but I don't --
18        Q.   I think we can assume what it means,
19     but in this context you don't know.
20        A.   Correct.
21        Q.   Not a guessing game.  When it says
22     Best Copy, are you familiar with why something
23     like this would be put on?
24        A.   I do not.
25        Q.   Are you familiar with underneath that
```



```
 1                   K. Denaro
 2    it says AZH/ALL transmittal number, date
 3    processed.  Is that something you are familiar
 4    with?
 5          A.   No, sir.
 6          Q.   Let's look at the next letter -- the
 7    next two document, which are 242 and 243.
 8          A.   Okay.
 9          Q.   Please read those two pages and tell
10    me when you are done.
11               (Pause in the proceedings.)
12          A.   Okay.
13          Q.   Now, this appears to be a letter that
14    was in Wells Fargo's possession because they
15    produced it, correct?
16          A.   Correct.
17          Q.   So someone would have sent this
18    letter to them, right?
19          A.   If we produced it, yes.
20          Q.   It purports to be a certified mail,
21    return receipt requested letter, which appears
22    to have been dated April 24, 2019, because the
23    second was crossed out, to Gutman, Mintz, but
24    you notice there is a cc to Wells Fargo care of
25    Corporation Services Company on the second
```



```
 1                     K. Denaro
 2   page.  Do you see that?
 3        A.   Yes, sir.
 4        Q.   In this letter, Mr. Fadlevich says,
 5   in the end of the first paragraph, "I have also
 6   enclosed a re-signed copy of the exemption
 7   claim form."
 8            So if you -- would you agree with me
 9   that if Mr. Fadlevich was telling the truth
10   and that he did, in fact, attach to this
11   letter a re-signed copy of the exemption claim
12   form, that Wells Fargo would have become in
13   receipt of it?
14        A.   I don't know.  I mean, I don't know
15   what he mailed.
16        Q.   If he did, in fact, mail the
17   exemption claim form and it was enclosed with
18   this letter, Wells Fargo would have received it
19   at some point in time?
20        A.   If he did.  If he enclosed it,
21   then -- and if we produced it, but I don't
22   remember exactly what it contained.
23        Q.   And we are getting to the next
24   document.  I am not trying to trick you.  I am
25   just trying to get a handle on the documents.
```



```
 1                    K. Denaro
 2              Let's go to 244.
 3        A.    Okay.
 4        Q.    Do you recognize what this document
 5   is?
 6        A.    This is a completed exemption claim
 7   form from Mr. Fadlevich dated April 24, 2019.
 8        Q.    And the date on the letter reflected
 9   on 242 and 243 is?
10        A.    Is April 24, 2019.
11        Q.    Again, since this was produced by
12   Wells, at some point in time Wells would have
13   come into possession of this document?
14        A.    Yes.
15        Q.    Let's look at the next document, 245
16   to 246.  Please read it and tell me when you
17   are done.
18              (Pause in the proceedings.)
19        A.    Okay.  I have read it.
20        Q.    Now, this letter was produced by
21   Wells so you would agree with me that at some
22   point in time Wells would have come into
23   possession of this letter, right?
24        A.    Yes.
25        Q.    Not sure of the date.  It says
```



```
 1                    K. Denaro
 2    April 2nd, 2019, but it's crossed out, and
 3    unlike the other letter, which is 242, there
 4    doesn't seem to be another clear date put on
 5    that; is that correct?
 6         A.   Correct.
 7         Q.   And this letter, at least according
 8    to this letter, was sent by certified mail,
 9    return receipt requested, to Gutman, Mintz with
10    a copy to Wells Fargo Bank care of Corporation
11    Services Company, right?
12         A.   Correct.
13         Q.   As well as Marshal Moses, correct?
14         A.   Yes.
15         Q.   And you would agree with me that when
16    comparing this letter to the April 24th letter,
17    this letter does not indicate that it's
18    attaching a re-signed copy of the exemption
19    claim form, correct?
20         A.   The claim form, no.
21         Q.   It does not reflect that, correct?
22         A.   It does not reflect that, no.
23         Q.   Let's move on.  Let's go to 244 and
24    255.
25         A.   Okay.
```



```
 1                    K. Denaro
 2        Q.   Now, you identified for me what this
 3   document reflects based upon your knowledge,
 4   experience, and investigation?
 5        A.   This is an information subpoena with
 6   restraining notice dated March 11, 2019.
 7        Q.   And this is an information subpoena,
 8   at least the first page, with restraining
 9   notice issued by Eric Keilbach at Gutman, Mintz
10   to Wells Fargo, care of Corporation Services
11   Company, regarding Mr. Fadlevich, correct?
12        A.   If that's what the cover letter says.
13        Q.   Okay.
14        A.   I don't know where that is, but if
15   that's what the cover letter says, we have to
16   go by it.
17        Q.   Let's look at 254.  Do you see the
18   bottom right it says Eric Keilbach, Esq.,
19   Gutman, Mintz?
20        A.   Yes.
21        Q.   Do you see at the top underneath the
22   People State of New York, it says to Wells
23   Fargo Bank NA?
24        A.   Yes.
25        Q.   Do you see the caption, it says Mark
```



```
 1                    K. Denaro
 2    Fadlevich?
 3         A.   Yes.
 4         Q.   Now, there's a stamp that says
 5    28582119LEGL.  Do you have an understanding as
 6    to what that means?
 7         A.   Well, it ends in 19 so I am going to
 8    assume it is one of our case numbers.  28582 --
 9    yes.  That is one of our case numbers.
10              The LEGL stands for when we
11    upload -- again, we call it the legal order.
12         Q.   Okay.
13         A.   This is the master legal order.  We
14    only have one legal order to each case, and
15    that tells me that this is that legal order
16    from that case.
17         Q.   Again, just to make the record clear,
18    this document, the first page at 254, is dated
19    March 11, 2019, right?
20         A.   Yes.
21         Q.   And 255 is the next page.  Is this
22    the Wells Fargo response to the information
23    subpoena?
24         A.   Yes, sir.
25         Q.   Now, you would agree with me that
```



```
 1                      K. Denaro
 2    someone -- if my client received this response,
 3    when it says under threshold, that's Wells
 4    Fargo is telling the recipient of this document
 5    that Wells has not restrained any money; is
 6    that correct?
 7              MR. KESHAVARZ:  Objection to the form
 8    of the question.
 9              Go ahead.
10              MR. NOVIKOFF:  I will rephrase the
11    question.
12         Q.   Does this document, 255, reflect,
13    because it says under threshold, that no monies
14    were being restrained pursuant to this
15    information subpoena at the time this response
16    was served?
17              MR. KESHAVARZ:  Objection to the form
18    of the question.
19              Go ahead.
20         A.   It does because the amount held is
21    blank.
22         Q.   And under threshold, you see the
23    stamp that says under threshold?
24         A.   Yes, sir.
25         Q.   What does that mean?
```



```
 1                        K. Denaro
 2        A.    Under threshold means when we apply
 3   the state exemptions, if the account balance
 4   is -- if the balance in the account is under
 5   the state exemption amount, then we do not
 6   restrain the account, we do not take any funds,
 7   so it's marked an invalid account.
 8        Q.    And then question number 3, it says
 9   what is the debtor's place of business
10   including name, address and telephone numbers
11   as listed in your records.  It says here
12   employer, Printfresh Studios with an address
13   and a phone number.  Do you see that?
14        A.    I do, yes.
15        Q.    Again, you didn't put this response
16   in, did you?
17        A.    No, sir.
18        Q.    But based upon your understanding,
19   this response is indicating that there is an
20   employer of Mr. Fadlevich, and it is Printfresh
21   Studios, correct?
22             MR. KESHAVARZ:  Objection to form.
23        A.    Correct.  We go into the system and
24   answer the questions with whatever information
25   we have.  You know, if the attorney asks for
```



```
 1                      K. Denaro
 2    employer, we give them what we have in our
 3    system.
 4         Q.   Got it.  Okay.  I am going to move
 5    on.  Let's go to WF305.
 6         A.   Okay.
 7         Q.   Would you agree with me that this was
 8    a document in the possession of Wells Fargo
 9    since it was produced?
10         A.   Yes, sir.
11         Q.   Would you also agree with me that
12    this document reflects a photocopy of an
13    envelope from Mark Fadlevich to Wells Fargo
14    Bank NA care of Corporation Services Company
15    that was mailed on April 24, 2019?
16         A.   Yes, sir.
17              MR. KESHAVARZ:  Sorry.  What Bates
18    stamp are we on?
19              MR. NOVIKOFF:  This is 305.
20         Q.   I believe we looked at the next
21    document, 306 and 307, previously.  This would
22    be a letter purported to be from Mr. Fadlevich
23    to Gutman, Mintz with a copy to Wells Fargo
24    Bank care of Corporation Services Company dated
25    April 24, 2019, where he indicates in the end
```



```
1                        K. Denaro
2     of the first paragraph, "I have also enclosed a
3     re-signed copy of the exemption claim form."
4              Do you see that?
5         A.   I have also enclosed a re-signed
6     copy.  Yes, sir.
7         Q.   Again, you don't know why there's a
8     best copy stamp on this, right?
9         A.   Correct, I don't.
10        Q.   The next document at 308 is a
11    similar -- is an identical exemption claim form
12    dated April 24, 2019, that we had previously
13    looked at, right?
14        A.   Correct.
15        Q.   And 309 is a CSC notice of service
16    process reflecting that on April 29, 2019, CSC
17    was served by Mark Fadlevich by certified mail
18    with a demand letter with the nature of the
19    action being garnishment/withholding, correct?
20        A.   Yes, sir.
21        Q.   And let's look at the next document,
22    which is at WF310.  Correct me if I am wrong,
23    but this reflects a document that was in Wells'
24    possession at some point in time, right?
25        A.   Yes.
```



```
 1                    K. Denaro

 2       Q.    And that it is a notice of service of

 3  process on CSC reflecting that on May 28, 2019,

 4  Mr. Fadlevich, via certified mail, served Wells

 5  Fargo Bank NA with a letter regarding exempt

 6  funds with the nature of the action being

 7  garnishment/withholding?

 8       A.    Correct.

 9       Q.    Again, do you have the 115146218

10  reflect the case number?

11       A.    Yes, sir.  That's one of our case

12  numbers.

13            MR. KESHAVARZ:  Sorry.  What Bates

14  stamp are we at?

15            MR. NOVIKOFF:  310.

16       Q.    Let's look at the next document,

17  Wells Fargo 311.  Just read it and tell me when

18  you are done.

19            (Pause in the proceedings.)

20       A.    I am done.

21       Q.    This would be in Wells' possession at

22  some point in time, right?

23       A.    Yes, sir.

24       Q.    And it purports to be a letter from

25  Mark Fadlevich dated May 22, 2019, via
```



```
 1              K. Denaro

 2   certified mail, return receipt requested, to

 3   Gutman, Mintz with a copy to Mr. Moses and

 4   Wells Fargo Bank care of Corporation Services

 5   Company, correct?

 6        A.   Yes, sir.

 7        Q.   In this letter that Wells received,

 8   Mr. Fadlevich appears to once again be

 9   complaining that funds that were previously

10   restrained have not been released; is that

11   correct?

12        A.   Correct.

13        Q.   Let's look at -- you know what?  I am

14   going to move on from that one -- actually, I

15   am not.  Let's look at 314 and 315.

16             Again, this would have been in

17   Wells's possession at some point in time

18   because it was produced by Wells, right?

19        A.   Correct.

20        Q.   And it's a letter purportedly from

21   Mr. Fadlevich -- well, you know what?  Not

22   quite yet -- from Mr. Fadlevich to Gutman,

23   Mintz with a copy to Wells Fargo Bank care of

24   Corporation Services Company, correct?

25        A.   Yes, sir.
```



```
 1                   K. Denaro

 2        Q.   This one is dated April 2, 2019.  Do

 3   you see that?

 4        A.   Yes, sir.

 5        Q.   At the end of this paragraph he says

 6   in this particular document, "I have also

 7   enclosed a re-signed copy of the exemption

 8   claim form."  Do you see that?

 9        A.   Yes, sir.

10        Q.   And the next document, 316, is, in

11   fact, an exemption claim form.  Do you see

12   that?

13        A.   Yes, sir.

14        Q.   Now, there are three things that are

15   checked off:  Social Security, Social Security

16   Disability, SSD; Supplemental Security SSI.  Do

17   you see that?

18        A.   Yes, sir.

19        Q.   And the caption says Mark Fadlevich

20   is the judgment debtor?

21        A.   Yes, sir.

22        Q.   And this went to Wells Fargo Bank NA

23   care of Corporation Services?

24        A.   Yes, sir.

25        Q.   You would agree with me that as this
```



```
 1                    K. Denaro
 2   document was produced, the name appears to be
 3   whited out or something happened that you can't
 4   really see the signature at all, right?
 5        A.   Correct.
 6             MR. KESHAVARZ:  Objection to form.
 7   It is part of it.
 8        Q.   Ms. Denaro, can you read a full name
 9   on the signature of this document?
10        A.   No, sir.
11        Q.   Can you read the date?
12        A.   No, sir.
13        Q.   Let's look at 330.
14        A.   Okay.
15        Q.   Just read it and tell me when you are
16   done.
17             (Pause in the proceedings.)
18        A.   Yes, sir, I am done.
19        Q.   This was in a letter from -- it is a
20   letter from Trina Gomez to Mark Fadlevich dated
21   December 24, 2018.  Subject:  Concerns
22   regarding Wells Fargo case number 115416218,
23   right?
24        A.   Yes, sir.
25        Q.   And Ms. Gomez writes to Mr. Fadlevich
```



```
 1                        K. Denaro
 2    in part, "This letter is to inform you that we
 3    are in receipt of your concerns."
 4              As you sit here today, do you know
 5    what those concerns were?
 6              MR. KESHAVARZ:  Objection to form.
 7              MR. ARTHUR:  Objection.
 8         A.   Well, knowing the history of this
 9    case, but, I mean, it is quite vague.
10         Q.   Based upon your investigation, do you
11    have an opinion or any knowledge as to what the
12    concerns were as Ms. Gomez referenced?
13              MR. ARTHUR:  Objection.
14         A.   In this letter, no.  Only based on my
15    research did I know what the concerns were.
16         Q.   And based upon your research, what
17    were the concerns of Mr. Fadlevich?
18              MR. ARTHUR:  Objecting.
19         A.   That we held his federally exempted
20    funds.
21         Q.   Okay.  Let's move on to Wells 371.
22         A.   Okay.
23         Q.   Again, this would have been in Wells'
24    possession at some point in time because they
25    produced it?
```



1              K. Denaro

2        A.    Yes.

3        Q.    And correct me if I am wrong, but

4    this document reflects a photocopy of an

5    envelope from Mr. Fadlevich to Wells Fargo

6    Processing, PO Box 1416, Charlotte, North

7    Carolina, which was purportedly mailed by

8    certified mail on December 15, 2018, correct?

9        A.    Correct.

10       Q.    Let's go to 377 now.  Please read it

11   and tell me when you are done.

12             (Pause in the proceedings.)

13       Q.    So this is from Ms. Gomez to Mr.

14   Fadlevich dated February 15, 2019, subject:

15   concerns regarding Wells Fargo case number

16   115416218, and Ms. Gomez in part says, "We are

17   writing to let you know the Operations

18   Complaint Management executive office received

19   your concerns."

20             What is the Operations Complaint

21   Management Executive office?

22       A.    I mean, I -- I don't know.  I mean, I

23   only know the title, but I don't know what they

24   do.  I am not familiar with it.

25       Q.    Based upon the title, is this some



```
 1                      K. Denaro
 2    elevated department that complaints go to?
 3         A.   I would think so.  I mean, but,
 4    again, I don't know for sure.
 5         Q.   Understood.  Once again, Ms. Gomez
 6    refers to concerns of Mr. Fadlevich.  Do you
 7    know what she is referring to in this specific
 8    letter?
 9              MR. ARTHUR:  Objection.
10         A.   In this letter, no.  I mean, it just
11    says concerns.
12         Q.   Let's go to the next document, 428.
13    Tell me when you are there.
14         A.   Okay.
15         Q.   Once again, this was in Wells'
16    possession because it was produced, right?
17         A.   Correct.
18         Q.   This is 428, and would you agree with
19    me that this document reflects a photocopy of
20    an envelope from Mr. Fadlevich to Wells Fargo
21    Processing, PO Box 1416, in Charlotte, North
22    Carolina, that was purportedly mailed by
23    certified mail on February 6, 2019?
24         A.   Yes, sir.
25         Q.   Now I am going to go through some of
```



                          K. Denaro

 1

 2       the exhibits Mr. Keshavarz showed you

 3       yesterday, and I will try to cut it as -- make

 4       it as quick as I can because I think you have

 5       answered a lot of my questions already.

 6                Let's go to Exhibit 2.

 7           A.   What page is that?

 8           Q.   WF26.

 9           A.   Okay.

10           Q.   Do you know why in this December 11,

11       2018, letter from Wells, the operations manager

12       to Mr. Fadlevich, it was -- it says if you want

13       more information about the legal order, contact

14       Ronald Moses, Marshal?

15           A.   Well, this letter told me that 0848

16       should be -- the requester should be Ronald

17       Moses -- sorry.  Wells Fargo case number ending

18       in 2418, the requester should be Ronald Moses.

19           Q.   You say requester.  What do you mean?

20           A.   So the requester is the party that

21       sent in or served the legal order, so 2418, and

22       2418 is one of the LLG case numbers that were

23       served by the New York marshal, so that's why.

24                I am looking at the letter 2418, the

25       letter page 26, and then I was looking at my



```
 1                     K. Denaro
 2    list of case numbers so I could confirm that
 3    it actually was a Wells Fargo case number and
 4    it is a marshal levy.
 5               I was just making sure the 2418 is
 6    the marshal levy case, and it is.
 7         Q.   Let's -- are you done with your
 8    answer?
 9         A.   Which is why the marshal is listed on
10    this letter.  That's how our letters go out.
11         Q.   Let's look at Exhibit 3, which is
12    Wells Fargo 89 to 90.
13         A.   Okay.
14         Q.   Do you have -- do you need to read
15    this before you answer some questions?
16         A.   No.  I think I am pretty good.  I
17    have read this a couple of times.
18         Q.   With respect, based upon your
19    investigation and research, was an amended
20    letter needed to be sent out on December 12,
21    2018?
22               MR. ARTHUR:  Objection.
23         A.   Because when we processed this case
24    on the date of service, the processor applied
25    for state exemption, which is higher than the
```



1                    K. Denaro
2    federal exemption; however, the processor
3    failed to enter in the federal exemption into
4    the system, so the letter never went out to the
5    customer.
6         We have a report that gets pulled
7    for the next day, and that tells us somehow we
8    missed a federal exemption, we missed entering
9    in a federal exemption into this case.
10        So we looked at the case, and sure
11   enough, the 1,562 wasn't applied in the case,
12   so we just sent out the correct letter.
13        Q.   Got it.
14        A.   Because, you know, to inform the
15   customer, inform the customer that we did, in
16   fact, you know, protect those funds, even
17   though they are technically -- they are
18   protected because the state exemption was
19   already higher.
20        Q.   Got it.  And what was meant, to the
21   extent you know, by the language that follows,
22   "Please disregard any other letters you
23   received regarding the below account number"?
24        MR. ARTHUR:  Objection.
25        A.   I don't know.



```
 1                        K. Denaro
 2        Q.   Okay.  Easy enough.
 3             Now let's go to 328 and 329, which
 4   is Exhibit 5 from yesterday.
 5             MR. ARTHUR:  Can you repeat the Bates
 6   number?
 7             MR. NOVIKOFF:  328 and 329.
 8        Q.   Tell me when you are done.
 9        A.   Okay, I have read it.
10        Q.   Now, Mr. Keshavarz asked you a
11   question yesterday about what was wrong with
12   this letter.  I am not going to repeat the same
13   question and ask you to go line by line with
14   it.  You answered it yesterday.
15             But I will highlight one other error
16   which I --
17             MR. KESHAVARZ:  What is the Bates
18   stamp on that one?
19             MR. NOVIKOFF:  328 and 329.
20        Q.   On 328, Ms. Gomez writes that -- it
21   says, "Since we didn't receive a fax to release
22   funds to you, check number 1671904 in the
23   amount of $16,570.21 was mailed to the City
24   Marshal Ronald Moses on December 13, 2018."
25             You had indicated that was wrong
```



```
 1                    K. Denaro
 2   because no check was ever mailed to Marshal
 3   Moses, correct?
 4           MR. KESHAVARZ:  Objection to form.
 5      A.   Correct.
 6      Q.   Isn't it also wrong that it would
 7   have been an impossibility for the check to
 8   have been mailed out on December 13 since, at
 9   least according to the check that was
10   introduced yesterday at your deposition, the
11   check was dated December 14?
12           MR. KESHAVARZ:  Objection to form.
13      A.   If that's the -- if that's the date.
14   I mean, I have to go by -- I don't have the
15   check in front of me.
16      Q.   I will show you WF151.
17      A.   Yes, sir.
18      Q.   Let's look at 376, which was
19   Exhibit 7.  Tell me when you are done looking
20   at it.
21           (Pause in the proceedings.)
22      Q.   Now, again, Mr. Keshavarz asked you a
23   general question yesterday about what was wrong
24   in this letter.  You answered it the way you
25   answered it.
```



1                    K. Denaro

2            Once again, I am going to highlight

3      that Ms. Gomez in this letter dated

4      February 25, 2019, said that the check was

5      sent out on December 13.  You would agree with

6      me that that would be an impossibility since

7      the check was dated December 14?

8            A.   Correct.

9            Q.   Let's go to Exhibit 16 now.  This

10     would have Bates stamps 1 through 54, and I

11     will tell you which ones I want you to look at.

12           A.   I am sorry.  What number again?

13           Q.   This is Exhibit 16.  I haven't given

14     you a Bates stamp number yet.  I am going

15     through it.  You have covered a lot, but let's

16     turn our attention to WF25.  Policies and

17     procedures.  Look at it and tell me when you

18     are done.

19           A.   This is a release sent in from the

20     City of New York, Marshal Ronald Moses.

21           Q.   It says, "You are hereby authorized

22     and directed to release the execution

23     heretofore served upon you in the above

24     matter."

25            The question is, and if you don't



```
 1                    K. Denaro
 2   know the answer to it, that's fine, why
 3   wouldn't this release have been -- well, why
 4   didn't Wells release all of the money that was
 5   restrained when it got this document from
 6   Marshal Moses?
 7            MR. ARTHUR:  Objection.
 8       Q.   To the extent that you know.
 9       A.   I don't know.
10       Q.   Then I will not question you on it.
11            Let's look at WF35 and 36.
12   Actually, I believe we have gone through it so
13   let's skip that.
14            Let's look at WF, I believe it is,
15   37.
16       A.   Okay.
17       Q.   Can you identify based upon your
18   knowledge and/or your investigations what this
19   document is?
20       A.   This is a full release from the
21   Gutman, Mintz firm.
22       Q.   Is there any reflection on this
23   document as to when Wells would have received
24   this?
25       A.   Well, I mean, I am just looking at
```



```
 1                    K. Denaro
 2    the fax time and date stamp, and that says
 3    July 17 of 2019.
 4         Q.   So Wells would have received this the
 5    same day, the same day as it is dated, July 17,
 6    2019?
 7         A.   It looks like it, yes.
 8         Q.   And how quickly would Wells then go
 9    about releasing the restraint placed on the
10    account as is requested in this document?
11              MR. KESHAVARZ:  Objection.  Form.
12              MR. ARTHUR:  Objection.
13         A.   That I do not know.
14         Q.   So you do not know -- is there a
15    policy that you are aware of at Wells that
16    discusses the timing of when a restraint is
17    released once Wells receives a request to
18    release the restraint?
19              MR. ARTHUR:  Objection.
20         A.   Honestly, I have not reviewed the
21    policy so I don't know.
22         Q.   That's fair.  Let's look at 45 and
23    46.  Tell me when you are done.
24              (Pause in the proceedings.)
25         Q.   What is 45?
```



```
 1                    K. Denaro
 2        A.   Page 45 is an information subpoena
 3   with restraining notice issued -- dated
 4   July 10, 2019, and addressed to Wells Fargo
 5   care of CSC.
 6        Q.   And it is concerning Mr. Fadlevich?
 7        A.   Yes, sir.
 8        Q.   And it is served by Gutman, Mintz by
 9   Eric Keilbach?
10        A.   Yes, sir.
11        Q.   Let's look at the next page, 46.  Is
12   this Wells' response to that information
13   subpoena?
14        A.   Yes, sir.
15        Q.   And there's a stamp here similar to a
16   prior one where it says under threshold,
17   correct?
18        A.   Correct.
19        Q.   I won't ask you what that means
20   because you have already been asked that.
21             There is also a reference here to
22   debtor's place of business as being Printfresh
23   Studios.  Do you see that?
24        A.   Yes, sir.
25        Q.   And this document also reflects,
```



```
1                    K. Denaro
2    given that it is under threshold -- which is
3    checked, is that right?
4         A.   Yes, sir.
5         Q.   And the amount held is zero.  At
6    least according to this document, Wells Fargo
7    is not restraining any money concerning this
8    specific information subpoena, correct?
9              MR. ARTHUR:  Objection.
10             MR. KESHAVARZ:  Objection to form.
11        A.   Yes, sir.
12        Q.   Let's look at Wells 48 and 49.
13        A.   Okay.
14        Q.   Now, this letter is from Wells dated
15   July 22, 2019, to Mr. Fadlevich reflecting that
16   Wells received on July 15, 2019, a garnishment
17   order, and that it took certain steps in
18   response to that, correct?
19        A.   Page 47, right?  Is that where we are
20   at?
21        Q.   48.
22        A.   Okay.  That's why.  Yes, sir.
23        Q.   You would agree with me that July 22
24   would have been five days after Wells Fargo got
25   the release, correct?
```



```
 1                      K. Denaro

 2        A.   Yes, but then you have to look at the

 3   same case number, did they release the same

 4   case.

 5        Q.   Got it.  I understand.

 6        A.   They served multiple orders, so, you

 7   know, when they send in a release, it's not

 8   going to close everything.  It's going to be

 9   specific to whatever the attorney wants us to

10   close.

11        Q.   Let's look at that release, and maybe

12   we can get a little more clarity on it.  Let's

13   go back to 37.

14             Mr. Keilbach is asking Wells Fargo

15   or stating to Wells Fargo or stating to Wells

16   Fargo regarding Mr. Fadlevich, "We have

17   previously served you with a restraining order

18   for the above case.  We now request that you

19   release the restraint placed on the account

20   (full release)."

21             What would Wells Fargo do?  What

22   would be its policy upon receiving this type

23   of document?

24             MR. ARTHUR:  Objection.

25        A.   I'm sorry.  I don't know.
```



```
 1                    K. Denaro
 2        Q.   Let me just go through my notes.  I
 3   am hoping to be done within the next five or
 4   ten minutes.
 5             I just want to get clarity.
 6   Yesterday you were testifying a couple of
 7   times, you said a check was issued.
 8             When you said "issued" in response
 9   to Mr. Keshavarz's questions, you just meant
10   that the check was internally cut and went
11   from one department to another, correct?
12             MR. KESHAVARZ:  Objection to form.
13        A.   Correct.
14        Q.   You don't mean issued that it went to
15   Marshal Moses, correct?
16        A.   Correct.
17        Q.   I am done.  Thank you.
18        A.   Thank you.
19             MR. KESHAVARZ:  I have a few more
20   follow-up questions.
21                  FURTHER EXAMINATION
22   BY MR. KESHAVARZ:
23        Q.   Just a few questions.  We were
24   talking about the check in the name of Ronald
25   Moses.  You indicated, I believe, that you saw
```



```
 1                    K. Denaro

 2   the front and the back of the check; is that

 3   right?

 4        A.   Yes, sir.

 5        Q.   What did the back of the check show?

 6   What did it say?

 7        A.   It had a signature, but I couldn't

 8   read -- I couldn't read any of the -- all the

 9   numbers were blurred.  I really couldn't read

10   even the date.  All I saw was a signature and

11   blurry numbers.

12        Q.   Was that a signature to deposit the

13   check into an account?

14        A.   Well, yes.  That's the check that

15   transfers the money from the New York

16   information subpoena with restraint into the

17   marshal levy case.  At the time, that's how

18   they moved funds from one case to another.

19        Q.   So that check was cashed; it just

20   wasn't cashed by Marshal Moses?  Is that what

21   you are saying?

22             MR. NOVIKOFF:  Objection.

23        A.   No.  This was an internal transfer.

24   It's when the funds are allocated to another

25   case.
```



```
 1                      K. Denaro
 2        Q.   Do you know who would have signed the
 3   back of the check?  Would it be a Wells Fargo
 4   employee?  Do you have any idea who it would
 5   be?  Not the name of the person, but the
 6   company it would be for?
 7        A.   It would be a Wells Fargo employee.
 8        Q.   So that Wells Fargo employee signed
 9   the back of the check for that check to be
10   deposited into an account somewhere?
11        A.   That's what it looks like.
12        Q.   Okay.  And what account was it
13   deposited into?
14        A.   I don't know.
15        Q.   Was it a Wells Fargo account?
16        A.   I don't know.  It could even be just
17   transfer money from case to case, but I am
18   not -- I don't know that information.  Payouts
19   and Releases handles that kind of transaction.
20        Q.   So when you talk about from case to
21   case, is it sometimes that a case is actually
22   an account?
23             MR. NOVIKOFF:  Objection.
24        A.   No.  I really don't know.  We -- the
25   funds have to be moved from a case to another
```



```
 1                    K. Denaro
 2    case so they are owned or -- I mean, it's -- I
 3    can't explain it, I really can't.  It's a very
 4    confusing document, but I don't know if it goes
 5    into a separate account, a different account.
 6    I have no idea.
 7         Q.   But the funds in the amount of the
 8    check that was issued to Ronald Moses when it
 9    was signed on the back, does that mean it was
10    taken out of the Wells Fargo general account?
11              MR. NOVIKOFF:  Note my objection to
12    the form.
13         A.   That I don't know because I don't
14    remember, you know, the account numbers.  I can
15    only talk to case numbers.
16         Q.   So based on your investigation and
17    looking at the check, the back side of the
18    check, when that check was signed and cashed,
19    do you know if that check was deposited to
20    another entity other than Wells Fargo?
21              MR. NOVIKOFF:  Object to the form.
22    Asked and answered.
23         A.   I have no idea.
24         Q.   So it could have been outside of the
25    possession of Wells Fargo, the amount of the
```



```
 1                      K. Denaro
 2   check in the --
 3              MR. NOVIKOFF:  Objection.
 4              MR. ARTHUR:  Objection.
 5        A.   I have no idea.  I don't know.
 6        Q.   How would you go about finding that
 7   out?
 8        A.   How would I go about finding it out?
 9        Q.   Yes.
10        A.   I would have to ask around.  I really
11   don't know.  I guess I would probably --
12   because these are processes from, you know,
13   2018, or 2019, so I guess we would have to
14   check with somebody to find out what the
15   procedures were at the time, but I don't know.
16        Q.   Who would you check with?
17        A.   I would go to the Payouts and Release
18   Department.  That's where I would start, and
19   then go from there.
20        Q.   So the Payouts and Releases
21   Department would have better knowledge than
22   your department about where the funds in the
23   check in the name of Ronald Moses were actually
24   deposited; is that what you are saying?
25        A.   Yes.
```



```
 1                          K. Denaro

 2        Q.   Do you know who that would be?

 3        A.   I mean, I only know the manager.  Her

 4   first name is Tina.  I can't remember her last

 5   name, but, again, that's where I would start,

 6   and if she could help me.  Or if she couldn't,

 7   she would direct me, you know, from there.

 8        Q.   Do you know if the -- did you call it

 9   the Payout Department?

10        A.   Payouts and Releases, yes.

11        Q.   By the way, do you know what Payouts

12   and Releases means, like payouts to who,

13   releases to who?

14        A.   It is my understanding that in my

15   department we do the legal processing.  We do

16   the restraining part.

17             The Payouts and Releases would

18   handle the payments that come in or, you know,

19   processing a check, sending out a check; you

20   know, sending a check to the marshal.  So they

21   kind of handle the cases after we process

22   them.

23        Q.   But the checks wouldn't go back to

24   the customer, would it?

25             MR. NOVIKOFF:  Objection.
```



```
 1                      K. Denaro
 2        A.   It depends.  If we are refunding the
 3   customer and their account is closed at the
 4   bank, then yes, we would issue any kind of
 5   refund to the customer by check.
 6             If their accounts were open at the
 7   bank, then the refund, or release, would just
 8   be, you know, released back into their
 9   account.
10        Q.   So this payouts department would have
11   -- do they have their own system about when
12   they track investigations or complaints like
13   the ones by Mr. Fadlevich?
14        A.   I'm sorry.  I don't know.
15             MR. NOVIKOFF:  Objection.
16        A.   I don't know.
17        Q.   I will leave a blank here to see if
18   you could find out -- so you are going to get a
19   copy of the transcript, and you can review and
20   revise it to the degree that you like.
21             I guess I will leave a blank here in
22   the transcript to see if you can find out if
23   the payouts department has any document,
24   screens, letters, any document, regarding its
25   own investigation, and I would call for the
```



```
 1                    K. Denaro
 2    production of those documents.
 3            Can you check on that?
 4            MR. ARTHUR:  Take it under
 5    advisement.
 6            MR. NOVIKOFF:  I am going to reserve
 7    my right to object once I see the transcript.
 8       Q.   Go ahead.  You can answer.
 9            MR. ARTHUR:  We will take it under
10    advisement.
11       A.   Whatever I am told to do, I will do.
12    (INSERT)
13       Q.   But you have the ability to do that,
14    right?
15       A.   I have the ability to pick up the
16    phone or send an email or -- yeah, I have the
17    ability to reach out to find out where it takes
18    me.  I don't know if I would get an answer, but
19    if I was asked to do, you know, this research,
20    I would do it.
21       Q.   We talked about the investigations
22    from the Operations and Complaint Management
23    office executive.  Do you remember that?
24       A.   Yes.
25       Q.   Because those letters that indicated
```



```
 1                        K. Denaro
 2      Wells Fargo had sent the money to the marshal,
 3      and whether money was released -- I can go back
 4      to the specific Bates stamp numbers -- well,
 5      let me just go back to the Bates stamp numbers.
 6      Let me do that.
 7                 I want to point your attention to
 8      previously marked Exhibit 5, which is Bates
 9      stamped Wells Fargo 328 to 329.  Can you get
10      to there, please?
11           A.   Got it.
12           Q.   The second page is the name Tina.  A
13      minute ago you used the name Tina.  Do you know
14      if that's the same person?
15                MR. NOVIKOFF:  Trina.
16           Q.   This is not the same person you were
17      referencing before?
18           A.   Correct.
19           Q.   You do --
20           A.   I do not know who Trina is.
21           Q.   This is the letter from what we are
22      calling the Payouts and Releases Department, is
23      that right, or is this a different department?
24           A.   Page 328 is a letter to the customer
25      from our Complaint Management Department.
```



```
 1                     K. Denaro
 2      Q.   Complaint Management is different
 3   than Payouts and Releases?
 4      A.   Correct.
 5      Q.   So Complaint Management did an
 6   investigation as to Mr. Fadlevich's contentions
 7   that Gutman caused the restraint of exempt
 8   money, right?
 9           MR. ARTHUR:  Objection.
10           MR. NOVIKOFF:  Objection.
11      A.   Could you repeat the question?
12      Q.   The Complaint Management office did
13   their own investigation about what happened to
14   Mr. Fadlevich's exempt money, right?
15           MR. NOVIKOFF:  Objection.
16           MR. ARTHUR:  Objection.
17      A.   I don't know what they did or didn't
18   do.
19      Q.   I am sorry if you answered this
20   already.  You don't know, or do you know what
21   the Complaint Management office is other than
22   the fact that it has that name?
23           MR. NOVIKOFF:  Objection.
24      A.   I am sorry.  I don't know what they
25   do.  I'm sorry.
```



```
 1                    K. Denaro

 2       Q.   The letter says that they researched

 3  your account, and the letter also says that

 4  according to their investigation, that they

 5  actually removed $23,839.89 and turned it over

 6  to the creditor --

 7            MR. NOVIKOFF:  Objection.

 8       Q.   -- according to their own

 9  investigation, right?

10            MR. ARTHUR:  Objection.

11       A.   I am reading where it would say that.

12  It says that they debited --

13       Q.   Why don't you read the letter.  Just

14  take your time.

15            (Pause in the proceedings.)

16       A.   It does say in the bottom -- I'm

17  sorry -- the second paragraph from the bottom,

18  it says "and had to turn these funds over to

19  your creditor."

20       Q.   I guess my question is, would it be

21  accurate to say that -- what is the name of

22  your department, again?

23       A.   Legal Order Processing.

24       Q.   And it was Legal Order Processing

25  that did the investigation that forms the basis
```



```
 1                      K. Denaro
 2    of your testimony today, right?
 3             MR. NOVIKOFF:  Objection.
 4        A.   I did my own investigation, and I am
 5    in the Legal Order Processing, and to do my
 6    research, I just went through the cases.  I
 7    just went through the cases to see what I could
 8    see because I wasn't familiar with anything.
 9        Q.   So you didn't go to the Complaint
10    Management office and see what documents or
11    information or investigations they might have
12    done about the complaint?
13             MR. NOVIKOFF:  Objection.
14        A.   That would be correct.
15        Q.   And you didn't also go to the
16    Releases Department to check about what
17    investigation they did about Mr. Fadlevich's
18    account, correct?
19             MR. NOVIKOFF:  Objection.
20             MR. ARTHUR:  Objection.
21        A.   I did not go to them about their
22    research, no.
23        Q.   And you didn't go to the -- you
24    didn't go to the research department --
25             MR. KESHAVARZ:  Strike that.
```



1                          K. Denaro

2          Q.    You didn't ask -- you didn't check to

3     see --

4                MR. KESHAVARZ:  Strike that.

5          Q.    You don't know what documents the

6     release department has about their own

7     investigation about Mr. Fadlevich, do you?

8                MR. NOVIKOFF:  Objection to form.

9                MR. ARTHUR:  Objection.

10         A.    Correct.

11               MR. KESHAVARZ:  I call for the

12    production of any documents in the possession

13    of the Complaints and Management Department and

14    the Releases Department regarding Mr. Fadlevich

15    and the investigation.

16               MR. NOVIKOFF:  I will reserve my

17    right to object.

18               MR. ARTHUR:  Same.

19         Q.    I call for the production of the back

20    of the check that you reviewed.

21               MR. NOVIKOFF:  I will reserve my

22    objection.

23         Q.    So this other system that you were

24    looking at during your investigation -- would

25    in be a true statement that -- looking at the



```
 1                     K. Denaro
 2   letters from Wells Fargo to Mr. Fadlevich about
 3   Wells Fargo's investigation, would it be a true
 4   statement that the Complaint and Management
 5   Department just came to a different conclusion
 6   than you did in your investigation as to what
 7   happened to Mr. Fadlevich's money?
 8            MR. NOVIKOFF:  Objection.
 9            MR. ARTHUR:  Objection.
10       A.   That I came -- yes, because I don't
11   agree with some of these letters, so yes.
12       Q.   So one part of Wells Fargo came to
13   one conclusion, and a different part of Wells
14   Fargo came to a different conclusion, right?
15            MR. ARTHUR:  Objection.
16            MR. NOVIKOFF:  Same objection.
17       Q.   So if you had different information,
18   would you have come -- if you had the
19   information --
20            MR. KESHAVARZ:  Strike that.
21       Q.   If you had additional information or
22   different information maybe than what
23   complaints and management --
24            MR. KESHAVARZ:  Strike that.
25       Q.   Mr. Novikoff was asking about
```



```
 1                     K. Denaro
 2    documents that were attached to certain
 3    letters, so let me just --
 4              MR. NOVIKOFF:  I thought I was asking
 5    about attached, but -- go on.  One followed the
 6    other, but this witness testified that she
 7    couldn't tell -- she didn't know what may have
 8    been attached or enclosed, but continue.
 9         Q.   If you go to Wells Fargo 61, please.
10         A.   Okay.
11         Q.   Now, this is the notice of service of
12    process in Mr. Fadlevich's case with the
13    subpoena that was served on CSC; is that right?
14         A.   Correct, on March 14, 2019.
15         Q.   Do you know if in Wells Fargo's
16    system if this document would be scanned as one
17    file?  In other words, could you tell from
18    Wells Fargo's system which pages would be
19    included along with document 61, the notice of
20    CSC?
21              MR. ARTHUR:  Objection.
22              MR. NOVIKOFF:  I am going to object.
23    I apologize for speaking.
24              MR. KESHAVARZ:  You could object as
25    to form.
```



```
 1                    K. Denaro
 2          MR. NOVIKOFF:  But that's not part of
 3    the process that you asked this witness to
 4    testify about, but go ahead.
 5          I am objecting to that and to form.
 6    Go ahead.
 7          MR. ARTHUR:  Same objections.
 8      Q.   In the manner that Wells Fargo keeps
 9    its document, do you know if Wells Fargo is
10    able to tell which documents were included with
11    the CSC notice such as on page Wells Fargo 161?
12          MR. NOVIKOFF:  Same objection.
13          MR. ARTHUR:  Objection.
14      A.   Yes.  For each case, when the CSC
15    cover page comes in with the legal order, that
16    document with the cover page gets scanned into
17    that case in its entirety.
18      Q.   That's what I was about to ask.  So
19    it's one digital file with everything that is
20    with the CSC documents; is that right?
21      A.   Per case, meaning we wouldn't have
22    multiple -- well, sometimes we do have multiple
23    debtors, but then we have to separate it.
24          But we do keep an original file or
25    copy, if you will, in the case, so we know how
```



```
 1              K. Denaro
 2   many pages, what we did or didn't get, because
 3   we have to follow up with requesters or
 4   branches, you know, to get the missing pages,
 5   so we do know what we received as far as page
 6   numbers.
 7        Q.   Are you suggesting that Wells Fargo
 8   keeps the originals of these documents it gets?
 9             MR. NOVIKOFF:  Objection.
10        A.   I do not know where the originals go.
11   I can only speak to our department because we
12   are paperless in here, so I am not sure where
13   the originals go or how that's handled.
14        Q.   Mr. Novikoff was asking you about
15   each of the CSC notices.  We can go through
16   them one at a time.  There is one on 61, 63,
17   78, 96, 147, 192, 241, 309 and 310.
18             I guess my question is, when those
19   CSC notices are complaints sent by Mr.
20   Fadlevich, are you able to tell which page
21   numbers or with which documents from CSC?
22             MR. NOVIKOFF:  Objection to the form.
23        A.   I haven't seen -- I haven't seen
24   them, so I guess I don't -- I don't think I
25   understand your question.
```



```
 1                    K. Denaro
 2        Q.    That's fair enough.  If you go to,
 3   for example, Wells Fargo 63 for a second.
 4        A.    Okay.
 5        Q.    There was an issue with this and some
 6   of the other letters about what documents were
 7   with this notice.  For example, this notice --
 8             MR. NOVIKOFF:  What Bates stamp
 9   number?
10             MR. KESHAVARZ:  63.
11        Q.    For example, the notice for page 63
12   is a demand for the release of the freeze by
13   Mark Fadlevich, right?
14             MR. NOVIKOFF:  I am going to object
15   when you said there was an issue, but go ahead.
16        A.    That's what it looks like.  63 is
17   from Mr. Fadlevich, and it says it's a demand
18   for release of freeze.
19        Q.    Is there a way you could tell which
20   documents were attached or that came with the
21   CSC notice that is Bates stamped 63?
22        A.    Is there a way that I could find out?
23             MR. NOVIKOFF:  Note my objection to
24   the question.  Beyond the scope.
25        A.    I haven't seen them so I really don't
```



```
 1                      K. Denaro
 2    know.  I would be relying on somebody else's
 3    research and seeing if I can track them down,
 4    and not knowing if we were paperless at the
 5    time or -- I don't know how things were handled
 6    in 2018 or 2019.
 7         Q.   So you don't know if, for example --
 8    did you say there is one image file --
 9              MR. KESHAVARZ:  Strike that.
10         Q.   Are the files, the electronic files
11    for Mr. Fadlevich's case, are these PDFs?
12              MR. NOVIKOFF:  Objection.
13              MR. ARTHUR:  Objection.
14         A.   Yes.  They would be PDF.  Our
15    computer can't upload Word or JPG or anything
16    like that so they would have to be Adobe PDF.
17         Q.   Do you know if the CSC service
18    document that begins on page 63, do you know,
19    or not, whether that CSC document is one PDF
20    file?
21              MR. ARTHUR:  Objection.
22              MR. NOVIKOFF:  Objection.
23         A.   I do not know.
24         Q.   Scooting down to Wells Fargo 96, this
25    is one of the CSC notices about receiving a
```



```
 1                      K. Denaro
 2    letter from Mr. Fadlevich demanding the return
 3    of his money, right?
 4              MR. ARTHUR:  Objection.
 5              MR. NOVIKOFF:  Objection.
 6         A.   It says it's a demand letter.  It
 7    doesn't say what.  It just says it's a demand
 8    letter.
 9         Q.   My next question is, is page Wells
10    Fargo 97 part of a document that was sent to
11    Wells Fargo with the CSC notice?
12              MR. NOVIKOFF:  Note my objection.
13              MR. ARTHUR:  Objection.
14         A.   I would have no idea.
15         Q.   You would have to check.  Do you
16    think you could find out by checking Wells
17    Fargo's records?
18              MR. ARTHUR:  Objection.
19              MR. NOVIKOFF:  I am going to raise an
20    objection now to that.
21              MR. KESHAVARZ:  Okay, objection.
22         Q.   Go ahead.
23              MR. NOVIKOFF:  No.  I am going to
24    object to that request.  You are asking this
25    nonparty --
```



```
 1                     K. Denaro
 2              MR. KESHAVARZ:  You can make an
 3     objection as to form.
 4              MR. NOVIKOFF:  It is now getting
 5     ridiculous.
 6              MR. KESHAVARZ:  She is not your
 7     client.
 8              MR. NOVIKOFF:  But this is now
 9     getting ridiculous.
10              MR. KESHAVARZ:  Can you read back the
11     question, Madam Court Reporter?
12              (Record read.)
13        Q.   What's your answer?
14              MR. NOVIKOFF:  Note my objection.
15              MR. ARTHUR:  Objection.
16        A.   I mean, I will do whatever I am told.
17     I will do whatever I am told.  If I am asked to
18     do that, I will do it to the best of my
19     ability.
20        Q.   I am going to leave a blank in your
21     deposition testimony, and subject to whatever
22     your employers or your counsels might say, I am
23     going to request that you or someone else from
24     Wells Fargo check to see if they are able to
25     determine which documents accompanied each of
```



```
 1                   K. Denaro
 2   the CSC notices.
 3   (INSERT)
 4
 5           MR. NOVIKOFF:  I am going to maintain
 6   my objection to that request.
 7           MR. ARTHUR:  Objection.  We will take
 8   it under advisement.
 9           MR. NOVIKOFF:  She said Mr. Fadlevich
10   testified to what he sent.  That's why I am
11   getting a little frustrated.  I mean, your
12   client has testified to the exact documents
13   that he has sent to Wells.  That is why I did
14   not press the issue with this witness, because
15   she clearly does not know.
16           If you are going to take this to the
17   court -- I am saying that is going to be an
18   issue here, because he has testified already to
19   what he sent.
20           MR. KESHAVARZ:  And just so the
21   record is clear, those CSC notices include
22   documents Bates stamped Wells Fargo 61, 63, 78,
23   96, 147, 192, 241, 309, and 310.  There may
24   have been a couple that I missed.
25       Q.   In the documents that you produced
```



```
 1                    K. Denaro
 2    where it says applied exemption, just to be
 3    clear, for Mr. Fadlevich, that is only the last
 4    two deposits --
 5              MR. KESHAVARZ:  Strike that.
 6         Q.   In the documents that you were going
 7    over where Wells Fargo said it was applying the
 8    exemption to Mr. Fadlevich's account, does
 9    Wells Fargo mean that it was checking the
10    Social Security direct deposits within the last
11    60 days?
12              MR. NOVIKOFF:  Objection.
13              MR. ARTHUR:  Objection.  I don't know
14    if you finished the question.
15         Q.   You can answer.
16         A.   So yes --
17              MR. ARTHUR:  Can you rephrase the
18    question?
19              If you understood it, go ahead.  If
20    you understood the question, you can go ahead.
21         A.   Yes.  When we are processing a case,
22    let's say the serve date is today, the
23    look-back period is 60 days to look for any
24    federally-protected funds or state exemptions
25    or anything that the state protects as far as
```



```
 1                    K. Denaro
 2   exemptions we look at.  If we find them, we
 3   enter them into the system.
 4       Q.   When Wells Fargo tells Gutman they
 5   applied the exemption, it only means the Social
 6   Security deposits within the last 60 days,
 7   right?
 8            MR. ARTHUR:  Objection.
 9            MR. NOVIKOFF:  Objection to form.
10       A.   If we have applied the exemptions, it
11   could be either federal or state, but the
12   look-back period is 60 days.
13       Q.   And that is your normal process,
14   correct?
15       A.   Correct.
16       Q.   And that's what you normally
17   communicate to the debt collectors, that when
18   you are saying apply exemption, that you are
19   informing the debt collection lawyers like
20   Gutman, that means deposits by Social Security
21   within the last 60 days, correct?
22            MR. NOVIKOFF:  Objection to form.
23   Lack of foundation that there was ever a
24   communication with Gutman about that.
25            Go ahead.
```



```
 1                      K. Denaro
 2         A.    That's what our answers would show,
 3    is that this is the balance we are holding and,
 4    you know, that we have applied certain
 5    exemptions.
 6         Q.    But since this is your standard
 7    practice with Wells Fargo and debt collection
 8    law firms like Gutman, Mintz, probably send a
 9    number of bank restraints and information
10    subpoenas over the years, my question is this:
11    Is this a true statement or not?  When you
12    communicate with law firms like Gutman, Mintz,
13    when you tell them that there's an applied
14    exemption, that is informing Gutman, Mintz that
15    that only means Social Security deposits within
16    the last 60 days, correct?
17              MR. ARTHUR:  Objection.
18              MR. NOVIKOFF:  Objection on so many
19    different reasons.
20         Q.    You can answer.
21         A.    You are only saying Social Security,
22    but that goes for any state or could be
23    welfare, could be unemployment.  There are a
24    number of different exemptions that we always
25    look at.
```



```
 1                      K. Denaro
 2              For New York, it's the state
 3    exemption and the federally-protected -- you
 4    know, federal exemption, Social Security and
 5    so forth.
 6         Q.   I asked the question badly.
 7              MR. NOVIKOFF:  What?
 8              MR. KESHAVARZ:  What?
 9              MR. NOVIKOFF:  I didn't hear what you
10    said.
11              MR. KESHAVARZ:  I asked the question
12    badly.
13              MR. NOVIKOFF:  Yeah, you did.
14         Q.   Let me rephrase it.  It is not just
15    Social Security, so I guess when you are
16    telling Gutman, Mintz that there's exempt
17    money, they know from what you are
18    communicating to them on a regular basis that
19    Wells Fargo is only looking for exempt deposits
20    within the last 60 days.  Is that a true
21    statement?
22              MR. NOVIKOFF:  Objection.  Telling
23    Gutman --
24         Q.   Go ahead.  You can answer.
25              MR. NOVIKOFF:  Foundation.  It is so
```



```
 1                   K. Denaro
 2   objectionable.  You know it, Ahmad.
 3            MR. ARTHUR:  Do you understand the
 4   question?
 5            MR. KESHAVARZ:  Why don't you reread
 6   the question, and I will assume that everyone
 7   is objecting so --
 8            MR. NOVIKOFF:  I am going to object
 9   again because it's egregious, what you are
10   asking.
11            (Record read.)
12            MR. NOVIKOFF:  Objection.
13       Q.   You could answer.
14       A.   The reason it's hard to answer is
15   that you are asking if we inform them that we
16   are only looking back 60 days.  I don't think
17   that we inform them of, you know, any look-back
18   time period.  We just let them know what we are
19   holding.
20            MR. NOVIKOFF:  That is what she has
21   been saying for the last day and a half.  I am
22   sorry.
23       Q.   I don't mean to --
24       A.   It's okay.
25       Q.   So in the letters to Mr. Fadlevich
```



```
 1                    K. Denaro
 2   when you are telling Mr. Fadlevich that
 3   applying the exempt amount, you mean to Mr.
 4   Fadlevich the same thing, 60 days, right?
 5             MR. NOVIKOFF:  Objection.
 6       A.   Yeah.  I can't answer that.  I
 7   don't -- I have not read anywhere in here that
 8   we are, you know, letting them know what the
 9   law is and what the bank policy is or anything,
10   so I haven't seen that in any of the
11   correspondence.
12       Q.   All right.  Based on what Mr.
13   Fadlevich mailed, the letters, the bank
14   statements, exemption claim forms that you went
15   over with Mr. Novikoff, his letter said that
16   all the money in his bank account was exempt.
17   Do you agree with that?
18             MR. ARTHUR:  Objection.
19       A.   There's no way for me to know.
20       Q.   Could you tell that from the bank
21   statements?
22             MR. ARTHUR:  Objection.
23             MR. NOVIKOFF:  Yeah, I am going to
24   object on that as well.
25       Q.   The bank statements that were
```



```
 1                      K. Denaro
 2    attached?
 3              MR. NOVIKOFF:   Objection.
 4         A.    I would have to go through the case,
 5    I would have to go through the statements, I
 6    would have to see the date of service.   There's
 7    so many -- not that easy.
 8         Q.    And the court reporter was asking for
 9    clarification as to the letters for that
10    computer software that we were talking about
11    that you looked at that we don't have a
12    document of.   What was the name of that
13    program, again?
14         A.    A copy of the canceled check, it is
15    OIB.   It stands for operations image something,
16    so that's our imaging system.
17         Q.    But I thought -- I might be wrong --
18    I thought you were saying there is another
19    computer system you also looked at that we
20    don't have the printouts for.   Am I wrong about
21    that?   The LLG system?
22         A.    The 1LLG, you have those printouts.
23    All the case comments, the account, the
24    screenshots, the case details, that's from
25    1LLG.
```



```
 1                    K. Denaro
 2        Q.   Were there any other screens that you
 3   looked at as part of your preparation today
 4   that haven't been produced?
 5              MR. ARTHUR:  Objection.
 6              MR. NOVIKOFF:  Objection.
 7        A.   That haven't been?  No, no.
 8        Q.   So there's nothing that you reviewed
 9   in preparation for your deposition today that's
10   not in the documents that you have seen
11   already?
12              MR. NOVIKOFF:  Objection.
13              MR. ARTHUR:  Objection.
14        A.   Correct.  When I received your
15   subpoena, that's how I started looking at
16   diving into the cases in 1LLG.
17        Q.   Were there any other documents that
18   you looked at that is part of your
19   investigation to determine whether funds were
20   sent to Ronald Moses that are not part of the
21   document production that we have been going
22   through?
23              MR. NOVIKOFF:  Objection.
24              MR. ARTHUR:  Objection.
25        A.   I don't really understand the
```



KIM DENARO Vol.II                                      December 19, 2025
FADLEVICH vs JD 34TH STREET REALTY                              234

```
1                        K. Denaro
2    question.  When I go through 1LLG, it really
3    should give me the information as to a check
4    that was cut, issued.
5              Again, I went through the case
6    comments, so I would have to say it looks like
7    you have, I mean, everything, I think.
8              When I did my investigation, I did
9    not see all these customer complaints or --
10   sorry -- the complaint letters from the
11   complaint department.
12        Q.   In response to information subpoenas,
13   you had put down the name of an employer.  How
14   does Wells Fargo get that information to put
15   that in the information subpoena response?
16        A.   All I can answer to is what we look
17   at.  It's in the system, but I don't know how
18   it gets there, when it gets there.  I can only
19   assume, but I don't know for sure.
20        Q.   So you are not looking at the
21   deposits on the bank statements; you are
22   looking at something else on the system that
23   has that information?
24             MR. NOVIKOFF:  Wait.  Object.  I just
25   wanted to have some clarity, Ahmad.  When you
```



1                    K. Denaro

2    say "you," you are referring to Wells?

3              MR. KESHAVARZ:  I meant Wells.

4              MR. NOVIKOFF:  That's what I wanted

5    to clarify.

6         A.   We have a computer system called

7    Hogan, which is our access to bank account

8    information, and it's very -- like the customer

9    name, address, their phone numbers, their

10   employer, their date of birth, their Social

11   Security number, so Hogan is the system that we

12   use to answer the information subpoenas with

13   restraining notices.

14        Q.   If you go to the first two pages --

15   actually, it is -- Exhibit 18 is the front two

16   pages of Exhibit 16, which was Wells Fargo

17   document production 1 through 54.  It is the

18   first two pages that is a letter from Wells

19   Fargo to Emma Cateribne dated December 13,

20   2019.  Do you see that?

21        A.   Yes, sir.

22              MR. ARTHUR:  What Bates stamped?

23              MR. KESHAVARZ:  It is not stamped.

24   It is at the beginning of the Bates stamped

25   documents 1 through 55, I believe -- 54.



 1                    K. Denaro

 2          MR. NOVIKOFF:  I think if you are

 3    talking the counsel's letter, I think that was

 4    a separate exhibit, wasn't it?

 5          MR. KESHAVARZ:  It is separated as an

 6    exhibit as 18, but since people were referring

 7    to Bates stamp numbers, I didn't know if it was

 8    easier for the witness to look at the first two

 9    pages of the documents that were Wells Fargo's

10    1 through 54.

11       Q.   In any event, do you have that

12    document in front of you, that letter?

13       A.   I do.

14       Q.   Let's go to the first one.  Amount

15    returned to the customer, $7,269.68.  Do you

16    know if and when that amount was actually given

17    back to Mr. Fadlevich?

18          MR. NOVIKOFF:  Objection.  Asked and

19    answered yesterday.

20          MR. ARTHUR:  Objection.

21       A.   All I can say is that when I did my

22    research, I determined that Wells released all

23    of the funds back to the customer.

24       Q.   But you don't know when, correct?

25          MR. NOVIKOFF:  Objection.



```
 1                      K. Denaro
 2             MR. ARTHUR:  Objection.
 3        A.    Correct, I don't know when.
 4        Q.    So is the allegation in the
 5   complaint -- and let me know if you know the
 6   answer or not.  I think you don't know, but I
 7   just want to make sure.
 8             From November 21, 2018, through
 9   July 15, 2019, Wells Fargo had restrained
10   somewhere between $7,519.68 to $25,042.08.
11             I guess my question is, do you know
12   if for that entire time period Wells Fargo had
13   restrained amounts within that range?
14             MR. ARTHUR:  Objection.
15             MR. NOVIKOFF:  Objection.
16        A.    I would have -- no.  I would have to
17   look at the case in the computer because,
18   again, the computer will sweep daily credits so
19   I would have no way to know -- I wouldn't know
20   that answer.
21        Q.    That's fine.  So you don't know, or
22   maybe you do know -- I am just asking -- for
23   that entire time, November 21, 2018, to
24   July 15, 2019, do you know if at least for the
25   amount of $7,519.68, that that amount in his
```



```
 1                      K. Denaro

 2    account was restrained?

 3             MR. NOVIKOFF:  Objection.

 4             MR. ARTHUR:  Objection.

 5        A.   I would not be able to answer that.

 6    I don't know.

 7        Q.   That's fine.  On page Wells Fargo

 8    316, there was an issue about part of Mr.

 9    Fadlevich's signature being whited out?

10             MR. NOVIKOFF:  Objection to the term

11    "issue."

12        Q.   Do you know how that happened?

13             MR. NOVIKOFF:  Objection.

14             MR. ARTHUR:  Objection.

15        A.   I do not know how that happened.

16        Q.   I appreciate your time, ma'am.

17             MR. NOVIKOFF:  I have one final

18    question.

19                 FURTHER EXAMINATION

20    BY MR. NOVIKOFF:

21        Q.   Other than responses to information

22    subpoenas that Wells sends to the lawyer for a

23    judgment creditor, are you aware of any other

24    independent communications that Wells sends to

25    a lawyer for a judgment creditor reflecting
```



```
 1                    K. Denaro
 2   what exemptions, if any, or what money, if any,
 3   was held back and why?
 4            MR. ARTHUR:  Objection.
 5            MR. KESHAVARZ:  Objection.  Form.
 6            MR. ARTHUR:  Do you understand the
 7   question?
 8        A.   Could you repeat it?
 9        Q.   Sure.  We went through some responses
10   to information subpoenas.  Wells puts in
11   responses and sends that information, the
12   responses, to the law firm, for a judgment
13   creditor, right?
14        A.   Correct.
15        Q.   Are you aware in the normal policies
16   and procedures of Wells, other than the
17   responses to the information subpoena, any
18   other communication that Wells initiates with
19   counsel for a judgment creditor that would
20   identify what funds were being withheld, the
21   amount, and why?
22        A.   Other than what we are seeing here,
23   no.
24        Q.   Got it.  That's it.  Thank you.
25            COURT REPORTER:  Mr. Novikoff, are
```



```
 1                   K. Denaro

 2   you ordering a copy of yesterday and today's

 3   transcripts?

 4           MR. NOVIKOFF:  Yes, and paper.

 5           COURT REPORTER:  Mr. Arthur?

 6           MR. ARTHUR:  No.

 7           (Time noted:  10:58 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1
2                    INDEX TO TESTIMONY
3   WITNESS                  BY                    PAGE
4   Kim Denaro           Mr. Keshavarz            134
5                        Mr. Novikoff            138
6                        Mr. Keshavaraz          204
7                        Mr. Novikoff            238
8
9         DOCUMENTS AND INFORMATION REQUESTS
10                 PAGE    LINE
11                 211     12
12                 216     11
13                 225      3
14
15
16
17
18
19
20
21
22
23
24
25
```



1

2                        CERTIFICATION

3           I, HELENE GRUBER, a New York State

4    certified shorthand reporter, hereby certify that

5    the foregoing transcript is a complete, true and

6    accurate transcript in the matter of Fadlevich v.

7    JD 34th Street Realty et al held on December 19,

8    2025.

9           I further certify that this

10   proceeding was reported by me and that the

11   foregoing transcript was prepared under my

12   direction.

13

14

15

16   Date: January 2, 2026

17

18

19

20

21

22                        _____

23

24                        HELENE GRUBER

25



1

2   Our Assignment No.  J13990769

3   Case Caption:  Fadlevich

4   vs.  JD 34th Street Realty et al

5   DECLARATION UNDER PENALTY OF PERJURY

6        I declare under penalty of perjury

7   that I have read the entire transcript of

8   my Deposition taken in the captioned matter

9   or the same has been read to me, and

10  the same is true and accurate, save and

11  except for changes and/or corrections, if

12  any, as indicated by me on the DEPOSITION

13  ERRATA SHEET hereof, with the understanding

14  that I offer these changes as if still under

15  oath.

16  _____

17  Kim Denaro

18  Subscribed and sworn to on the _____ day of

19  _____, 20_____ before me,

20

21  _____

22  Notary Public,

23  in and for the State of _____

24

25



1

2              DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20

21

22   SIGNATURE:_____DATE:_____

23   Kim Denaro

24

25



```
 1
 2                    DEPOSITION ERRATA SHEET
 3     Page No._____Line No._____Change to:_____
 4     _____
 5     Reason for change:_____
 6     Page No._____Line No._____Change to:_____
 7     _____
 8     Reason for change:_____
 9     Page No._____Line No._____Change to:_____
10     _____
11     Reason for change:_____
12     Page No._____Line No._____Change to:_____
13     _____
14     Reason for change:_____
15     Page No._____Line No._____Change to:_____
16     _____
17     Reason for change:_____
18     Page No._____Line No._____Change to:_____
19     _____
20     Reason for change:_____
21
22     SIGNATURE:_____DATE:_____
23     Kim Denaro
24
25
```

